UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:25-cv-22530-JB/Torres

JESUS E. GONZALEZ HERNANDEZ,

    Plaintiff,

    v.

STATEWIDE ELECTRICAL SERVICES, INC.
and NOEL MELO,

    Defendants.

_____/

**DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants Statewide

Electrical Services, Inc. ("Statewide") and Noel Melo ("Melo") submit this Statement of Material

Facts as to which there is no genuine dispute in support of their contemporaneously filed Motion

for Summary Judgment.

**I.    THE PARTIES, COVERAGE, AND THE RELEVANT EMPLOYMENT PERIOD**

1. Statewide Electrical Services, Inc. is a Florida corporation engaged in the electrical contracting business. Ex. A, Melo Dep. 18:16–18; 19:22–20:3.

2. Noel Melo is the sole owner and President of Statewide. Ex. A, Melo Dep. 17:15–21.

3. In their Amended Answer, Defendants admit the allegations of paragraphs 2, 3, 5 through 9, and 14 through 23 of the Complaint, including that Plaintiff Jesus E. Gonzalez Hernandez ("JGH") was employed by Statewide, that both Statewide and Melo are "employers" as defined by the FLSA, and that Statewide was an enterprise engaged in commerce within the meaning of the FLSA. Defs.' Am. Answer ¶¶ 2–3, 5–9, 14–23 [D.E. 15]; Compl. ¶¶ 2–3, 5–9, 14–23 [D.E. 1].

1

4. During the period in which they now claim unpaid overtime—April 17, 2023 through September 28, 2023—JGH and Opt-In Plaintiff Esnol Alejandro Gonzalez Cantero ("Esnol"), both licensed electricians, worked together for Statewide on a Miami-Dade County Metrorail public-works project subject to the Miami-Dade County Prevailing Wages Ordinance. Ex. A, Melo Dep. 76:11–16; Ex. J, JGH Dep. 26:17–19, 9:11-24; Ex. K, Esnol Dep. 9:1–2, 9:16-17; Ex. I, Melo Decl. ¶ 3.

5. Throughout 2023, both JGH and Esnol were paid the Miami-Dade County prevailing-wage rate of $50.52 per hour. Ex. A, Melo Dep. 76:11–16; Ex. E, Certified Payroll Reports LCP #71–#100; Ex. I, Melo Decl. ¶ 4.

6. JGH filed his Complaint asserting a single count for unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. § 207, on June 3, 2025. [D.E. 1].

7. Esnol filed his Notice of Consent to Join on August 15, 2025. [D.E. 19-1].

## II.   PLAINTIFFS' SWORN CLAIMS

8. In their Second Amended Rule 26(a)(1) Disclosures, JGH and Esnol each seek $6,331.92 in unpaid overtime wages and $6,331.92 in liquidated damages, for an identical total of $12,663.84 per Plaintiff. Ex. B, Pls.' 2nd Am. Rule 26(a) Disclosures at 4.

9. In sworn answer to Defendants' Interrogatory No. 13, JGH claims exactly 84 hours of unpaid overtime worked between April 17, 2023 and September 28, 2023. Ex. C, JGH Ans. to Rogs. No. 13.

10. In sworn answer to Defendants' Interrogatory No. 13, Esnol claims exactly 84 hours of unpaid overtime worked between April 17, 2023 and September 28, 2023. Ex. D, Esnol Ans. to Rogs. No. 13.

11. JGH and Esnol identify the same six Miami-Dade Metrorail station sites as the locations of their alleged unpaid overtime—Allapattah (ALP), Santa Clara (SCL), Culmer (CUL), Gap Tie 2 (GT2), Overtown (OVT), and Brickell (BKL). Ex. C, JGH Ans. to Rogs. No. 13; Ex. D, Esnol Ans. to Rogs. No. 13.

12. JGH and Esnol provide the identical week-by-week breakdown of their claimed 84 hours of overtime: Station 1 (ALP), 8 + 8 hours; Station 2 (SCL), 6 + 6 + 8 hours; Station 3 (CUL), 6 + 8 + 10 hours; Station 4 (GT2), 4 + 4 hours; Station 5 (OVT), 4 + 4 hours; and

Station 6 (BKL), 2 + 3 + 4 hours. Ex. C, JGH Ans. to Rogs. No. 13; Ex. D, Esnol Ans. to Rogs. No. 13.

13. In sworn answers to Defendants' Interrogatory No. 4, JGH and Esnol each stated that during the relevant period he "regularly worked approximately 48 hours per week" as determined by his "personal recollection, routine work schedule, and handwritten notes which have been produced (Bates No. 000856)." Ex. C, JGH Ans. to Rogs. No. 4; Ex. D, Esnol Ans. to Rogs. No. 4.

14. Plaintiffs' own Rule 26(a) Disclosures concede that they "are unable to precisely calculate their damages due to the absence of accurate records made or maintained by Defendants." Ex. B, Pls.' 2nd Am. Rule 26(a) Disclosures at 4.

### III.   STATEWIDE'S CONTEMPORANEOUS BUSINESS RECORDS

15. Throughout JGH's and Esnol's employment, Melo personally maintained handwritten daily time sheets recording the hours worked by each employee on each project. Ex. A, Melo Dep. 123:5 – 126:13; Ex. I, Melo Decl. ¶ 5.

16. Because the Miami-Dade Metrorail project was subject to federal and county prevailing-wage requirements, Statewide was required to submit weekly Certified Payroll Reports ("CPRs") to Miami-Dade County through the County's LCP Tracker system, signed by Melo under penalty of perjury. The LCP Tracker reports are filed weekly with Miami-Dade County and made available to applicable federal monitoring authorities, and any false statement contained in them exposes the signatory to federal criminal liability under 18 U.S.C. § 1001. Ex. A, Melo Dep. 63:5–65:12; Ex. E, Certified Payroll Reports LCP #71–#100; Ex. I, Melo Decl. ¶¶ 6–7.

17. Statewide's CPRs for the entire April through October 2023 period (LCP #71 through LCP #100) reflect that JGH and Esnol each worked 40 federal hours or fewer in every workweek and contain no entries for any overtime hours for either Plaintiff. Ex. E, Certified Payroll Reports LCP #71–#100; Ex. I, Melo Decl. ¶ 8.

18. On February 9, 2026, Defendants filed a Supplemental Rule 26(e) Disclosure producing in native format a contemporaneous Microsoft Excel spreadsheet titled "412034 Hours," maintained in the ordinary course of Statewide's business. [D.E. 28].

19. The "412034 Hours" spreadsheet records, day by day, the project activities performed at which stations, the employees assigned to each task, the hours attributed to each employee, and weekly totals cross-referenced to the corresponding LCP report numbers. Ex. F, Hours Spreadsheet; Ex. I, Melo Decl. ¶¶ 9–10.

20. For every week JGH and Esnol worked during the April–October 2023 period in which they now claim overtime, the "412034 Hours" spreadsheet shows that neither Plaintiff worked more than 40 hours in any single workweek. Ex. F, Hours Spreadsheet; Ex. I, Melo Decl. ¶ 11.

21. Each week, Statewide issued payroll checks signed by Melo and hand-delivered to JGH and Esnol; each check corresponded to 40 hours at the prevailing-wage rate, with no overtime premium. During the approximately 26-week period covering their claimed overtime, JGH and Esnol each received and signed approximately 26 such paychecks, every one of which reflected 40 hours of work and no overtime. Ex. G, Usuga Dep. 90:6–11; 91:13-22; Ex. E, Certified Payroll Reports LCP #71–#100; Ex. I, Melo Decl. ¶ 12; Ex. C, JGH Ans. to Rogs. No. 9.

22. Statewide furnished JGH with a company vehicle—a Ford (VIN 1FBR1C86LK1367655, Florida tag QGZ27)—equipped with a SunPass transponder (Account #276439, Transponder #028166331010) for use in transporting himself and Esnol to and from the Miami-Dade Metrorail jobsites during the relevant period. JGH kept the vehicle at his residence and drove it to and from the jobsites each workday until approximately September 1, 2023, when the vehicle required warranty repairs. Esnol confirmed at deposition that during the April through September 2023 period he and JGH rode to work together, with JGH picking him up each morning, driving them to the jobsite, and dropping him off each evening, and that they "would be together all that time" between leaving for work and returning home. Ex. A, Melo Dep. 67:18 – 69:5; Ex. I, Melo Decl. ¶¶ 13–14; Ex. J, JGH Dep. 58:19 – 59:14; Ex. K, Esnol Dep. 11:13 – 12:6.

23. As the SunPass account holder, Statewide received and has produced the toll transaction records for that vehicle covering the period April 3, 2023 through July 1, 2023, and the period July 2, 2023 through August 29, 2023. Ex. L, Statewide SunPass Toll Records (Apr.

3–Jul. 1, 2023); Ex. M, Statewide SunPass Toll Records (Jul. 2–Aug. 29, 2023); Ex. I, Melo Decl. ¶¶ 13–16.

24. Melo, testifying both individually and as Statewide's designated Rule 30(b)(6) corporate representative, testified that JGH and Esnol never worked more than 40 hours in any workweek during the relevant period. Ex. A, Melo Dep. 12:1-19, 76:17–20; Ex. I, Melo Decl. ¶ 4.

25. Statewide's project manager Paola Usuga testified that the Miami-Dade Metrorail project budget capped JGH's and Esnol's work at 40 hours per week and 160 hours per station, that they were instructed they could not exceed 40 hours in a workweek without express advance approval, and that no Statewide employee, including JGH or Esnol, ever informed her that he had in fact worked more than 40 hours in any workweek. Ex. G, Usuga Dep. 87:21–89:9.

## IV.   PLAINTIFFS' LACK OF CONTEMPORANEOUS RECORDS AND JGH'S DESTRUCTION OF HIS NOTES OF DAILY WORK HOURS

26. JGH testified at deposition that he first noticed he was not receiving payment for overtime during the first week of work on the Metrorail project: "First week of work, he paid only 40 hours. He paid only 40 hours for every week." Ex. J, JGH Dep. 35:21–36:2.

27. Esnol testified at deposition that he became aware he was not being paid for overtime from looking at his paycheck: "It's not that I believe it, it's a reality, because if I don't see it in my check." Ex. K, Esnol Dep. 43:18–44:10.

28. JGH testified at deposition that, during the April through September 2023 period, he and Esnol kept written records of the hours they claim to have worked in a notebook and on sheets of paper: "Yes. We kept a notebook with those hours"; "I would write it down, on a sheet of paper, all the hours that we work during the week"; and "we would keep on a sheet of papers the hours that we worked." Ex. J, JGH Dep. 39:5–9; 39:24–40:6; 41:12–24.

29. JGH testified that in approximately September 2023, after completing work at the last Metrorail station, he created a summary document by giving his handwritten records to his wife, who "prepared this document because she has good handwriting." Ex. J, JGH Dep. 43:25–45:25.

5

30.   That summary document is the handwritten sheet marked Bates Gonzalez 000856, which was not written by either Plaintiff. Ex. J, JGH Dep. 45:4–11; Ex. K, Esnol Dep. 46:21–47:22.

31.   Esnol confirmed that Bates Gonzalez 000856 was created by all three of them together: "Yes, we were all together. All three of us. She was the one that wrote it." Ex. K, Esnol Dep. 47:14–22.

32.   JGH testified that after his wife prepared the Bates Gonzalez 000856 summary, he intentionally discarded all of the underlying daily and weekly written records from which the summary was derived—which contained day-by-day, week-by-week, station-by-station detail about the hours JGH claims to have worked: "I threw them out once my wife declared this record here. I had all the numbers for each one of the stations. Why did I want to keep those notes?" Ex. J, JGH Dep. 39:5–14; 39:24–40:6; 41:17–24; 46:1–24.

33.   No copy or reproduction of the destroyed daily and weekly records has been produced in this litigation, and neither Plaintiff possesses any such copy. Ex. J, JGH Dep. 40:2–6; 41:17–24; Ex. B, Pls.' 2nd Am. Rule 26(a) Disclosures at 3–4.

34.   The surviving Bates Gonzalez 000856 summary contains the names of six Metrorail stations and a single total number of claimed overtime hours next to each station name. It does not record any daily start times, daily stop times, daily hours worked, or any other day-by-day detail. Ex. H, Bates Gonzalez 000856.

35.   JGH testified at deposition that the 84 hours of overtime he claims are "an estimate": "Are these hours an estimate? A. An estimate? Yes. Based on what I jotted down." Ex. J, JGH Dep. 88:5–8.

36.   JGH testified that he has no documents showing what time he started work on any given day, no documents showing what time he stopped work on any given day, and no documents showing his total hours worked in any given week. Ex. J, JGH Dep. 40:7–25.

37.   When asked at deposition what specific work caused his claimed overtime at each of the six stations, Esnol testified "I don't remember" as to Station 1 (Allapattah), both weeks; Station 2 (Santa Clara), all three weeks; Station 3 (Culmer), all three weeks; Station 4 (Gap Tie 2), both weeks; Station 5 (Overtown), both weeks; and Station 6 (Brickell), all three

weeks. Ex. K, Esnol Dep. 38:3–12; 38:13–21; 38:22–39:4; 39:5–18; 39:19–40:1; 40:9–21; 41:17–24; 41:25–42:7; 42:8–17.

38. JGH was asked the same question at each of the six stations and could not identify any specific work that caused his claimed overtime; after giving non-responsive answers that he was "working" as to Allapattah and Santa Clara, JGH expressly agreed that his answer to every remaining such question would be that he was "working." Ex. J, JGH Dep. 64:1–22; 65:13–66:3; 66:21–67:3; 67:4–9.

39. JGH further testified that he could not recall the specific dates on which he allegedly worked any of his claimed overtime hours—testifying generally that "right now I don't recall based on my memory what days I worked overtime hours," Ex. J, JGH Dep. 63:17–24, and confirming, as to each of the six stations in turn, that he could not specify the dates on which the claimed overtime was worked: as to Allapattah, "That's impossible. . . . I don't keep that in my memory"; as to Santa Clara, "I can't tell you when I did the overtime hours. . . . I don't remember when"; as to Culmer, "The same answer"; and as to Gap Tie 2, Overtown, and Brickell collectively, "Correct." Ex. J, JGH Dep. 52:21–53:12.

40. When asked at deposition why his claimed overtime at Brickell increased from two hours in the first week to three hours in the second week to four hours in the third week, Esnol testified "I don't remember." Ex. K, Esnol Dep. 42:18–20. When JGH was asked the analogous question as to Santa Clara—why his claimed overtime increased from six hours in the first two weeks to eight hours in the third week—he could not identify any specific reason, testifying only that "the work in each station got complicated. Each station wasn't the same. . . . It was unpredictable." Ex. J, JGH Dep. 67:15–23.

41. Esnol testified that he could not recall when he first realized he was working overtime for which he was not being paid, could not identify the month in which he became aware, and could not recall whether he began keeping any records after becoming aware. Ex. K, Esnol Dep. 43:18–44:6; 44:11–14.

42. Esnol testified that, in calculating his overtime claim, he did not consult any documents but relied solely on his own memory: "Did you consult any documents in order to calculate your overtime claim? A. No, not that I remember. No. Q. Did you rely on your memory? … A. Yes, my memory, because I was the one that lived it." Ex. K, Esnol Dep. 46:4–14.

43. In sworn answer to Defendants' Interrogatory No. 2, Esnol stated that he "regularly worked approximately 48 hours per workweek, including overtime hours, for which he was not fully compensated." Ex. D, Esnol Ans. to Rogs. No. 2.

44. At deposition, Esnol confirmed that 48 hours per workweek means 8 hours of overtime per week for the approximately 25-week relevant period—implying 200 hours of total overtime, more than double the 84 hours he claims—and he did not explain the discrepancy. Ex. K, Esnol Dep. 20:6–23:10; Ex. D, Esnol Ans. to Rogs. Nos. 2, 13.

45. Esnol testified at deposition that he does not keep a calendar, planner, notebook, or diary; that he kept no personal records showing the hours he worked each day; and that he has no documents showing what time he started or stopped work each day. Ex. K, Esnol Dep. 42:21–43:17.

46. Plaintiffs have produced no contemporaneous time records of their own—no daily start- or stop-time records, no e-mails or text messages reporting overtime, no photographs, no GPS data, and no notes created during the period of their alleged overtime work. Ex. B, Pls.' 2nd Am. Rule 26(a) Disclosures at 3–4; Ex. C, JGH Ans. to Rogs.; Ex. D, Esnol Ans. to Rogs.

47. JGH testified that he and Esnol jointly prepared their notes and calculated their overtime claims together. Ex. J, JGH Dep. 13:4–15; 51:4–10.

48. Esnol testified that he and his father "always" worked the same hours, "100 percent." Ex. K, Esnol Dep. 49:21–23.

49. Esnol has produced no documentary evidence of his own—independent of the jointly-cited Bates 000856 summary written by JGH's wife—to support his claim of 84 unpaid overtime hours. Ex. D, Esnol Ans. to Rogs.; Ex. K, Esnol Dep. 42:21–43:17; 46:4–14.

50. Melo testified that during the entire course of their employment, neither JGH nor Esnol ever complained that the hours reflected in their paychecks were inaccurate or that they were owed unpaid overtime. Ex. A, Melo Dep. 140:6–18; Ex. I, Melo Decl. ¶ 17.

51. JGH testified at deposition that during his employment he submitted no written objection to Statewide concerning his claim that he was not being paid overtime, did not consult with an attorney, and did not contact the Department of Labor. Ex. J, JGH Dep. 38:3–12.

8

## V.       CONTRADICTIONS BETWEEN PLAINTIFFS' CLAIMS AND STATEWIDE'S RECORDS

52.     For nine of the ten workweeks identified by Plaintiffs at Stations 1 (Allapattah), 2 (Santa Clara), 3 (Culmer), and 4 (Gap Tie 2), Statewide's contemporaneous "412034 Hours" spreadsheet shows that JGH and Esnol either were not working at all, or were working at a different station than the one they identified for the dates they identified in their sworn interrogatory answers. Ex. F, Hours Spreadsheet; Ex. I, Melo Decl. ¶ 11; Ex. C, JGH Ans. to Rogs. No. 13; Ex. D, Esnol Ans. to Rogs. No. 13.

53.     Throughout the Metrorail Project, JGH and Esnol worked a four-day, ten-hour-per-day schedule, Monday through Thursday, for a total of 40 scheduled hours per week. This schedule was established at JGH's request. Ex. G, Usuga Dep. 25:6-8, 26:3-7; Ex. A, Melo Dep. 84:3-88:16; Melo Decl. ¶ 4.

54.     Both JGH and Esnol stated in their sworn interrogatory answers that the commute from JGH's residence to the jobsite took approximately 20 minutes. Ex. C, JGH Ans. to Rogs. No. 12; Ex. D, Esnol Ans. To Rogs, No. 12.

55.     Under JGH's requested four-day, ten-hour schedule, a fully-completed workweek with commute time would require 42 hours and 40 minutes of cumulative toll-to-toll vehicle time to reflect 40 compensable hours. No workweek covered by the SunPass records shows cumulative toll-to-toll time reaching that 42-hour-40-minute baseline. Ex. L, Statewide SunPass Toll Records (Apr. 3–Jul. 1, 2023); Ex. M, Statewide SunPass Toll Records (Jul. 2–Aug. 29, 2023); Ex. C, JGH Ans. to Rogs. No. 13; Ex. D, Esnol Ans. to Rogs. No. 13.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of May 2026, I served a true and correct copy of the foregoing by the CM/ECF system and by email to the following: **Brian H. Pollock, Esq.,** *Counsel for Plaintiffs,* FAIRLAW Firm, 135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146, Email: brian@fairlawattorney.com

Respectfully submitted,

**STEPHEN R. VERBIT, P.A.**
Counsel for Defendants
6741 Orange Drive
Davie, Florida 33314
Tel: (954) 965-8350
Email: sverbit@verbitlawfl.com

By: /s/ Stephen R. Verbit
Stephen R. Verbit, Esq.
Florida Bar No. 710857