Esnol Gonzalez Cantero
February 24, 2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-22530

JESUS E. GONZALEZ HERNANDEZ,

      Plaintiff,

v.

STATEWIDE ELECTRICAL SERVICES, INC.
AND NOEL MELO,

      Defendants.

_____/

REMOTE DEPOSITION OF

ESNOL A. GONZALEZ CANTERO

THROUGH A SPANISH INTERPRETER

VOLUME 1 (Pages 1 - 61)

Tuesday, February 24, 2026
10:03 a.m. - 12:45 p.m.

LOCATION:   Remote via Zoom
          Florida

Reported by:    Marquetta Edwards,
Notary Commission No. TX/RON 135116657

Job No.:    436519

Exhibit K

Esnol Gonzalez Cantero
February 24, 2026

Page 2

APPEARANCES:

On behalf of Jesus E. Gonzalez Hernandez:

FairLaw Firm
135 San Lorenzo Avenue
Suite 770
Coral Gables, Florida 33146

BY:  KATELYN SCHICKMAN, ESQ.
katie@fairlawattorney.com

On behalf of Statewide Electrical Services, Inc., and Noel Melo:

Stephen R. Verbit, P.A.
6741 Orange Drive
Davie, Florida 33314

BY:  STEPHEN R. VERBIT, ESQ.
sverbit@verbitlawfl.com

Also Present:

Yarissa Tabora, Interpreter

Page 3

INDEX OF EXAMINATION

EXAMINATION:                                PAGE

Testimony of Esnol A. Gonzalez Cantero

Direct Examination by Mr. Verbit           6

Cross-Examination by Ms. Schickman         57

Certificate of Oath                        59

Certificate of Digital Reporter            60

Certificate of Transcriptionist            61

INDEX TO EXHIBITS

DEFENDANT'S        DESCRIPTION              PAGE

Exhibit 1     The Interrogatory Answers        13

Exhibit 2    Handwritten document, Bates no 856     46

Exhibit 3    Pre-Suit Demand Letter of 02/24/2025   54

Page 4

Proceedings began at 10:03 a.m.:

THE REPORTER:  We're going on the record. Today is February 24th, 2026, and the time is 10:03 a.m. eastern standard time.

Good morning.  My name is Marquetta Edwards, and I am the Texas notary and reporter assigned by Lexitas.  I request all parties stipulate and agree that, by videoconference technology, this will be the remote deposition of Esnol A. Gonzalez Cantero or Gonzalez Cantero.  Before going on the record, the witness positively identified themselves to me as Gonzalez Cantero by commercial driver's license issued by the Bureau of Motor Vehicles for the State of Florida.  And the witness is presently located in Florida.

Counsel, will you please?

MS. SCHICKMAN:  Good morning.  My name is Katelyn Schickman.  I'm counsel for the plaintiff in this matter.

MR. VERBIT:  Good morning.  Stephen Verbit.  I represent the defendants, Statewide Electrical Services, Inc., and Noel Melo, and we do stipulate and agree to the remote deposition.

MS. SCHICKMAN:  We also stipulate and agree.

THE REPORTER:  And thank you.  I will now place

Page 5

our witness under oath in the case of Jesus Gonzalez Hernandez v. Statewide Electrical Services.  First, we'll swear in our interpreter.  Madam Interpreter, please state your name for the record.

THE INTERPRETER:  Yarissa Tabora, Spanish interpreter.

THE REPORTER:  And please raise your right hand.  Do you swear or affirm that you will interpret the questions and the answers during this proceeding to the best of your ability, from English to Spanish and from Spanish to English?

THE INTERPRETER:  I swear.

YARISSA TABORA, after having been first duly sworn, interpreted English to Spanish, and Spanish to English as follows:

THE REPORTER:  And now we'll swear in our witness.  Please raise your right hand.  For our witness, do you swear or affirm the testimony you're about to give is the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I promise.

Thereupon:

ESNOL A. GONZALEZ CANTERO, having been first duly sworn, was examined and testified as follows:

Esnol Gonzalez Cantero
February 24, 2026

Page 6

THE REPORTER: Counsel, you may now proceed.

MR. VERBIT: Thank you.

DIRECT EXAMINATION

BY MR. VERBIT:

Q. Please, again, state your full legal name.

A. Esnol Alejandro Gonzalez Cantero.

Q. Where were you born?

A. Cuba.

Q. Your date of birth is November 8th, 1996, correct?

A. Yes, correct.

Q. Are you a citizen of the United States?

A. Yes.

Q. When did you become a citizen?

A. I don't remember.

Q. When did you first come to live permanently in the United States?

A. I don't remember the exact date.

Q. Do you remember what year it was?

A. No.

Q. Have you ever had your deposition taken before?

A. No.

Q. Do you understand that you are under oath today?

A. Yes.

Page 7

Q. Do you understand that lying under oath is the crime of perjury, which is a felony punishable by up to five years in prison?

A. Okay.

Q. Could you say yes or no?

A. Yes, yes.

Q. If you don't understand any of my questions, will you please let me know?

A. Yes.

Q. If you don't ask for clarification, I will assume you understood the question. Is that fair?

A. Okay, sounds good.

Q. Are you taking any medications today that would affect your ability to answer questions?

A. No, nothing.

Q. Is there any reason that you cannot give full and complete testimony today?

A. No.

Q. Do you speak only Spanish?

A. Spanish and English.

Q. Do you speak English?

A. Yes.

Q. Can you read English?

A. It depends on how hard it is, because I don't dominate it 100 percent.

Page 8

THE INTERPRETER: (sneezes)

MS. SCHICKMAN: Bless you.

MR. VERBIT: Bless you.

BY MR. VERBIT:

Q. Can you write in English?

THE INTERPRETER: Excuse me, Counsel. I apologize. Hello?

BY MR. VERBIT:

Q. Can you write in English?

A. No.

Q. What language do you prefer to communicate in?

A. Spanish.

Q. What is the highest level of education you have obtained?

A. Twelfth grade.

Q. Did you graduate from high school?

A. Yes, in Cuba.

Q. So, based on your date of birth, assuming that you would have been 18 when you graduated from high school, then you would have graduated in 2014, is that correct?

A. No, I don't remember.

Q. Do you remember what age you were when you graduated from high school?

A. I don't remember the date.

Page 9

Q. Are you an electrician?

A. Yes.

Q. How did you learn to be an electrician?

A. Studying. I had to do a school.

Q. Where did you do that?

A. A school in Hialeah.

Q. When did you finish your training at that school?

A. I don't remember.

Q. Did your father train you to be an electrician?

A. I learned from him in the day-to-day.

Q. When did you begin working as an electrician?

A. I don't remember the date.

Q. Do you remember the year?

A. No.

Q. Are you a licensed electrician in Florida?

A. Yes.

Q. What type of a license do you have?

THE INTERPRETER: Counsel, I'm trying to understand how to spell it so I can spell it out for you.

MR. VERBIT: What? Which word? Journeyman?

THE INTERPRETER: Is that what he said? Then, yeah.

MR. VERBIT: Yeah.

Esnol Gonzalez Cantero
February 24, 2026

Page 10

THE WITNESS:  (In English) Journeyman electrician.

MR. VERBIT:  Journeyman electrician.  That's J-O-U-R-N-E-Y-M-A-N electrician.

THE INTERPRETER:  Perfect.  Thank you.  I didn't want to misspell it for you.

MR. VERBIT:  No problem.

BY MR. VERBIT:

Q.  Have you ever held an electrical license in any other state?

A.  No.

Q.  Do you have any certifications as an electrician?

A.  The license.

Q.  Before working at Statewide Electrical, where did you work?

A.  I worked at a Forever 21.

Q.  Is that a retail shop?

A.  Yes, a store at the mall.

Q.  Was that the first job you had after coming to the United States?

A.  I don't remember if it was the first job or not.

Q.  Did you work for any other – did you do any other work before working at Statewide?

Page 11

A.  I don't remember.

Q.  Jesus Gonzalez Hernandez is your father, correct?

A.  Yes.

Q.  How often do you see or speak with your father?

A.  We talk every day, seeing him maybe every other day or every two days.

Q.  During April through September of 2023, how often did you see your father outside of work?

A.  I don't remember the dates, but I was probably seeing him every day, every other day.  I don't remember exactly.

Q.  During April through September of 2023, did you and your father ride to work together?

A.  Yes.

Q.  Every day?

A.  Yes.  Not every – all of those dates, though.  By the third station, he started going in his own car.

Q.  Your father picked you up each morning, correct?

MS. SCHICKMAN:  Objection to form.

THE WITNESS:  Yes.

BY MR. VERBIT:

Q.  And he dropped you off each evening?

A.  Yes.

Page 12

Q.  So you and your father were together from the moment you left for work until the moment you got home, correct?

MS. SCHICKMAN:  Objection to form.

THE WITNESS:  Yes, we would be together all that time.

BY MR. VERBIT:

Q.  Have you and your father discussed this lawsuit?

A.  Yes.

Q.  How many times have you discussed this lawsuit with your father?

A.  I don't know the number.

Q.  When was the most recent time you discussed this lawsuit with your father?

A.  One, two, three days.  I don't know the exact day.

Q.  One, two, or three days ago?

A.  It could be approximately.  I don't know the exact day.

Q.  Did you discuss this lawsuit with your father in the days before his deposition?

A.  I don't remember.

Q.  Have you discussed this lawsuit with your father since his deposition this past Friday, February

Page 13

20th?

A.  No, I haven't talked about that topic with him.

Q.  Did your father tell you about any of the questions he was asked at his deposition?

A.  I don't remember if he mentioned it or not.

MR. VERBIT:  Ms. Interpreter, could you repeat his response?

THE INTERPRETER:  I don't remember if he mentioned it or not.

BY MR. VERBIT:

Q.  Did your father tell you about any of the answers he gave at his deposition?

A.  No.

Q.  I'd like to show you what we're going to mark as Exhibit 1 to this deposition, which is "Plaintiff Esnol A. Gonzalez Cantero Response to Defendant's First Set of Interrogatories."  Do you recognize this document?

(Defendant's Exhibit 1 marked for identification.)

MS. SCHICKMAN:  Mr. Verbit, can you scroll through it for him, please?

MR. VERBIT:  Sure.

MS. SCHICKMAN:  Thank you.

THE WITNESS:  Yes.  That document, yes.

BY MR. VERBIT:

Esnol Gonzalez Cantero
February 24, 2026

Page 14

Q.  How were your interrogatory answers prepared?

A.  Can you clear up the question?  I don't understand what you're asking me.

Q.  Okay.  What information did you contribute to the interrogatory answers?

A.  I responded from the questions that they sent me that I had to respond.

Q.  To which answers did you contribute information?

A.  I don't understand the question.

Q.  Okay.  My question is which answers did you contribute information to or did you provide or supply information for?

A.  So the document is in English, so I already don't understand the entire thing that was sent.  But if it was sent to me, then it's my questions and my answers.

Q.  Did you initially answer the questions in Spanish, and then did someone have to translate them for you and write them in English?

A.  I answered in Spanish, and the lawyers translated to the English language.

Q.  On page 11 of the interrogatory answers, is that your signature?

A.  Yes, that's my signature.

Q.  And it appears that you signed the answers to

Page 15

interrogatories on December 2nd, 2025, correct?

A.  Yes.

Q.  Did you discuss your interrogatory answers with your father before signing them?

A.  I don't remember if I talked to him about that.

Q.  How did you get the job to start working at Statewide?

A.  I don't remember.  It was such a long time.  It's been such a long time now.

Q.  Did your father get you the job?

A.  No, not that I remember.  No, I don't remember.

Q.  When did you start working at Statewide?

A.  I don't remember the dates.

Q.  Do you remember what year it was?

A.  No.

Q.  What was your job title when you started working at Statewide?

A.  Helper.

Q.  When did you begin working on the Miami-Dade Metro Station projects?

A.  I don't know the date.

Q.  Do you know what year it was?

A.  No.

Q.  How many metro stations did you work on?

A.  I don't know the exact number.

Page 16

Q.  Which stations did you work at?

A.  I don't know the name of all the stations I worked at.  I don't remember.

Q.  What was the typical work involved at each station?

THE INTERPRETER:  Yes.  I might need him to repeat himself.

THE WITNESS:  Okay, yes.  So as soon as we would arrive, we would demount, take off the old stuff, unplug where all the stations send their signals.  And then we would mount new connections with cables and countless of other stuff.

BY MR. VERBIT:

Q.  During April through September of 2023, what was your typical daily work schedule?

A.  Some days we will start working at 6 a.m. Other days we would start working at 10 a.m.

Q.  What time did you typically wake up?

A.  4:30.

MR. VERBIT:  I'm hearing some voices in the background.  Who has them?

MS. SCHICKMAN:  Sorry.  It's probably us. There's people in the office.  Do you want me to ask them to quiet down?  Can I have a second off the record?

Page 17

MR. VERBIT:  Yeah, if you wouldn't mind.  I mean, one second -- I mean, if they're not going to continue, if they're just moving on, then no problem, but I don't know.

MS. SCHICKMAN:  Let me go see, because I honestly have the door closed, so I honestly don't know what's going on.  Give me two minutes, please.

MR. VERBIT:  Sure, no problem.

THE REPORTER:  We're off record.  The time is 10:34 a.m.

(Off the record.)

THE REPORTER:  We're back on record.  The time is 10:35 a.m.

BY MR. VERBIT:

Q.  What time did your father pick you up?

A.  I don't remember the exact time.

Q.  What time did you leave your house?

A.  I don't remember.

Q.  How long was the drive from your house to the work sites?

A.  I don't remember the time that it would take.

Q.  What time did you typically arrive at the work site?

A.  I don't remember.

Q.  What time did you typically begin working?

Esnol Gonzalez Cantero
February 24, 2026

Page 18

A. We would start working at 6 a.m. A lot of times actually before then.

Q. What time did you typically stop working?

A. If it was from 6 a.m., we would end at 4:30, but a lot of days, we would continue.

MR. VERBIT: I'm sorry. Ms. Interpreter, you said a lot of something, we would continue?

THE INTERPRETER: Yes, if the day started at 6 a.m., we would leave at 4:30, but a lot of days, we would continue. I apologize. I don't mean to mumble.

MR. VERBIT: Maybe, I don't know if it's possible to make your mic so that it picks up your voice a little more loud. I don't know.

THE INTERPRETER: I can try. Give me one second.

MR. VERBIT: Okay. Or maybe speak closer to it, I don't know. I'm not a tech.

THE INTERPRETER: Yeah, I'll get closer.

THE REPORTER: Off the record at 10:37 a.m. to adjust for technical difficulties.

(Off the record.)

THE REPORTER: We're back on record at 10:38 a.m.

MR. VERBIT: Are you ready, Ms. Interpreter?

Page 19

THE INTERPRETER: Yes, I'm here. I think we're good.

MR. VERBIT: Yeah, that's better. Thank you.

THE INTERPRETER: Okay, perfect.

BY MR. VERBIT:

Q. Mr. Gonzalez, what time did you typically leave the work site?

A. I don't remember. Depending on the day, so it could vary.

Q. What time did you typically arrive at your house?

A. I don't know. I don't remember.

Q. Did your schedule vary from day to day?

A. Well, not the schedule, but the work. So what could happen was there was more work, so we would have to stay there till 5, 6.

Q. Did your schedule vary from station to station?

A. I don't remember.

Q. Going back to Exhibit 1, "The Interrogatory Answers," you swore under oath on December 2nd, 2025, that your answers to the interrogatories are true and correct. Right?

A. Yes.

Q. And you understand that lying under oath in sworn answers to interrogatories is also the crime of

Page 20

perjury, a felony punishable by up to five years in prison, correct?

MS. SCHICKMAN: Objection. Asked and answered.

THE WITNESS: Yes.

BY MR. VERBIT:

Q. And you told the truth in all of your answers to the interrogatories, correct?

A. Yes, correct.

Q. In answer to interrogatory number two, you stated that you regularly worked approximately 48 hours per workweek, including overtime hours, for which he was not fully compensated. Was that your answer?

MS. SCHICKMAN: Can we have the translator also read him the answer, because it's like he said, he gave them to us in Spanish, not in English, so he can't read that.

THE INTERPRETER: Yes, of course.

MS. SCHICKMAN: Thank you.

THE INTERPRETER: So I'm reading answer number two. One second, please, while I review it myself.

BY MR. VERBIT:

Q. And Mr. Gonzalez, your answer says that you regularly worked approximately 48 hours per workweek, correct?

A. Yes, approximately. That's what it – that's –

Page 21

– it tells you there.

Q. And you gave the exact same answer to number four, correct?

A. Can you read me – read me number four?

MR. VERBIT: Sure. Read him the answer to number four.

THE INTERPRETER: Okay.

THE WITNESS: Yes, correct. That's my answer.

BY MR. VERBIT:

Q. So if you regularly worked approximately 48 hours per week, that is 8 hours of overtime per week, correct?

A. Yes.

Q. And the period of time from April through September of 2023 is 25 weeks. Assuming that that's true, that would mean that you have sworn that you work 200 hours of overtime, correct?

THE INTERPRETER: What's the final number, Counsel? I apologize.

MR. VERBIT: 200.

THE WITNESS: That, that was said is approximately. I can't say an exact day or number.

BY MR. VERBIT:

Q. Would you agree that if you worked eight hours of overtime per week for 25 weeks, that that would mean

Esnol Gonzalez Cantero
February 24, 2026

Page 22

that you work 200 hours of overtime, correct?

A. I don't know. I don't have a calculator to know if that number is true.

Q. Can you multiply 25 times 8?

A. Yes.

Q. And what number do you get if you do that?

A. I don't know. I don't have a calculator.

Q. Well, I have a calculator.

A. (In English) Okay.

Q. And when I multiply eight hours of overtime per week times 25 weeks, I get 200 hours of overtime, correct?

A. Okay.

Q. Does that mean yes?

A. I didn't calculate it myself.

THE INTERPRETER: Excuse me. I just need one second.

THE WITNESS: (In Spanish).

MR. VERBIT: Could you translate what he just said?

MS. SCHICKMAN: She took a second, but he said yes, 25 times 8 is 200.

MR. VERBIT: Okay.

THE INTERPRETER: Yes, I'm back. I apologize.

MR. VERBIT: Ms. Interpreter, did you hear his

Page 23

response?

THE INTERPRETER: No, I didn't. I'm sorry, Counsel. I had to close the door. My dog was barking.

MR. VERBIT: Oh, I'm sorry. I didn't know. Okay.

BY MR. VERBIT:

Q. Mr. Gonzalez, could you repeat your response to the last question?

A. Yes. If you multiply 25 with 8, it's 200.

Q. I'd like to draw your attention to your answer to paragraph -- I'm sorry -- to interrogatory six. And you have an answer designated as subsection D. Interpreter, would you read that answer to him?

THE INTERPRETER: Yes. Let me review it.

MR. VERBIT: Starts with "The work I did."

BY MR. VERBIT:

Q. In your sworn interrogatory answer that you gave at 6D, you stated that "The project was designed for a crew of four, but only two of us were assigned to it." Was that your answer?

A. Yes, that's correct. My father and I.

Q. Who designed the project for a crew of four?

A. I don't have that answer.

Q. Did anyone tell you that -- did anyone tell you

Page 24

that the project was designed for a crew of four?

A. I don't remember.

Q. What is your factual basis for claiming that the project was designed for a crew of four?

A. I don't know. I, I wouldn't know what to answer you there.

Q. If the project was designed for a crew of four, how did the Miami-Dade County project managers allow the project to proceed with a crew of two?

MS. SCHICKMAN: Objection, calls for speculation.

THE WITNESS: Counsel, can you repeat the question?

BY MR. VERBIT:

Q. If the project was designed for a crew of four, how did the Miami-Dade County project managers allow the project to proceed with a crew of two?

A. I don't know. That's not a responsibility that falls on my hands.

Q. In fact, the Miami-Dade project managers did allow the project to proceed with a crew of two, correct?

A. Well, I can't respond for them. I can respond for myself. But the only people who worked there was my father and I.

Q. And the Miami-Dade project managers knew that,

Page 25

correct?

A. Yes. They would see it and know it. They would see it daily because they would come to the station.

Q. So, in fact, Statewide was allowed to do the project with a crew of two, wasn't it?

MS. SCHICKMAN: Objection. Calls for speculation.

MR. VERBIT: You can answer.

THE WITNESS: No, that I don't know.

BY MR. VERBIT:

Q. During your time working at Statewide between April and September of 2023, did you ever have any conversations with Paola Usuga, that's U-S-U-G-A, about your hours or your pay?

THE INTERPRETER: Starting in April?

MR. VERBIT: Yeah. Let me repeat the question.

BY MR. VERBIT:

Q. During the time from April through September of 2023, did you ever have any conversations with Paola +

Q. How many conversations did you personally have with Paola Usuga about hours or pay?

A. A couple -- I don't remember the exact number.

Q. Did you speak directly with Paola, or did your father handle those communications?

Esnol Gonzalez Cantero
February 24, 2026

Page 26

A.  When she would come to the stations and she was present, I talked to her a couple times.

Q.  Were those conversations in person?

A.  Yes, in person.

Q.  Is there any particular conversation with Paola Usuga that stands out in your memory?

A.  Yes.  I don't remember the date, but it was a conversation.  She wanted to move 20 hours from one week to another, and that was the conversation where we went back and forth the most.

MR. VERBIT:  Could you repeat?  I got, she wanted to move 20 hours from one something to another.  What was it?

THE INTERPRETER:  From one week to the other.  She wanted to move the 20 hours to the next week.  That's all he said.

BY MR. VERBIT:

Q.  What else do you remember about that conversation?

A.  She said that they, they weren't going to pay those hours – that they weren't going to pay those hours, that they could make it up with time.

Q.  Do you know what Paola meant when she said they could make it up with time?

A.  Yes.  So she said they are not going to make up

Page 27

the money.  They don't offer overtime so they could tell you, "oh, I can give you hours for next week."

Q.  Your sworn interrogatory answer that has been designated as the answer to number six and subparagraph F.  Your sworn interrogatory answer places this conversation at Station 2 on or about May 25th, 2023.  Is that correct?

A.  Correct, yes.

Q.  Are you certain it was May 25th, 2023?

A.  I don't remember the exact date.

Q.  Did you write down the date at the time?

A.  No.

Q.  Do you have any notes from that date?

A.  No.

Q.  And are you certain that this conversation took place at Station 2, Santa Clara?

A.  I don't remember exact 100 percent sure.

MR. VERBIT:  Could you repeat the response, Ms. Interpreter?

THE INTERPRETER:  I don't remember 100 percent.  I'm not sure.

BY MR. VERBIT:

Q.  Do you remember what specific work you were doing at Station 2 on May 25th, 2023?

A.  The work that one does at the stations, but the

Page 28

work that I was doing that specific day, no.

Q.  You don't remember?

A.  What I was doing that day specifically?

Q.  Right.

A.  No, that day, I don't remember.

Q.  Who was present during this conversation?

A.  Dad, Paola, and I.

Q.  Was anyone else within earshot?

THE INTERPRETER:  Excuse me, Counsel, can you repeat that?

MR. VERBIT:  Sure.  Was anyone else within earshot?  Meaning able to hear?

THE WITNESS:  I don't remember.  We were in the station.  Everything was open.  The doors – everything was open.

BY MR. VERBIT:

Q.  Where exactly at the station did this conversation take place?

A.  In the station.  I don't remember the exact place.

Q.  Was it inside the station?

A.  Yes.

Q.  Was it in the traction power room?

A.  I don't understand that question.  In what room?

Page 29

Q.  Did the station have a room that was known as the traction power room?  Traction meaning T-R-A-C-T-I-O-N.

A.  I never encountered – knew that room that you're saying.

Q.  What time of day did the conversation occur?

A.  I don't have the exact time.  I don't remember.

Q.  How long did the conversation last?

A.  I don't remember.

Q.  Was the conversation in English or Spanish?

A.  Spanish.

Q.  Did your father say anything during this conversation?

A.  Yes.

Q.  What did your father say?

A.  I don't remember.

Q.  Did you say anything during this conversation?

A.  Yes.

Q.  What did you say?

A.  I don't remember exactly what I said.

Q.  Did Paola say anything else during that conversation that you haven't mentioned already?

A.  I don't remember right now.

Q.  Your interrogatory answer says that Paola said the work had to be completed in 20 hours.  Is that

Esnol Gonzalez Cantero
February 24, 2026

Page 30

accurate?

A.  Yes, she said that.

Q.  What work was she referring to?

A.  I don't remember exactly what it was.

Q.  Was she talking about the work at one specific station?

A.  I don't know.  I don't remember.

Q.  Was the 20 hours, the amount of time Paola said should be, needed to complete the work at that particular station?

A.  According to her, yes.

Q.  So that is Paola's estimate of how long the job at one station should take, right?

MS. SCHICKMAN:  Objection, speculation.

THE WITNESS:  According to her, the job that she was talking about, yes.

BY MR. VERBIT:

Q.  In that conversation, did Paola say anything about how many hours you should work per day?

A.  I don't remember.

Q.  Did Paola say anything in that conversation about how many hours you should work per week?

A.  I don't remember.

Q.  Did Paola say anything in that conversation about working more than 40 hours in a week?

Page 31

A.  I don't remember.

Q.  In this conversation, did Paola tell you that you had actually worked more than 40 hours in any particular week?

A.  I don't remember.

Q.  Did Paola acknowledge that you had worked any overtime?

A.  She 100 percent knew that we worked extra hours.

Q.  My question was, in that conversation, did Paola acknowledge that you had worked overtime?

A.  I don't remember.

Q.  Did Paola say the word "overtime" during this conversation?

A.  I don't remember.

Q.  In this conversation, did anyone state a specific number of hours that you or your father had actually worked in a particular week?

A.  I don't remember.

Q.  Did anyone in this conversation say anything like, "You worked 48 hours last week" or "You worked 50 hours last week"?

A.  I don't remember.

Q.  Your sworn interrogatory answer says that Paola told you that if you exceeded 20 hours, you would not be

Page 32

paid for that week, but would be compensated later with time on(sic).  Is that what she said?

A.  It's correct.  They were going to compensate it with time, but overtime, they were not going to pay you.

MR. VERBIT:  Could you repeat is answer, Ms. Interpreter?

THE INTERPRETER:  Yes.  Paola said that they will change the hours to next week, but overtime they're not going to pay you.

BY MR. VERBIT:

Q.  So, according to your answer, Paola said that if you went over 20 hours on a station assignment, you would not be paid for the excess hours that week.  Is that correct?

MS. SCHICKMAN:  Objection.  Asked and answered.

THE WITNESS:  Yes.  She would say that they were not going to pay for the extra time.

BY MR. VERBIT:

Q.  And instead you would receive time off at some later date as compensation?

A.  Yes.

Q.  Did Paola explain how that would work?

A.  Yes.  So if you passed the 10 hours extra a week, they would say something like, "Don't come Friday." And then they would put the hours there.  But they never

Page 33

paid anything for the extra hours of overtime.

Q.  Did Paola say when you would get the time off?

A.  I don't remember.

Q.  Did Paola say how much time off you would get?

A.  Whatever time you did extra, they would have to find time to give it to you because the hours of itself, they were not going to pay you the extra time hours.

Q.  So if you work two extra hours beyond the 20-hour target, would you get two hours off?

A.  It wasn't time off.  It was time that I had worked and that they didn't want to pay it.  So it wasn't like a time off.

Q.  Did you ever actually receive time off as compensation for extra hours worked?

A.  I don't remember.

Q.  Can you identify a single specific day during April through September of 2023 when you took a day off because of this time off compensation system?

A.  No, I don't remember.

Q.  Can you identify a single specific week during April through September 2023 when you worked fewer than 40 hours because of accumulated time off credits?

A.  I don't remember any dates exactly.

Q.  Did you ever ask Paola when you would receive the compensatory time off?

Esnol Gonzalez Cantero
February 24, 2026

Page 34

A.  Yes.  A lot of times I asked her, when are they going to give those hours.

Q.  What was her response?

A.  Yes.  Like, for example, we were working at one station.  And they owed us, like, 20 hours.  She said, "Oh, well, no, we're going to give you -- we're going to pay you that when we're working in Brickell."  Well, where do you see that -- anywhere that you get paid six months later?

Q.  And did you get paid six months later?

A.  No.

MS. SCHICKMAN:  Mr. Verbit, it's been a little less than an hour and a half.  Can we have 10 or 15 minutes, please?

THE INTERPRETER:  Yes, I can use a break as well.

MR. VERBIT:  Yeah.  Sure.  Let's do it now.  How long do you want?

MS. SCHICKMAN:  10 or 15 minutes can make the call.

MR. VERBIT:  Let's go for 10 minutes?

MS. SCHICKMAN:  Okay, that's fine with me.

MR. VERBIT:  Come back at 11:36?

MS. SCHICKMAN:  Yes, sir.

THE REPORTER:  We are now off record.  The time

Page 35

is 11:26 a.m.

(Off the record.)

THE REPORTER:  We are now on record.  The time is 11:39 a.m.

BY MR. VERBIT:

Q.  Mr. Gonzalez, we're going to keep looking at Exhibit 1, your sworn answers to interrogatories, and I would like to direct your attention to your sworn answer to interrogatory number 13.  And in your sworn answer to interrogatory number 13, you stated, "I estimated 84 hours of overtime based on the following overtime hours worked during the following weeks at each of the stations I worked for the defendants."  Is that correct?

THE INTERPRETER:  Counsel, I can translate it for him.  But I do need it to be bigger.  I can't really see it this way.

MR. VERBIT:  Okay.  Can you see where my arrow's pointed?

THE INTERPRETER:  Yes.

MS. SCHICKMAN:  Sir, it's showing you're sharing like a split screen.  So we see the screen that you're on and then we also see the images.

MR. VERBIT:  Oh, no.  Oh, dear.  Hold on.  I don't know much of it.

THE INTERPRETER:  Don't worry.  I don't know

Page 36

how to use this either.

MR. VERBIT:  I don't know.  All right, you're saying it's now a split screen still?

MS. SCHICKMAN:  Yeah.  So the images are like, really small on our screen, and then the other half is just your camera.

MR. VERBIT:  Oh dear, how do I get rid of that?

MS. SCHICKMAN:  You may have to stop sharing and then try sharing again and select the document.

MR. VERBIT:  Okay.  On it.

THE REPORTER:  So on my end, Counsel, I'm able to see the document without the split.  You also have the option when the document is shared, there is a menu there that allows you a view to fit to screen or allows you to zoom the document as well for yourself.

So, Counsel Verbit, I think if you share again, you shouldn't have a problem in the document.

MR. VERBIT:  How about now?  Are we good now?  Is it still split?

MS. SCHICKMAN:  It's still split for us.

THE INTERPRETER:  It's still split, but it's letting me zoom in.  So we could continue, whatever you guys prefer.

MR. VERBIT:  What about if I --

Page 37

THE REPORTER:  Again, I'm not seeing a split screen.

MR. VERBIT:  What I propose to do is to leave the meeting and then rejoin it, okay?  Is that okay with everyone?

MS. SCHICKMAN:  It's fine with this.  I can zoom into it here too.

THE INTERPRETER:  I think we're fine zooming in.

MR. VERBIT:  Well, I'm not comfortable with what I'm hearing, so I'm going to leave and come right back, okay?  Thank you.

THE REPORTER:  We're going to go off record.  The time is 11:41 a.m.

(Off the record.)

THE REPORTER:  We're back on record.  The time is 11:42 a.m.

BY MR. VERBIT:

Q.  I'm going to start my question over again.  In your sworn answer to interrogatory number 13, that's this one, you stated, "I estimated 84 hours of overtime based on the following overtime hours worked during the following weeks at each of the stations I worked for the defendants," correct?

A.  Yes, it was approximately.  It's an estimate.

Esnol Gonzalez Cantero
February 24, 2026

Page 38

Q.  How did you arrive at that estimate?

A.  I don't remember.

Q.  According to your sworn interrogatory answers, you worked at Station 1, Allapattah, from April 17th to April 20, 2023, and you claim eight hours of unpaid overtime for that week.  Is that correct?

A.  Yes.  Like my answer says, it's an approximate and they did not pay.

Q.  What specific work were you doing at that station that week that caused you to work overtime?

A.  I don't remember what, what I was doing that week.

Q.  According to your sworn interrogatory answers, you also worked at Station 1, Allapattah, from April 24 to April 27, 2023, and claimed eight hours of unpaid overtime for that week.  Is that correct?

A.  Correct.  I worked and it wasn't paid.  They didn't pay.

Q.  What specific work were you doing that week at that station that caused you to work overtime?

A.  I don't remember.

Q.  According to your sworn interrogatory answers, you worked at Station 2, Santa Clara, from May 8 to May 11, 2023, and you claimed six hours of overtime.  Is that correct?

Page 39

A.  Yes.  Okay.

Q.  What specific work caused overtime at that station that week?

A.  I don't remember.

Q.  According to your sworn interrogatory answers, you worked at Station 2, Santa Clara, from May 15th to May 18th, 2023, and claimed six hours of overtime.  Is that correct?

THE INTERPRETER:  May 15th to 18th?

MR. VERBIT:  Yeah.

THE WITNESS:  Okay.

BY MR. VERBIT:

Q.  Is that a yes?

A.  Yes.  All of the dates that are stipulated in my answers are an estimate that has been given.

Q.  What specific work caused overtime at that station that week?

A.  I don't remember.

Q.  According to your sworn interrogatory answers, you worked at Station 2, Santa Clara, from May 22 to May 25, 2023, and you claimed eight hours of overtime.  Is that correct?

A.  Yes.  Correct.

Q.  What specific work caused overtime at that station that week?

Page 40

A.  I don't remember.

Q.  Why did the overtime increase from six hours in the first two weeks at Santa Clara to eight hours in the third week?

A.  I'm, I'm not sure exactly why.  But if we were already by the third week, that means that we were already delayed, because we only get one month and it was only two of us, and there's a lot of work to be done.

Q.  According to your sworn interrogatory answers, you worked at Station 3, Culmer, from June 12 to June 29, 2023, claiming six hours of overtime for each of the first two weeks and eight hours of overtime in the third week.  Is that correct?

THE INTERPRETER:  We're doing Station 3, counsel?

MR. VERBIT:  Yes.

THE WITNESS:  Yes, correct.

BY MR. VERBIT:

Q.  What specific work caused overtime at that station during those weeks?

A.  I don't remember.

Q.  Why did the overtime increase from six hours in each of the first two weeks to eight hours in the third week of Culmer?

A.  I don't remember, but, like, I responded

Page 41

previously, it must be for that same reason.

Q.  According to your sworn interrogatory answers, you worked at Station 4, which is also known as GAP Tie 2, that's G-A-P, separate word, T-I-E, the number 2, from July 17 to July 27, 2023, claiming six hours of overtime in each of the two weeks.  Is that correct?

THE INTERPRETER:  Counsel, I'm trying to follow along with you, but I think it says four hours.  Or am I reading the wrong thing?

MR. VERBIT:  Oh, I'm sorry.  No, you're reading the right thing.  Okay, let me change that.  Let me rephrase.

THE INTERPRETER:  Yeah, I just want to give you an exact translation.

MR. VERBIT:  Thank you.

BY MR. VERBIT:

Q.  According to your sworn interrogatory answers, you worked at Station 4 from July 17 to July 27, 2023, claiming four hours of overtime in each of the two weeks.  Is that correct?

A.  Yes, correct.

Q.  What specific work caused overtime at that station during those weeks?

A.  I don't remember.

Q.  According to your sworn interrogatory answers,

Esnol Gonzalez Cantero
February 24, 2026

Page 42

you worked at Station 5, Overtown, from Aug 21 to Aug 31, 2023, claiming four hours of overtime in each of those two weeks. Is that correct?

A. Yes.

Q. What specific work caused overtime at that station during those weeks?

A. I don't remember.

Q. According to your sworn interrogatory answers, you worked at Station 6, Brickell, from September 11 to September 28, 2023, claiming two hours of overtime the first week, three hours of overtime in the second week, and four hours of overtime in the third week. Is that correct?

A. Yes, correct.

Q. What specific work caused overtime at that station during those weeks?

A. I don't remember.

Q. Why did the overtime increase from two to three to four hours over the three weeks?

A. I don't remember.

Q. During April through September 2023, did you write down your work hours anywhere?

A. I don't remember right now.

Q. Did you keep a calendar or a planner?

A. Me? No.

Page 43

Q. Did you keep a notebook or diary?

A. No.

Q. Did you keep any personal records showing the hours you worked each day?

A. I didn't.

Q. Did you keep any personal records showing hours you worked each week?

A. I don't remember?

Q. Do you have any documents that show what time you start to work each day?

A. No, that I haven't. No.

Q. Do you have any documents that show what time you stop to work each day?

A. I don't.

Q. Did you ever create any records for yourself showing overtime hours worked?

A. I don't remember.

Q. When did you first arrive at the belief that you were working overtime hours for which you were not being paid?

A. I don't remember the exact week, but as soon as you pass the 40 hours, they are owing you money for overtime.

Q. So you don't remember when you first realized that you were working overtime hours, for which you were

Page 44

not being paid?

MS. SCHICKMAN: Objection. Asked and answered.

THE WITNESS: The exact date, no.

BY MR. VERBIT:

Q. Do you remember what month it was?

A. No either.

Q. Did you, at some point, come to believe that you weren't being paid for overtime?

A. Yes. It's not that I believe it, it's a reality, because if I don't see it in my check.

Q. After you became aware that you weren't being paid for overtime, did you begin keeping records for yourself of your work times?

A. I don't remember.

Q. If you were working overtime hours for which you were not being paid, did you report that to Leo Interian, that's I-N-T-E-R-I-A-N, or Dalton Rivera, D-A-L-T-O-N R-I-V-E-R-A, the Miami-Dade Project managers?

A. No, I don't remember. But if I was going to complain with somebody, it was Paola because she was the one that would pass by, not them. They wouldn't come.

Q. Did you ask the Miami-Dade project managers to escalate the issue of you're not being paid for overtime within Miami-Dade County?

A. I don't remember.

Page 45

Q. Did you ask the Miami-Dade County Project managers to speak to Noel Melo about you working overtime that you were not being paid for?

A. I don't remember.

Q. Is it your testimony that the Miami-Dade project managers knew all along that you and your dad were working overtime and not being paid for it?

A. I don't have to confirm that.

MR. VERBIT: I'm sorry, could you repeat his answer?

THE WITNESS: I don't have confirm that. That does not depend on me. I don't know if they knew it or not.

BY MR. VERBIT:

Q. Do you have any text messages about your work hours?

A. No, not that I remember, no.

Q. Do you have any photographs showing what time you were at work?

A. I don't remember.

Q. How did you calculate the amount of overtime you are claiming in this lawsuit?

A. Approximately, an estimate.

Q. How did you calculate the amount of your approximate estimate?

Esnol Gonzalez Cantero
February 24, 2026

Page 46

A. You have to calculate it. The hours of overtime and what you usually get paid for it, and you, you multiply.

Q. Did you use any documents to calculate your overtime claim?

A. I don't understand your question.

Q. Did you consult any documents in order to calculate your overtime claim?

A. No, not that I remember. No.

Q. Did you rely on your memory?

A. For what?

Q. To calculate your overtime claim?

A. Yes, my memory, because I was the one that lived it.

Q. Did anyone help you calculate your overtime claim?

A. That I remember, no. My lawyer and I.

Q. Did your father help you calculate your overtime claim?

A. I don't remember.

Q. I'd like to show you what we're going to mark as Exhibit 2 to this deposition, which appears to be a handwritten document that was produced as Bates number 856. Do you recognize this document?

(Defendant's Exhibit 2 marked for

Page 47

identification.)

A. Yes.

Q. Is this your handwriting?

A. No, it's not my handwriting.

Q. Whose handwriting is it?

A. If I remember correctly, it's Maritza.

MS. SCHICKMAN: I'm sorry, Mr. Verbit, this is Exhibit 2, right?

MR. VERBIT: Exhibit 2.

MS. SCHICKMAN: Thank you.

BY MR. VERBIT:

Q. And who is Maritza?

A. My dad's woman.

Q. Did you create this document?

A. Yes, we were all together. All three of us. She was the one that wrote it.

Q. So it was you, your dad, and Maritza?

A. Correct, yes.

Q. So the three of you created this document together?

A. Yes. She didn't create it. She just wrote down the information we were giving her.

Q. When was this document created?

A. I don't remember.

Q. What sources of information were used or

Page 48

consulted in order to arrive at the hours for each station listed here?

A. I don't remember.

Q. Where were you when this document was created?

A. I don't remember. I was with them. Where we were, I don't remember.

Q. Are the hours listed in this document the amount of overtime hours you claim to have worked?

A. Yes, approximately.

Q. Which came first? The 84 hours or the number of overtime hours you put for each station?

A. The amount of hours. How am I going to get 84 if we don't add together the other?

Q. What was your purpose in creating this document?

A. I don't remember.

Q. Did anyone ask you to create this document?

A. I don't remember.

Q. This document refer – let me start over. The document references calendar next to some station entries. What calendar is that referring to?

A. I don't remember.

Q. The document shows a date range of, looks like, 1 Julio 2022 to 1 Julio 2025. Three years. What does that three-year period refer to?

Page 49

A. (In Spanish).

MR. VERBIT: Let's wait for the interpreter to interpret my question.

THE WITNESS: I don't know. I don't remember.

BY MR. VERBIT:

Q. How often did you interact with Paola Usuga between April and September of 2023?

A. When she would come to the station, I would greet her because it wasn't every day, it was just when she appeared.

Q. You know how Statewide tracked the hours you worked each week?

A. I don't know. But they don't have a way of tracking everything. There was no way, or it didn't even exist to any of them – to some of them.

Q. Did you personally report your hours to anyone?

A. No.

Q. Did your father report your hours to anyone at Statewide?

A. I respond for myself. That I know of, no.

Q. Did you and your father always work the same hours?

A. Yes, 100 percent.

Q. Were there ever days when you work different hours from your father?

Esnol Gonzalez Cantero
February 24, 2026

Page 50

A. No, not that I remember. No.

Q. Do you know someone named Leo Interian?

A. Yes.

Q. How do you know him?

A. He was one of the bosses from the – for the project.

Q. How often did you see Mr. Interian during April through September 2023?

A. I don't remember, but pretty often in the stations.

Q. Did Mr. Interian visit the metro station worksites?

A. Yes.

Q. How often did he visit the worksites?

A. I don't – I don't remember, but pretty often.

Q. Did Mr. Interian participate with you in any discussions about overtime hours at the worksites?

A. I don't remember.

Q. Was Mr. Interian ever present during any discussions about overtime?

A. I don't remember.

Q. Did Mr. Interian participate in any discussions between your father and Paola about overtime?

A. I don't remember.

Q. Was Mr. Interian ever present during any

Page 51

arguments about overtime?

A. I don't remember.

Q. Did Mr. Interian ever comment to you on whether you were working overtime?

A. I don't remember.

Q. Did you ever discuss your overtime hours directly with Leo Interian?

A. I don't remember.

Q. During the period from April through September of 2023, where did your father live?

A. I don't remember.

Q. Did you ever visit your father where he was living during the period from April through September 2023?

A. Yes. I don't remember exactly, but I have to - - have gone visit him.

Q. Do you recall what the location was of where your father was living at that time?

A. No, I don't remember.

Q. Do you know who owned the property where your father was living at that time?

A. No.

Q. Do you know how long your father lived at that location?

A. No, I don't know.

Page 52

Q. Did you personally ever discuss overtime with Noel Melo?

A. No, he was not president.

Q. Did Noel Melo ever tell you that there was no money to pay overtime?

A. Correct. He would say that there was no money for him to pay extra.

Q. Did he say that to you?

A. Yes, he said it at the station.

Q. So I had asked you if you ever personally discussed overtime with Noel Melo, and your answer was no. Would you like to correct that then?

A. The first time that you asked, the first question, was if I had discussed anything with Noel Melo. What happened was one day he said it at the station, "We only have one month to work on the project, and there is no money to pay for extra hours." So the answer applies now to the question that you're asking me.

Q. When did Mr. Melo say this?

A. I don't remember.

Q. Do you remember who else was present when he said that?

A. Yes, my, my dad was present when he said that.

Q. Were you present for any conversations between your father and Noel Melo about overtime?

Page 53

A. That I – that I remember, no.

Q. Did your father tell you about conversations he had with Noel Melo about overtime that you were not present for?

A. I don't remember.

Q. Did Noel Melo ever promise you a bonus?

A. Yes. He promised a bonus when we were done with all six stations.

Q. When did Noel make this promise?

A. I don't remember the date.

Q. Where were you when Noel made this promise?

A. I don't remember.

Q. Who was present when Noel made this promise?

A. I don't know. I don't remember.

Q. Was your father present?

A. Yes.

Q. Was Mr. Interian present?

A. I don't remember.

Q. What were the exact words Mr. Melo used?

A. I don't remember.

Q. Did Mr. Melo say the bonus was to compensate for unpaid overtime?

A. No, I don't remember.

Q. Was this bonus promise ever reduced to writing?

A. No, I don't remember.

Esnol Gonzalez Cantero
February 24, 2026

Page 54

Q.  Did you ever receive anything in writing from Mr. Melo confirming a bonus?

A.  No.  Written, nothing.

Q.  Did you ever send anything in writing to Mr. Melo confirming a bonus?

A.  No.  Me?  No.

Q.  Did Mr. Melo specify a dollar amount for the bonus?

A.  I don't remember.

Q.  I'd like to show you what we're going to mark as Exhibit 3, which is the Pre-Suit Demand Letter dated February 24th, 2025.  Do you recognize this document, sir?

(Defendant's Exhibit 3 marked for identification.)

MS. SCHICKMAN:  Objection, speculation.  He wasn't even a part of the suit at this time.

MR. VERBIT:  I'm just asking if he recognizes the document.

MS. SCHICKMAN:  Can you scroll for him?

THE WITNESS:  No.

BY MR. VERBIT:

Q.  Were you aware that before this lawsuit was filed that your father's attorney sent a demand letter to Mr. Melo?

Page 55

A.  A letter of what?  I don't understand the question that you're making.

Q.  Were you aware that before this lawsuit was filed that your father's attorney sent a demand letter?  And I'm talking about the letter that's on my screen or on your screen.  Were you aware of it?

A.  I, I knew when he sent it.  He told me that he had done it and that he had sent it.

Q.  The demand letter claimed that your father was owed $150,000 as a commission or bonus for phase three, plus $10,000 as a commission or bonus for phase two, plus 10 percent of change order earnings.  Were you aware of that?

A.  Yes, of course, I knew.

Q.  Were those bonuses also supposed to be for you or just for your father?

A.  The bonus to finish the stations was for both of us.

Q.  So the bonus was 150,000 for both of you, or was it 150,000 for each of you?

A.  I don't remember exactly.

Q.  When was your last day of work at Statewide?

A.  I don't remember.  I mean, according to them, no one ever told me that I was done working there, not a message or a call.

Page 56

Q.  Was there any particular reason you stopped working at Statewide?

A.  We stopped working because no one ever again called me.

Q.  Did you quit or were you fired?

A.  Well, no, I didn't quit.  And the word fired is that they let me go.  But no one fired me.  No one called me or dismissed me.

Q.  During the period from April through September of 2023, did you receive a paycheck every week?

A.  Yes.

Q.  Did you receive those checks on the Monday after each weekly pay period?

A.  Yes.  Not every Monday.  There was Mondays that the check hadn't arrived, and we had to wait Tuesday or Wednesday.

Q.  Did you review your paychecks when you received them?

A.  Yes.

Q.  Did you notice that your paychecks showed 40 hours each week?

A.  Yes.

Q.  So you could tell from looking at your paychecks how many hours you were being paid for?

A.  Yes, they would pay for the hours only.

Page 57

Q.  Since leaving Statewide, have you worked anywhere else?

A.  Yes.

Q.  Where have you worked?

A.  Yes, I work with Miami-Dade County as a bus operator.

Q.  Is that your current employment?

A.  Yes.

Q.  Have you worked as an electrician since leaving Statewide?

A.  No.

Q.  When you said that you work with Miami-Dade County as a bus operator, are you referring to the public buses that are in transit around the city?

A.  Yes.

MR. VERBIT:  I have no further questions.

MS. SCHICKMAN:  I have one question for him, and then we can go ahead and finish up.

CROSS-EXAMINATION

BY MS. SCHICKMAN:

Q.  Esnol, who was in charge of coordinating the hours that you were working each day?

A.  So, yes, my dad was the one that was coordinating the times.  Like, he would tell, "Leo, okay, tomorrow."  He would coordinate.  And then he also

Esnol Gonzalez Cantero
February 24, 2026

Page 58

mentioned some escorts, the people from Dade County who were the ones who opened the gates from them. And we worked under their surveillance.

MS. SCHICKMAN: I have no further questions at this time either.

THE REPORTER: Will the witness read today's transcript for spelling corrections?

MS. SCHICKMAN: We'll waive that.

THE REPORTER: Counsel, will you be ordering transcripts?

MR. VERBIT: I will.

MS. SCHICKMAN: We'll let you know.

THE REPORTER: If there's nothing further for our witness, we are now off record. The time is 12:45 p.m. eastern standard time.

(Deposition concluded at 12:45 p.m.)

Page 59

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, Marquetta Edwards, Notary Public, certify that ESNOL A. GONZALEZ CANTERO, the witness, and YARISSA TABORA, the interpreter, remotely appeared before me and was duly sworn on February 24, 2026.

WITNESS my hand and official seal this 3rd day of March 2026.

*Marquetta Edwards*
Marquetta Edwards
Notary Commission TX/RON 135116657
Commission Expires: October 3, 2028

Page 60

CERTIFICATE OF DIGITAL REPORTER

I, MARQUETTA EDWARDS, a Digital Reporter and Notary Public within and for the State of Florida, do hereby certify:

That the foregoing proceeding hereinbefore set forth was accurately captured with annotations by me during the proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 24th day of February, 2026.

*Marquetta Edwards*
Marquetta Edwards, Notary
Notary Commission TX/RON 135116657
Commission Expires: October 3, 2028

Page 61

CERTIFICATE OF TRANSCRIPTIONIST

I, SHERLY AUGUSTINE, do hereby certify:

That said audio transcription is a true record as reported by me, a disinterested person.

I further certify that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS THEREOF, I have hereunto set my hand this 3rd day of March, 2026.

Sherly Augustine

Esnol Gonzalez Cantero
February 24, 2026
1

**Exhibits**

436519_
Esnol_
Gonzalez_
Cantero_
022426_
Ex 001
  3:9 13:15,
  18 19:19
  35:7
436519_
Esnol_
Gonzalez_
Cantero_
022426_
Ex 002
  3:10
  46:22,25
  47:8,9
436519_
Esnol_
Gonzalez_
Cantero_
022426_
Ex 003
  3:11
  54:11,14

**$**

$10,000
  55:11
$150,000
  55:10

**1**

1
  13:15,18
  19:19 35:7

38:4,14
48:24
10
  16:17
  32:23
  34:13,19,
  21 55:12
100
  7:25
  27:17,20
  31:8 49:23
10:03
  4:1,3
10:34
  17:10
10:35
  17:13
10:37
  18:20
10:38
  18:23
11
  14:22
  38:24 42:9
11:26
  35:1
11:36
  34:23
11:39
  35:4
11:41
  37:14
11:42
  37:17
12
  40:10
12:45
  58:15,16
13
  35:9,10

37:20
15
  34:13,19
150,000
  55:19,20
15th
  39:6,9
17
  41:5,18
17th
  38:4
18
  8:19
18th
  39:7,9
1996
  6:9

**2**

2
  27:6,16,24
  38:23
  39:6,20
  41:4
  46:22,25
  47:8,9
20
  26:8,12,15
  29:25 30:8
  31:25
  32:12 34:5
  38:5
20-
  33:8
200
  21:17,20
  22:1,11,22
  23:10
2014
  8:20

2022
  48:24
2023
  11:8,13
  16:14
  21:15
  25:13,20
  27:6,9,24
  33:17,21
  38:5,15,24
  39:7,21
  40:11
  41:5,18
  42:2,10,21
  49:7 50:8
  51:10,14
  56:10
2025
  15:1 19:20
  48:24
  54:12
2026
  4:3
20th
  13:1
21
  10:17 42:1
22
  39:20
24
  38:14
24th
  4:3 54:12
25
  21:15,25
  22:4,11,22
  23:10
  39:21
25th
  27:6,9,24
27

38:15
41:5,18
28
  42:10
29
  40:10
2nd
  15:1 19:20

**3**

3
  40:10,14
  54:11,14
31
  42:1

**4**

4
  41:3,18
40
  30:25 31:3
  33:22
  43:22
  56:20
48
  20:10,23
  21:10
  31:21
4:30
  16:19
  18:4,9

**5**

5
  19:16 42:1
50
  31:21

Esnol Gonzalez Cantero
February 24, 2026

2

**6**

6
  16:16
  18:1,4,8
  19:16 42:9
6D
  23:19

**8**

8
  21:11
  22:4,22
  23:10
  38:23
84
  35:10
  37:21
  48:10,12
856
  46:24
8th
  6:9

**A**

a.m.
  4:1,4
  16:16,17
  17:10,13
  18:1,4,9,
  20,24
  35:1,4
  37:14,17
ability
  5:10 7:14
accumulated
  33:22
accurate
  30:1

acknowledge
  31:6,11
add
  48:13
adjust
  18:21
affect
  7:14
affirm
  5:8,18
age
  8:23
agree
  4:7,23,24
  21:24
ahead
  57:18
Alejandro
  6:6
Allapattah
  38:4,14
allowed
  25:5
amount
  30:8
  45:21,24
  48:8,12
  54:7
answers
  5:9 13:12
  14:1,5,8,
  11,16,22,
  25 15:3
  19:20,21,
  25 20:6
  35:7 38:3,
  13,22
  39:5,15,19
  40:9 41:2,
  17,25 42:8

apologize
  8:7 18:10
  21:19
  22:24
appeared
  49:10
appears
  14:25
  46:22
applies
  52:17
approximate
  38:7 45:25
approximate
ly
  12:19
  20:10,23,
  25 21:10,
  22 37:25
  45:23 48:9
April
  11:8,13
  16:14
  21:14
  25:13,16,
  19 33:17,
  21 38:4,5,
  14,15
  42:21 49:7
  50:7 51:9,
  13 56:9
arguments
  51:1
arrive
  16:9 17:22
  19:10 38:1
  43:18 48:1
arrived
  56:15
arrow's
  35:18

assigned
  4:6 23:20
assignment
  32:12
assume
  7:11
assuming
  8:18 21:15
attention
  23:11 35:8
attorney
  54:24 55:4
Aug
  42:1
aware
  44:11
  54:23
  55:3,6,12

**B**

back
  17:12
  18:23
  19:19
  22:24
  26:10
  34:23
  37:12,16
background
  16:21
barking
  23:4
based
  8:18 35:11
  37:21
basis
  24:3
Bates
  46:23

began
  4:1
begin
  9:12 15:19
  17:25
  44:12
belief
  43:18
bigger
  35:15
birth
  6:9 8:18
Bless
  8:2,3
bonus
  53:6,7,21,
  24 54:2,5,
  8 55:10,
  11,17,19
bonuses
  55:15
born
  6:7
bosses
  50:5
break
  34:15
Brickell
  34:7 42:9
Bureau
  4:13
bus
  57:5,13
buses
  57:14

**C**

cables
  16:12

Esnol Gonzalez Cantero
February 24, 2026

3

calculate
  22:15
  45:21,24
  46:1,4,8,
  12,15,18
calculator
  22:2,7,8
calendar
  42:24
  48:20,21
call
  34:20
  55:25
called
  56:4,7
calls
  24:10 25:7
camera
  36:6
Cantero
  4:9,10,12
  5:23 6:6
  13:16
car
  11:18
case
  5:1
caused
  38:10,20
  39:2,16,24
  40:19
  41:22
  42:5,15
certifications
  10:12
change
  32:8 41:11
  55:12
charge
  57:21

check
  44:10
  56:15
checks
  56:12
citizen
  6:12,14
city
  57:14
claim
  38:5 46:5,
  8,12,16,19
  48:8
claimed
  38:15,24
  39:7,21
  55:9
claiming
  24:3 40:11
  41:5,19
  42:2,10
  45:22
Clara
  27:16
  38:23
  39:6,20
  40:3
clarification
  7:10
clear
  14:2
close
  23:3
closed
  17:6
closer
  18:17,19
comfortable
  37:10

comment
  51:3
commercial
  4:12
commission
  55:10,11
communicate
  8:11
communications
  25:25
compensate
  32:3 53:21
compensated
  20:12 32:1
compensation
  32:20
  33:14,18
compensatory
  33:25
complain
  44:20
complete
  7:17 30:9
completed
  29:25
concluded
  58:16
confirm
  45:8,11
confirming
  54:2,5
connections
  16:11
consult
  46:7
consulted
  48:1

continue
  17:3 18:5,
  7,10 36:23
contribute
  14:4,8,12
conversation
  26:5,8,9,
  19 27:6,15
  28:6,18
  29:6,8,10,
  13,17,22
  30:18,21,
  24 31:2,
  10,14,16,
  20
conversations
  25:14,20,
  21 26:3
  52:24 53:2
coordinate
  57:25
coordinating
  57:21,24
correct
  6:10,11
  8:21 11:3,
  20 12:3
  15:1 19:22
  20:2,7,8,
  24 21:3,8,
  12,17
  22:1,12
  23:22
  24:21 25:1
  27:7,8
  32:3,14
  35:13
  37:24
  38:6,16,

  17,25
  39:8,22,23
  40:13,17
  41:6,20,21
  42:3,13,14
  47:18
  52:6,12
corrections
  58:7
correctly
  47:6
counsel
  4:16,18
  6:1 8:6
  9:19 21:19
  23:3 24:12
  28:9 35:14
  36:11,17
  40:15 41:7
  58:9
countless
  16:12
County
  24:8,16
  44:24 45:1
  57:5,13
  58:1
couple
  25:23 26:2
create
  43:15
  47:14,21
  48:17
created
  47:19,23
  48:4
creating
  48:14
credits
  33:22
crew

Esnol Gonzalez Cantero
February 24, 2026
4

23:20,23
24:1,4,7,
9,15,17,21
25:6
**crime**
7:2 19:25
**CROSS-**
**EXAMINATION**
57:19
**Cuba**
6:8 8:17
**Culmer**
40:10,24
**current**
57:7

**D**

**D-A-**
44:17
**dad**
28:7 45:6
47:17
52:23
57:23
**dad's**
47:13
**Dade**
58:1
**daily**
16:15 25:3
**Dalton**
44:17
**date**
6:9,18
8:18,25
9:13 15:21
26:7
27:10,11,
13 32:20
44:3 48:23

53:10
**dated**
54:11
**dates**
11:10,17
15:13
33:23
39:14
**day**
11:6,7,11,
16 12:17,
20 18:8
19:8,13
21:22
28:1,3,5
29:6 30:19
33:16,17
43:4,10,13
49:9 52:15
55:22
57:22
**day-to-day**
9:11
**days**
11:7
12:16,18,
22 16:16,
17 18:5,9
49:24
**dear**
35:23 36:7
**December**
15:1 19:20
**defendant's**
13:16,18
46:25
54:14
**defendants**
4:21 35:13
37:24
**delayed**
40:7

**demand**
54:11,24
55:4,9
**demount**
16:9
**depend**
45:12
**Depending**
19:8
**depends**
7:24
**deposition**
4:9,23
6:21
12:22,25
13:4,12,15
46:22
58:16
**designated**
23:13 27:4
**designed**
23:19,23
24:1,4,7,
15
**diary**
43:1
**difficultie**
**s**
18:21
**direct**
6:3 35:8
**directly**
25:24 51:7
**discuss**
12:21 15:3
51:6 52:1
**discussed**
12:8,11,
14,24
52:11,14

**discussions**
50:17,20,
22
**dismissed**
56:8
**document**
13:17,24
14:14
36:9,12,
13,15,18
46:23,24
47:14,19,
23 48:4,7,
15,17,19,
20,23
54:12,19
**documents**
43:9,12
46:4,7
**dog**
23:3
**dollar**
54:7
**dominate**
7:25
**door**
17:6 23:3
**doors**
28:14
**draw**
23:11
**drive**
17:19
**driver's**
4:12
**dropped**
11:24
**duly**
5:14,24

**E**

**earnings**
55:12
**earshot**
28:8,12
**eastern**
4:4 58:15
**education**
8:13
**Edwards**
4:5
**electrical**
4:21 5:2
10:9,15
**electrician**
9:1,3,10,
12,16
10:2,3,4,
13 57:9
**employment**
57:7
**encountered**
29:4
**end**
18:4 36:11
**English**
5:10,11,
14,15
7:20,21,23
8:5,9 10:1
14:14,19,
21 20:15
22:9 29:10
**entire**
14:15
**entries**
48:21
**escalate**
44:23

Esnol Gonzalez Cantero
February 24, 2026
5

| | | | | |
|---|---|---|---|---|
| **escorts**<br>58:1<br>**Esnol**<br>4:9 5:23<br>6:6 13:16<br>57:21<br>**estimate**<br>30:12<br>37:25 38:1<br>39:15<br>45:23,25<br>**estimated**<br>35:10<br>37:21<br>**evening**<br>11:24<br>**exact**<br>6:18<br>12:16,20<br>15:25<br>17:16<br>21:2,22<br>25:23<br>27:10,17<br>28:19 29:7<br>41:14<br>43:21 44:3<br>53:19<br>**EXAMINATION**<br>6:3<br>**examined**<br>5:24<br>**exceeded**<br>31:25<br>**excess**<br>32:13<br>**Excuse**<br>8:6 22:16<br>28:9<br>**Exhibit**<br>13:15,18 | 19:19 35:7<br>46:22,25<br>47:8,9<br>54:11,14<br>**exist**<br>49:15<br>**explain**<br>32:22<br>**extra**<br>31:8<br>32:17,23<br>33:1,5,7,<br>8,14 52:7,<br>17<br><br>—————<br>**F**<br>—————<br><br>**fact**<br>24:20 25:5<br>**factual**<br>24:3<br>**fair**<br>7:11<br>**falls**<br>24:19<br>**father**<br>9:10 11:2,<br>5,9,14,19<br>12:1,8,12,<br>15,21,25<br>13:3,11<br>15:4,10<br>17:15<br>23:22<br>24:24<br>25:25<br>29:12,15<br>31:17<br>46:18<br>49:18,21,<br>25 50:23<br>51:10,12, | 18,21,23<br>52:25<br>53:2,15<br>55:9,16<br>**father's**<br>54:24 55:4<br>**February**<br>4:3 12:25<br>54:12<br>**felony**<br>7:2 20:1<br>**fewer**<br>33:21<br>**filed**<br>54:24 55:4<br>**final**<br>21:18<br>**find**<br>33:6<br>**fine**<br>34:22<br>37:6,8<br>**finish**<br>9:7 55:17<br>57:18<br>**fired**<br>56:5,6,7<br>**fit**<br>36:14<br>**Florida**<br>4:14,15<br>9:16<br>**follow**<br>41:7<br>**Forever**<br>10:17<br>**form**<br>11:21 12:4<br>**Friday**<br>12:25 | 32:24<br>**full**<br>6:5 7:16<br>**fully**<br>20:12<br><br>—————<br>**G**<br>—————<br><br>**G-A-P**<br>41:4<br>**GAP**<br>41:3<br>**gates**<br>58:2<br>**gave**<br>13:12<br>20:15 21:2<br>23:19<br>**give**<br>5:19 7:16<br>17:7 18:15<br>27:2 33:6<br>34:2,6<br>41:13<br>**giving**<br>47:22<br>**Gonzalez**<br>4:9,10,12<br>5:1,23 6:6<br>11:2 13:16<br>19:6 20:22<br>23:8 35:6<br>**good**<br>4:5,17,20<br>7:12 19:2<br>36:19<br>**grade**<br>8:15<br>**graduate**<br>8:16 | **graduated**<br>8:19,20,24<br>**greet**<br>49:9<br>**guys**<br>36:24<br><br>—————<br>**H**<br>—————<br><br>**half**<br>34:13 36:5<br>**hand**<br>5:8,17<br>**handle**<br>25:25<br>**hands**<br>24:19<br>**handwriting**<br>47:3,4,5<br>**handwritten**<br>46:23<br>**happen**<br>19:15<br>**happened**<br>52:15<br>**hard**<br>7:24<br>**hear**<br>22:25<br>28:12<br>**hearing**<br>16:20<br>37:11<br>**held**<br>10:9<br>**Helper**<br>15:18<br>**Hernandez**<br>5:2 11:2 |

Esnol Gonzalez Cantero
February 24, 2026

6

**Hialeah**
9:6

**high**
8:16,19,24

**highest**
8:13

**Hold**
35:23

**home**
12:2

**honestly**
17:6

**hour**
33:9 34:13

**hours**
20:10,11,
23 21:11,
17,24
22:1,10,11
25:15,22
26:8,12,
15,21,22
27:2 29:25
30:8,19,
22,25
31:3,9,17,
21,22,25
32:8,12,
13,23,25
33:1,6,7,
8,9,14,22
34:2,5
35:11
37:21,22
38:5,15,24
39:7,21
40:2,3,11,
12,22,23
41:5,8,19
42:2,10,
11,12,19,
22 43:4,6,

16,19,22,
25 44:15
45:16 46:1
48:1,7,8,
10,11,12
49:11,16,
18,22,25
50:17 51:6
52:17
56:21,24,
25 57:22

**house**
17:17,19
19:11

_____

**I**

_____

**I-N-T-E-R-I-A-N**
44:17

**identificat ion**
13:19 47:1
54:15

**identified**
4:11

**identify**
33:16,20

**images**
35:22 36:4

**including**
20:11

**increase**
40:2,22
42:18

**information**
14:4,9,12,
13 47:22,
25

**initially**
14:17

**inside**
28:21

**interact**
49:6

**Interian**
44:17
50:2,7,11,
16,19,22,
25 51:3,7
53:17

**interpret**
5:9 49:3

**interpreted**
5:14

**interpreter**
5:3,5,6,12
8:1,6
9:19,23
10:5 13:6,
8 16:6
18:6,8,15,
19,25
19:1,4
20:17,19
21:7,18
22:16,24,
25 23:2,
14,15
25:16
26:14
27:19,20
28:9 32:6,
7 34:15
35:14,19,
25 36:22
37:8 39:9
40:14
41:7,13
49:2

**interrogatories**
13:17 15:1

19:21,25
20:7 35:7

**interrogatory**
14:1,5,22
15:3 19:19
20:9
23:12,18
27:3,5
29:24
31:24
35:9,10
37:20
38:3,13,22
39:5,19
40:9 41:2,
17,25 42:8

**involved**
16:4

**issue**
44:23

**issued**
4:13

_____

**J**

_____

**J-**
10:3

**Jesus**
5:1 11:2

**job**
10:20,22
15:6,10,16
30:12,15

**Journeyman**
9:22 10:1,
3

**Julio**
48:24

**July**
41:5,18

**June**
40:10

_____

**K**

_____

**Katelyn**
4:18

**keeping**
44:12

**knew**
24:25 29:4
31:8 45:6,
12 55:7,14

_____

**L**

_____

**L-T-O-N**
44:18

**language**
8:11 14:21

**lawsuit**
12:9,11,
15,21,24
45:22
54:23 55:3

**lawyer**
46:17

**lawyers**
14:20

**learn**
9:3

**learned**
9:11

**leave**
17:17 18:9
19:6 37:3,
11

**leaving**
57:1,9

**left**
12:2

Esnol Gonzalez Cantero
February 24, 2026

7

legal
  6:5
Leo
  44:16 50:2
  51:7 57:24
letter
  54:11,24
  55:1,4,5,9
letting
  36:23
level
  8:13
Lexitas
  4:7
license
  4:12 9:18
  10:9,14
licensed
  9:16
listed
  48:2,7
live
  6:16 51:10
lived
  46:14
  51:23
living
  51:13,18,
  21
located
  4:14
location
  51:17,24
long
  15:8,9
  17:19 29:8
  30:12
  34:18
  51:23
lot

18:1,5,7,9
34:1 40:8
loud
  18:14
lying
  7:1 19:24

───────────

**M**

Madam
  5:3
made
  53:11,13
make
  18:13
  26:22,24,
  25 34:19
  53:9
making
  55:2
mall
  10:19
managers
  24:8,16,
  20,25
  44:18,22
  45:2,6
Maritza
  47:6,12,17
mark
  13:14
  46:21
  54:10
marked
  13:18
  46:25
  54:14
Marquetta
  4:5
matter
  4:19

meaning
  28:12 29:2
means
  40:6
meant
  26:23
medications
  7:13
meeting
  37:4
Melo
  4:22 45:2
  52:2,4,11,
  14,19,25
  53:3,6,19,
  21 54:2,5,
  7,25
memory
  26:6
  46:10,13
mentioned
  13:5,9
  29:22 58:1
menu
  36:14
message
  55:25
messages
  45:15
metro
  15:20,24
  50:11
Miami-dade
  15:19
  24:8,16,
  20,25
  44:18,22,
  24 45:1,5
  57:5,12
mic
  18:13

mind
  17:1
minutes
  17:7
  34:14,19,
  21
misspell
  10:6
moment
  12:2
Monday
  56:12,14
Mondays
  56:14
money
  27:1 43:22
  52:5,6,17
month
  40:7 44:5
  52:16
months
  34:9,10
morning
  4:5,17,20
  11:19
Motor
  4:13
mount
  16:11
move
  26:8,12,15
moving
  17:3
multiply
  22:4,10
  23:10 46:3
mumble
  18:11

───────────

**N**

named
  50:2
needed
  30:9
Noel
  4:22 45:2
  52:2,4,11,
  14,25
  53:3,6,9,
  11,13
notary
  4:6
notebook
  43:1
notes
  27:13
notice
  56:20
November
  6:9
number
  12:13
  15:25
  20:9,19
  21:2,4,6,
  18,22
  22:3,6
  25:23 27:4
  31:17
  35:9,10
  37:20 41:4
  46:23
  48:10

───────────

**O**

O-U-R-N-E-
Y-M-A-N
  10:4

Esnol Gonzalez Cantero
February 24, 2026

8

**oath**
5:1 6:23
7:1 19:20,
24

**Objection**
11:21 12:4
20:3 24:10
25:7 30:14
32:15 44:2
54:16

**obtained**
8:14

**occur**
29:6

**offer**
27:1

**office**
16:23

**on(sic)**
32:2

**open**
28:14,15

**opened**
58:2

**operator**
57:6,13

**option**
36:13

**order**
46:7 48:1
55:12

**ordering**
58:9

**overtime**
20:11
21:11,17,
25 22:1,
10,11 27:1
31:7,11,13
32:4,8
33:1 35:11

37:21,22
38:6,10,
16,20,24
39:2,7,16,
21,24
40:2,11,
12,19,22
41:5,19,22
42:2,5,10,
11,12,15,
18 43:16,
19,23,25
44:8,12,
15,23
45:2,7,21
46:2,5,8,
12,15,19
48:8,11
50:17,20,
23 51:1,4,
6 52:1,5,
11,25
53:3,22

**Overtown**
42:1

**owed**
34:5 55:10

**owing**
43:22

**owned**
51:20

———————

**P**

———————

**p.m.**
58:15,16

**paid**
32:1,13
33:1 34:8,
10 38:17
43:20
44:1,8,12,
16,23

45:3,7
46:2 56:24

**Paola**
25:14,20,
22,24
26:5,23
28:7
29:21,24
30:8,18,
21,24
31:2,6,11,
13,24
32:7,11,22
33:2,4,24
44:20 49:6
50:23

**Paola's**
30:12

**paragraph**
23:12

**part**
54:17

**participate**
50:16,22

**parties**
4:7

**pass**
43:22
44:21

**passed**
32:23

**past**
12:25

**pay**
25:15,22
26:20,21
32:4,9,17
33:7,11
34:7 38:8,
18 52:5,7,
17 56:13,
25

**paycheck**
56:10

**paychecks**
56:17,20,
24

**people**
16:23
24:23 58:1

**percent**
7:25
27:17,20
31:8 49:23
55:12

**perfect**
10:5 19:4

**period**
21:14
48:25
51:9,13
56:9,13

**perjury**
7:2 20:1

**permanently**
6:16

**person**
26:3,4

**personal**
43:3,6

**personally**
25:21
49:16
52:1,10

**phase**
55:10,11

**photographs**
45:18

**pick**
17:15

**picked**
11:19

**picks**
18:13

**place**
4:25 27:16
28:18,20

**places**
27:5

**plaintiff**
4:18 13:15

**planner**
42:24

**point**
44:7

**pointed**
35:18

**positively**
4:11

**power**
28:23 29:2

**Pre-suit**
54:11

**prefer**
8:11 36:24

**prepared**
14:1

**present**
26:2 28:6
50:19,25
52:21,23,
24 53:4,
13,15,17

**presently**
4:14

**president**
52:3

**pretty**
50:9,15

**previously**
41:1

Esnol Gonzalez Cantero
February 24, 2026
9

**prison**
  7:3 20:2
**problem**
  10:7 17:4,
  8 36:18
**proceed**
  6:1 24:9,
  17,21
**proceeding**
  5:10
**Proceedings**
  4:1
**produced**
  46:23
**project**
  23:19,23
  24:1,4,7,
  8,9,15,16,
  17,20,21,
  25 25:6
  44:18,22
  45:1,6
  50:6 52:16
**projects**
  15:20
**promise**
  5:21 53:6,
  9,11,13,24
**promised**
  53:7
**property**
  51:20
**propose**
  37:3
**provide**
  14:12
**public**
  57:13
**punishable**
  7:2 20:1

**purpose**
  48:14
**put**
  32:25
  48:11

─────────

**Q**

─────────

**question**
  7:11 14:2,
  10,11 23:9
  24:13
  25:17
  28:24
  31:10
  37:19 46:6
  49:3
  52:14,18
  55:2 57:17
**questions**
  5:9 7:7,14
  13:4 14:6,
  16,17
  57:16 58:4
**quiet**
  16:24
**quit**
  56:5,6

─────────

**R**

─────────

**R-I-V-E-R-A**
  44:18
**raise**
  5:7,17
**range**
  48:23
**read**
  7:23
  20:14,16
  21:4,5
  23:14 58:6

**reading**
  20:19
  41:9,10
**ready**
  18:25
**reality**
  44:10
**realized**
  43:24
**reason**
  7:16 41:1
  56:1
**recall**
  51:17
**receive**
  32:19
  33:13,24
  54:1
  56:10,12
**received**
  56:17
**recent**
  12:14
**recognize**
  13:17
  46:24
  54:12
**recognizes**
  54:18
**record**
  4:2,10 5:4
  16:25
  17:9,11,12
  18:20,22,
  23 34:25
  35:2,3
  37:13,15,
  16 58:14
**records**
  43:3,6,15
  44:12

**reduced**
  53:24
**refer**
  48:19,25
**references**
  48:20
**referring**
  30:3 48:21
  57:13
**regularly**
  20:10,23
  21:10
**rejoin**
  37:4
**rely**
  46:10
**remember**
  6:15,18,19
  8:22,23,25
  9:9,13,14
  10:22
  11:1,10,11
  12:23
  13:5,8
  15:5,8,11,
  13,14 16:3
  17:16,18,
  21,24
  19:8,12,18
  24:2 25:23
  26:7,18
  27:10,17,
  20,23
  28:2,5,13,
  19 29:7,9,
  16,20,23
  30:4,7,20,
  23 31:1,5,
  12,15,19,
  23 33:3,
  15,19,23
  38:2,11,21

  39:4,18
  40:1,21,25
  41:24
  42:7,17,
  20,23
  43:8,17,
  21,24
  44:5,14,
  19,25
  45:4,17,20
  46:9,17,20
  47:6,24
  48:3,5,6,
  16,18,22
  49:4 50:1,
  9,15,18,
  21,24
  51:2,5,8,
  11,15,19
  52:20,21
  53:1,5,10,
  12,14,18,
  20,23,25
  54:9
  55:21,23
**remote**
  4:9,23
**repeat**
  13:6 16:7
  23:8 24:12
  25:17
  26:11
  27:18
  28:10 32:5
  45:9
**rephrase**
  41:12
**report**
  44:16
  49:16,18
**reporter**
  4:2,6,25
  5:7,16 6:1

Esnol Gonzalez Cantero
February 24, 2026

10

17:9,12
18:20,23
34:25 35:3
36:11
37:1,13,16
58:6,9,13

**represent**
4:21

**request**
4:7

**respond**
14:7 24:22
49:20

**responded**
14:6 40:25

**response**
13:7,16
23:1,8
27:18 34:3

**responsibility**
24:18

**retail**
10:18

**review**
20:20
23:15
56:17

**rid**
36:7

**ride**
11:14

**Rivera**
44:17

**room**
28:23,25
29:1,2,4

────────

**S**
────────

**Santa**

27:16
38:23
39:6,20
40:3

**schedule**
16:15
19:13,14,
17

**Schickman**
4:17,18,24
8:2 11:21
12:4
13:20,23
16:22 17:5
20:3,13,18
22:21
24:10 25:7
30:14
32:15
34:12,19,
22,24
35:20
36:4,8,21
37:6 44:2
47:7,10
54:16,20
57:17,20
58:4,8,12

**school**
8:16,20,24
9:4,6,8

**screen**
35:21
36:3,5,15
37:2 55:5,
6

**scroll**
13:20
54:20

**select**
36:9

**send**

16:10 54:4

**separate**
41:4

**September**
11:8,13
16:14
21:15
25:13,19
33:17,21
42:9,10,21
49:7 50:8
51:9,13
56:9

**Services**
4:22 5:2

**Set**
13:17

**share**
36:17

**shared**
36:13

**sharing**
35:21
36:8,9

**shop**
10:18

**show**
13:14
43:9,12
46:21
54:10

**showed**
56:20

**showing**
35:20
43:3,6,16
45:18

**shows**
48:23

**signals**
16:11

**signature**
14:23,24

**signed**
14:25

**signing**
15:4

**single**
33:16,20

**sir**
34:24
35:20
54:13

**site**
17:23 19:7

**sites**
17:20

**small**
36:5

**sneezes**
8:1

**sounds**
7:12

**sources**
47:25

**Spanish**
5:5,11,15
7:19,20
8:12
14:18,20
20:15
22:18
29:10,11
49:1

**speak**
7:19,21
11:5 18:17
25:24 45:2

**specific**
27:23 28:1
30:5 31:17
33:16,20

38:9,19
39:2,16,24
40:19
41:22
42:5,15

**specifically**
28:3

**speculation**
24:11 25:8
30:14
54:16

**spell**
9:20

**spelling**
58:7

**split**
35:21
36:3,12,
20,21,22
37:1

**standard**
4:4 58:15

**stands**
26:6

**start**
15:6,12
16:16,17
18:1 37:19
43:10
48:19

**started**
11:18
15:16 18:8

**Starting**
25:16

**Starts**
23:16

**state**
4:13 5:4
6:5 10:10

Esnol Gonzalez Cantero
February 24, 2026
11

31:16

**stated**
20:10
23:19
35:10
37:21

**States**
6:12,17
10:21

**Statewide**
4:21 5:2
10:15,25
15:7,12,17
25:5,12
49:11,19
55:22 56:2
57:1,10

**station**
11:18
15:20 16:5
19:17 25:4
27:6,16,24
28:14,17,
19,21 29:1
30:6,10,13
32:12 34:5
38:4,10,
14,20,23
39:3,6,17,
20,25
40:10,14,
20 41:3,
18,23
42:1,6,9,
16 48:2,
11,20 49:8
50:11
52:9,15

**stations**
15:24
16:1,2,10
26:1 27:25
35:12

37:23
50:10 53:8
55:17

**stay**
19:16

**Stephen**
4:20

**stipulate**
4:7,22,24

**stipulated**
39:14

**stop**
18:3 36:8
43:13

**stopped**
56:1,3

**store**
10:19

**Studying**
9:4

**stuff**
16:10,12

**subparagraph**
27:4

**subsection**
23:13

**suit**
54:17

**supply**
14:12

**supposed**
55:15

**surveillance**
58:3

**swear**
5:3,8,12,
16,18

**swore**
19:20

**sworn**
5:14,24
19:25
21:16
23:18
27:3,5
31:24
35:7,8,9
37:20
38:3,13,22
39:5,19
40:9 41:2,
17,25 42:8

**system**
33:18

_____

T
_____

**T-I-E**
41:4

**T-R-A-C-T-I-O-**
29:2

**Tabora**
5:5,13

**taking**
7:13

**talk**
11:6

**talked**
13:2 15:5
26:2

**talking**
30:5,16
55:5

**target**
33:9

**tech**
18:18

**technical**
18:21

**technology**
4:8

**tells**
21:1

**testified**
5:25

**testimony**
5:18 7:17
45:5

**Texas**
4:6

**text**
45:15

**thing**
14:15
41:9,11

**three-year**
48:25

**Tie**
41:3

**till**
19:16

**time**
4:3,4
12:6,14
15:8,9
16:18
17:9,12,
15,16,17,
21,22,25
18:3 19:6,
10 21:14
25:12,19
26:22,24
27:11
29:6,7
30:8 32:2,
4,17,19
33:2,4,5,

6,7,10,12,
13,18,22,
25 34:25
35:3
37:14,16
43:9,12
45:18
51:18,21
52:13
54:17
58:5,14,15

**times**
12:11 18:2
22:4,11,22
26:2 34:1
44:13
57:24

**title**
15:16

**today**
4:3 6:24
7:13,17

**today's**
58:6

**told**
20:6 31:25
55:7,24

**tomorrow**
57:25

**topic**
13:2

**tracked**
49:11

**tracking**
49:14

**traction**
28:23 29:2

**train**
9:10

**training**
9:7

Esnol Gonzalez Cantero
February 24, 2026
12

| | | | | |
|---|---|---|---|---|
| **transcript** 58:7 | **understand** 6:23 7:1,7 9:20 14:3,10,15 19:24 28:24 46:6 55:1 | 23 22:19,23,25 23:5,7,16,17 24:14 25:9,11,17,18 26:11,17 27:18,22 28:11,16 30:17 32:5,10,18 34:12,17,21,23 35:5,17,23 36:2,7,10,17,19,25 37:3,10,18 39:10,12 40:16,18 41:10,15,16 44:4 45:9,14 47:7,9,11 49:2,5 54:18,22 57:16 58:11 | 19 ——————— **W** ——————— **wait** 49:2 56:15 **waive** 58:8 **wake** 16:18 **wanted** 26:8,12,15 **Wednesday** 56:16 **week** 21:11,25 22:11 26:8,14,15 27:2 30:22,25 31:4,18,21,22 32:1,8,13,24 33:20 38:6,10,12,16,19 39:3,17,25 40:4,6,13,24 42:11,12 43:7,21 49:12 56:10,21 **weekly** 56:13 **weeks** 21:15,25 22:11 35:12 37:23 40:3,12,20,23 41:6,19,23 42:3,6,16, | **woman** 47:13 **word** 9:22 31:13 41:4 56:6 **words** 53:19 **work** 10:16,24,25 11:9,14 12:2 15:24 16:1,4,15 17:20,22 19:7,14,15 21:16 22:1 23:16 27:23,25 28:1 29:25 30:3,5,9,19,22 32:22 33:8 38:9,10,19,20 39:2,16,24 40:8,19 41:22 42:5,15,22 43:10,13 44:13 45:15,19 49:21,24 52:16 55:22 57:5,12 **worked** 10:17 16:3 20:10,23 21:10,24 24:23 31:3,6,8,11,18,21 33:11,14, |
| **transcripts** 58:10 | | | | |
| **transit** 57:14 | | | | |
| **translate** 14:18 22:19 35:14 | **understood** 7:11 | | | |
| | **United** 6:12,17 10:21 | | | |
| **translated** 14:21 | **unpaid** 38:5,15 53:22 | | | |
| **translation** 41:14 | **unplug** 16:10 | | | |
| **translator** 20:13 | **Usuga** 25:14,22 26:6 49:6 | | | |
| **true** 19:21 21:16 22:3 | | | | |
| **truth** 5:19,20 20:6 | ——————— **V** ——————— | | | |
| **Tuesday** 56:15 | **vary** 19:9,13,17 | | | |
| **Twelfth** 8:15 | **Vehicles** 4:13 | | | |
| **type** 9:18 | **Verbit** 4:20 6:2,4 8:3,4,8 9:22,25 10:3,7,8 11:23 12:7 13:6,10,20,22,25 16:13,20 17:1,8,14 18:6,12,17,25 19:3,5 20:5,21 21:5,9,20, | **videoconference** 4:8 | | |
| **typical** 16:4,15 | | **view** 36:14 | | |
| **typically** 16:18 17:22,25 18:3 19:6,10 | | **visit** 50:11,14 51:12,16 | | |
| | | **voice** 18:14 | | |
| ——————— **U** ——————— | | **voices** 16:20 | | |
| **U-S-U-G-A** 25:14 | | | | |

Esnol Gonzalez Cantero
February 24, 2026                                                                    13

21 35:12,
13 37:22,
23 38:4,
14,17,23
39:6,20
40:10
41:3,18
42:1,9
43:4,7,16
48:8 49:12
57:1,4,9
58:3

**working**
9:12
10:15,25
15:6,12,
17,19
16:16,17
17:25
18:1,3
25:12
30:25
34:4,7
43:19,25
44:15
45:2,7
51:4 55:24
56:2,3
57:22

**worksites**
50:12,14,
17

**workweek**
20:11,23

**worry**
35:25

**write**
8:5,9
14:19
27:11
42:22

**writing**

53:24
54:1,4

**Written**
54:3

**wrong**
41:9

**wrote**
47:16,21

_____

**Y**

_____

**Yarissa**
5:5,13

**year**
6:19 9:14
15:14,22

**years**
7:3 20:1
48:24

_____

**Z**

_____

**zoom**
36:15,23
37:7

**zooming**
37:8