UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-22530-BECERRA/TORRES

JESUS E. GONZALEZ HERNANDEZ,

       Plaintiff,

vs.

STATEWIDE ELECTRICAL SERVICES, INC.

and NOEL MELO,

       Defendants.

_____/

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Jesus E. Gonzalez Hernandez ("JGH") and Esnol Alejandro Gonzalez Cantero ("Esnol"), file this Statement of Material Facts in support of their Response to Defendants' Motion for Summary Judgment.

**I.  THE PARTIES, COVERAGE, AND THE RELEVANT EMPLOYMENT PERIOD**

    1.    Undisputed.

    2.    Undisputed

    3.    Undisputed

    4.    Undisputed.

    5.    Undisputed.

    6.    Undisputed.

    7.    Undisputed.

**II.  PLAINTIFFS' SWORN CLAIMS**

    8.    Undisputed.

    9.    Undisputed.

    10.    Undisputed.

11.     Undisputed.

12.     Undisputed. Plaintiffs note that the identical week-by-week breakdown of their claimed overtime hours is directly explained by the undisputed fact that they always worked the same shifts together throughout the entire Metrorail project. Esnol testified that he and his father "always" worked the same hours, "100 percent." [ECF No. 33-11, P. 49:21-23]. Esnol further testified there were no days he remembered working different hours than his father, and that JGH picked him up every morning and dropped him off every afternoon, such that they "were together from when he picked me up from the house to when he dropped me off." JGH likewise testified, when asked why both he and Esnol claim exactly 84 hours: "We work together, both of us. . . . We did it together. We prepared the notes together. We worked together." [ECF No. 33-10, Pgs. 51:4-10]. Project manager Paola Usuga independently confirmed that "Jesus and Esnol always worked the same hours." [ECF No. 33-7, P. 65:9-11]. Because Plaintiffs worked side-by-side at the same stations on the same days throughout the project, the identical station-by-station overtime breakdown is consistent with, and corroborated by, the record evidence.

13.     Undisputed.

14.     Undisputed.

## III.     STATEWIDE'S CONTEMPORANEOUS BUSINESS RECORDS

15.     Disputed. Melo testified that the handwritten time sheets were prepared by him in his office based solely on hours verbally relayed to him by Paola Usuga, not through his own direct observation. [ECF No. 33-1, P. 34:1-4]. For all stations after Allapattah, Melo was not present at the job site: "Paola sometimes was there, sometimes was not. They were providing the information to Paola, Paola was referring that information to me, and I was doing the timesheet every, every day." [ECF No. 33-1, P. 36:19-24]. No contemporaneous documents prepared by Paola exist. Melo confirmed that Paola communicated hours to him "verbally" on every occasion, with no written intermediary records to corroborate the chain of information. [ECF No. 33-1, Pgs. 47:9-10, 51:17-22]. Usuga herself confirmed she was never present at the stations when Plaintiffs arrived in the morning, and was present only "few times, very few times" when they left. [ECF No. 33-7, P. 42:9-17]. Plaintiffs further dispute that the time sheets accurately reflect the hours worked. Melo admitted he had no procedure to verify reported hours. [ECF No. 33-1, P. 69:17-19]. Melo

additionally stated that he rounded Plaintiffs' recorded hours up to 40 even when SunPass records allegedly showed Plaintiffs had actually worked fewer hours. [ECF No. 33-1, P. 33:9-15].

16.     Undisputed that Statewide was required to submit, and did submit, Weekly Certified Payroll Reports ("CPRs") to Miami-Dade County under penalty of perjury. Disputed to the extent Defendants imply the CPRs accurately reflected actual hours worked. Plaintiffs contend that the CPRs were false because they worked more than 40 hours per week and were not compensated for those hours. [ECF No. 33-1, P. 76:21-23]; [ECF No. 33-9, ¶ 12]; [ECF No. 33-5]. Additionally, the CPRs list Defendant Melo and an "Electrical Worker" named Angel Vaillant for unworked hours under false job classifications. [ECF No. 33-1, Pgs. 78:12-23, 93:7-17, 95:7-8]; [ECF No. 33-5]; [ECF No. 33-7, Pgs. 75:11-17, 80:14-15, 83:6-7]. Furthermore, Melo admitted he personally performed electrical and construction work that he never reported to the county or recorded anywhere. [ECF No. 33-1, Pgs. 99:21-25]. The CPRs thus omit Melo's own unrecorded labor while purporting to constitute a complete and accurate account of all hours worked on the project. Finally, when asked whether the CPR entries accurately reflected his hours, Melo declined to use the word "accurately," stating: "This is the time that I reported that I worked in that project. I'm not obligated to have a time clock and see the clock and determine how many hours." [ECF No. 33-1, Pgs. 133:13-135:12].

17.     Undisputed that Statewide's CPRs reflect that JGH and Esnol worked 40 or fewer hours each week during the relevant period. Plaintiffs dispute that the CPRs accurately reflect the hours the hours they worked; the CPRs reflect only the hours for which Defendants chose to pay Plaintiffs. Plaintiffs assert that they regularly worked more than 40 hours per week during the relevant period. [ECF No. 33-1, P 76:21-23]; [ECF No. 33-9, ¶ 12]; [ECF No. 33-5].

18.     Undisputed that the "412034 Hours" spreadsheet was first produced on February 9, 2026, via supplemental disclosure approximately one hour before the deposition of Defendant Melo—both in his individual capacity and as corporate representative of Statewide. Plaintiffs dispute that this spreadsheet accurately reflects the hours they actually worked and the job duties they actually performed. Plaintiffs further dispute the reliability and completeness of the spreadsheet and contend that the timing of the disclosure deprived them of a meaningful opportunity to analyze the document or question Defendants regarding the spreadsheet's preparation and underlying data.

19. Undisputed as to Defendants' description of what the "412034 Hours" spreadsheet purports to show. Disputed as to accuracy. The spreadsheet was created and maintained solely by Defendant Melo without any independent verification, and Plaintiffs dispute that it accurately reflects the hours they actually worked. [ECF No. 33-1, P 76:21-23]; [ECF No. 33-9, ¶ 12]; [ECF No. 33-5].

20. Disputed. JGH and Esnol regularly worked more than 40 hours per week during the claimed overtime period. Defendants' spreadsheet does not reflect actual hours worked but rather the hours Defendants chose to record and pay. [ECF No. 33-1, P 76:21-23]; [ECF No. 33-9, ¶ 12]; [ECF No. 33-5].

21. Disputed in part. Undisputed that Defendants issued weekly paychecks compensating Plaintiffs for only 40 hours per week, and that JGH and Esnol signed approximately 26 such checks. Disputed that Plaintiffs' signatures constitute an acknowledgement that the reflected hours were accurate. Both Plaintiffs swore in their interrogatory answers that signing was a condition imposed on them to receive payment, not a voluntary attestation of accuracy: "I signed the checks because I was told I had to sign them to receive payment for the week. I was afraid that not signing for the paycheck would result in not being paid or losing my job." [ECF No. 33-3, No. 9]; [ECF No. 33-4, No. 9]. Both Plaintiffs further swore that "[t]he hours reflected on those paychecks were always shown as exactly 40 hours per week, regardless of the actual time worked. Those hours were not accurate." [ECF No. 33-3, No. 9]; [ECF No. 33-4, No. 9]; [ECF No. 33-9, ¶12]; [ECF No. 33-10, Pgs. 53:15-17, 78:6-15].

22. Disputed in part. Undisputed that Statewide furnished JGH with a company vehicle equipped with a SunPass transponder, and that JGH drove the vehicle to work until approximately September 1, 2023. Disputed that the SunPass records constitute an accurate reflection of the hours Plaintiffs worked. First, JGH testified that he was uncertain whether the vehicle was even registered with SunPass and that he had "no knowledge about" the SunPass entries attributed to him. [ECF No. 33-10, Pgs. 59:9-14, 62:6-8]. Second, JGH testified that he did not always take the expressway: "Not always did I take — I didn't always take the expressway. Sometimes I would go using the … side streets." [ECF No. 33-10, P. 60:4-7]. On any day JGH used a non-toll route, the SunPass would generate zero entries, but that does not mean zero work was performed. Third, and most fundamentally, the SunPass records capture only the times JGH passed through a toll

plaza; they do not reflect his arrival at the worksite, the time he started or stopped working, or the total hours he spent performing electrical work at the station. The records are, therefore, an incomplete and structurally inadequate proxy for hours worked, and their coverage ends before the final four overtime weeks of the project when JGH used his personal vehicle. [ECF No. 33-1, Pgs. 67:18-22, 68:5-14, 71:1-5]; [ECF No. 33-9, ¶¶ 15-16]; [ECF No. 33-10, Pgs. 58:21-24, 59:9-14, 60:2-7].

23. Undisputed that Sun Pass records were produced for the periods stated. Plaintiffs note that the Sun Pass records cover only a portion of the claimed unpaid overtime period, and after September 1, 2023, JGH commuted to and from work using his personal vehicle. [ECF No. 33-1, P. 68:5-14]; [ECF No. 33-9, ¶15]; [ECF No. 33-10, P. 58:19-24]; [ECF No. 33-11, P. 18:1-5].

24. Disputed. Noel Melo's testimony that JGH and Esnol never worked more than 40 hours is self-serving, uncorroborated by any independent observation after Station 1, and directly contradicted by Plaintiff's sworn testimony. [ECF No. 33-1, P. 76:17-20]; [ECF No. 33-3, Nos. 2, 4]; [ECF No. 33-4, Nos. 2, 4]; [ECF No. 33-7, P. 42: 13-18]; [ECF No. 33-9, ¶4]; [ECF No. 33-11, P. 18:1-5].

25. Disputed in part. Undisputed that Paola Usuga so testified. Disputed as to accuracy. Both Plaintiffs testified and swore in their interrogatory answers that they made repeated verbal complaints to Ms. Usuga about working overtime and not being paid for it. JGH swore that he "discussed the issue of working overtime (but not being paid for it) with Mr. Melo's secretary, Ms. Usuga," that he "would ask her about why the checks did not reflect the actual hours I worked," and that "she never gave a satisfactory response." [ECF No. 33-3, No. 6(f)]. Esnol swore the same in his interrogatory answers, stating he attempted to raise the issue of unpaid overtime with Mr. Melo, and when Melo stopped responding to his calls and stopped visiting the worksites, he "complained about not being paid overtime wages to Ms. Usaga, who handled Mr. Melo's communications." [ECF No. 33-4, Nos. 6(e), 6(f), 8]. At deposition, Esnol confirmed that he spoke with Ms. Usuga about the unpaid overtime on multiple occasions: "A lot of times I asked her, when are they going to give those hours." [ECF No. 33-11, P. 34:1-2]. When asked whether Paola knew they were working extra hours, Esnol testified: "She 100 percent knew that we worked extra hours." [ECF No. 33-11, P. 31:8-9]. Both Plaintiffs also identified a specific, memorable

conversation between Plaintiffs and Ms. Usuga on or about May 25, 2023, at Station 2 (Santa Clara), during which Ms. Usuga told Plaintiffs "that the work had to be completed in 20 hours" and that "if we exceeded the 20 hours, we would not be paid for that week but would instead be compensated later with time off" — a promise that was never honored. [ECF No. 33-3, No. 6(f)]; [ECF No. 33-4, No. 6(f)]; [ECF No. 33-7, Pgs. 87:21-89:9, 90:18-21, 91:4-12, 92:22-25]; [ECF No. 33-10, Pgs. 22:19-21, 37:16-23, 75:3-10, 76:11-19]; [ECF No. 33-11, Pgs. 26:1-22, 31:6-9, 34:1-2].

## IV. PLAINTIFFS' LACK OF CONTEMPORANEOUS RECORDS AND JGH'S DESTRUCTION OF HIS NOTES OF DAILY WORK HOURS

26. Undisputed.

27. Undisputed.

28. Undisputed.

29. Undisputed.

30. Undisputed.

31. Undisputed.

32. Undisputed that JGH discarded the underlying daily and weekly records that Plaintiffs relied on when JGH's wife prepared the summary at Bates No. 000856. JGH discarded the raw notes after consolidating the information into the summary document. This occurred before litigation was commenced. JGH had no obligation to preserve documents before any litigation was reasonably anticipated. *Managed Care Sols, Inc., v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1324 (S.D. Fla. 2010).

33. Undisputed.

34. Undisputed as to the face of the document, with qualification. Bates Gonzalez 000856 lists six Metrorail station names with total overtime hours per station, includes references to a calendar next to the Santa Clara and Gap Tie 2 entries, and contains an explanatory note stating that "[u]nloading the equipment at each station[,] [Plaintiffs] always worked more than the [10] established hours," identifying equipment unloading as the primary driver of overtime. [ECF No. 33-8]. Contrary to Defendants' implication that the document contains nothing beyond bare station names and totals, JGH testified that this notation means: "Unloading the equipment at each station, we always worked more than 10 hours established. And that's where we accumulated most of the overtime hours. We would finish at 8, 9 or 10 o'clock in the evening every time we did

that." [ECF No. 33-10, P. 51:14-18]. The week-by-week breakdowns within each station total are provided in Plaintiffs' sworn interrogatory answers. [ECF No. 33-3, No. 13]; [ECF No. 33-4, No. 13].

35.     Disputed to the extent this characterization is misleading. JGH testified that his claimed hours represent an estimate "based on what I jotted down." The estimate is derived from JGH's contemporaneous handwritten records before they were consolidated and later discarded. Under the FLSA, where an employer fails to keep required records, an employee's reasonable estimate based on personal recollection and contemporaneous notes is sufficient to support a wage claim. [ECF No. 33-3, Nos. 3-5]; [ECF No. 33-4, Nos. 3-5]; [ECF No. 33-10, Pgs. 39:5-9, 39:24 – 40:3, 43:12-14]; *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S. Ct. 1187 (1946).

36.     Undisputed that JGH has no documents of his own showing daily start or stop times. This is a direct result of Defendants' failure to create and maintain accurate timekeeping records as required by the FLSA. 29 USCS §211; *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S. Ct. 1187 (1946).

37.     Undisputed that Esnol so testified. Plaintiffs note that Esnol's inability to recall the specific nature of work performed at each station years later does not negate the fact that overtime work was performed. The general work of completing electrical installations at each Metrorail station is not disputed. *Leonard v. Carmichael Props. & Mgmt. Co.,* 614 F. Supp. 1182, 1187 (S.D. Fla. 1985); *Hernandez v. Tadala's Nursery, Inc.,* 34 F. Supp. 3d 1229, 1242 (S.D. Fla. 2014).

38.     Disputed as a characterization. JGH consistently testified that he was "working" at each station when he performed overtime work. This is a responsive answer. JGH's testimony that he was performing electrical work at assigned Metrorail stations is consistent with his overtime claim and not a non-answer. [ECF No. 33-3, No. 6(d)]; [ECF No. 33-10, Pgs. 51:14-18, 58:3-7, 64:2-22, 67:1-9, 67:18-23].

39.     Undisputed that JGH could not recall the specific dates of overtime by station from memory at deposition. Plaintiffs note, however, that JGH provided a complete week-by-week, date-specific breakdown of overtime hours for each of the six stations in his sworn answer to Interrogatory No. 13, based on his personal recollection and contemporaneous handwritten records. [ECF No. 33-3, No. 13]. Precision as to dates is not required where an employer has failed

to maintain adequate records, particularly where Defendants bear the underlying recordkeeping obligation. 29 U.S.C. § 211; *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S. Ct. 1187 (1946).

40.    Undisputed that JGH testified during deposition that increasing overtime resulted because "the work in each station got complicated. Each station wasn't the same. . . . It was unpredictable." [ECF No. 33-10, P. 67:15-23]. This is a substantive explanation, not an absence of one, and is consistent with the undisputed fact that only two electricians were assigned to complete a project designed for a crew of four. [ECF No. 33-3, No. 6(d)]; [ECF No. 33-4, No. 6(d)]; (*See* Exhibit "A," the 2023 Miami Dade County Prevailing Wage Schedule, P. 18).

41.    Undisputed.

42.    Undisputed that Esnol so testified. Plaintiffs note, however, that the consistency between Esnol's 84-hour estimate and JGH's identical figure is directly explained by the undisputed fact that Plaintiffs always worked the same shifts together. Esnol testified that he and his father "always" worked the same hours, "100 percent." [ECF No. 33-11, Pgs. 49:21-23]. Esnol further testified that there were "[n]o days I remember working different hours than my father," and that his father picked him up each morning and dropped him off each afternoon, so they "were together from when he picked me up from the house to when he dropped me off." Paola Usuga likewise confirmed that "Jesus and Esnol always worked the same hours." [ECF No. 33-7, P. 65:9-11]. JGH also testified that he and Esnol jointly prepared their notes and calculated their overtime claims together. [ECF No. 33-10, Pgs. 13:4-15, 51:4-10]. Because Plaintiffs worked the same schedule, at the same stations, every day of the project, the fact that Esnol's memory-based estimate independently matches JGH's note-derived figure is corroborating evidence. [ECF No. 33-11, Pgs. 49:21-23]; [ECF No. 33-10, Pgs. 13:4-15, 51:4-10]; [ECF No. 33-7, P. 65:9-11].

43.    Undisputed.

44.    Disputed. Esnol's statement that he "regularly worked approximately 48 hours per week" is an approximation and does not mean he worked 8 hours of overtime in every single workweek of the approximately 25-week period at issue. Esnol's estimate that he performed 84 hours of overtime work, for which he was not paid, is based on a station-by-station calculation reflecting specific weeks in which overtime was worked, not an average across all weeks. The purported mathematical inconsistency identified by Defendants is therefore not an inconsistency.

[ECF No. 33-3, Nos. 2, 13]; [ECF No. 33-4, Nos. 2, 13]; [ECF No. 33-8]; [ECF No. 33-11, Pgs. 38:3-8, 48:10-13].

45.     Undisputed.

46.     Undisputed that Plaintiffs produced no formal time records because none existed. Defendants were obligated under the FLSA to create and maintain accurate time records but failed to do so. Plaintiffs relied on Defendants to keep proper records and on their own personal recollection and contemporaneous notes to document the overtime work they performed. [ECF No. 33-3, Nos. 2,3]; [ECF No. 33-4, Nos. 2,3]; [ECF No. 33-1, Pgs. 59:22-24, 61:21-24]; [ECF No. 33-8]; (*See* Exhibit "B," Ans and Obj to JGH Rogs to SW (10-16-2025), No. 5).

47.     Undisputed.

48.     Undisputed.

49.     Undisputed that Esnol produced no independent documentary evidence separate from the jointly prepared Bates No. 000856 summary. Plaintiffs note that both JGH and Esnol have testified under oath as to the overtime hours worked, and both independently corroborate the same station-by-station breakdown. [ECF No. 33-3, No. 13]; [ECF No. 33-4, No. 13]; [ECF No. 33-10, Pgs. 51:4-7, 79:23-25, 80:1-3].

50.     Disputed. Defendant Melo's testimony that no complaints were ever made is self-serving and directly contradicted by both Plaintiffs' sworn testimony. JGH swore that he "repeatedly complained verbally to Ms. Usaga" about unpaid overtime throughout the project, asking her, "why the checks did not reflect the actual hours I worked," and that she "never gave a satisfactory response." [ECF No. 33-3, Nos. 6(f), 8]. Esnol swore the same: "I attempted to raise the issue of unpaid overtime with Mr. Melo, but he stopped responding to my calls and stopped visiting the worksites. Since he was not responsive, I complained about not being paid overtime wages to Ms. Usaga." Esnol further swore that he "objected verbally to the inaccuracy of the hours reflected on the paychecks on multiple occasions." [ECF No. 33-4, Nos. 6(e), 6(f), 8]. At deposition, Esnol confirmed he asked Paola Usuga many times about the unpaid hours: "A lot of times I asked her, when are they going to give those hours," and that Usuga herself "100 percent knew that we worked extra hours." [ECF No. 33-11, Pgs. 31:8-9, 34:1-2]. [ECF No. 33-1, P. 140:10-18]; [ECF No. 33-3, Nos. 6(e), 6(f), 8]; [ECF No. 33-4, Nos. 6(e), 6(f), 8]; [ECF No. 33-9, ¶17]; [ECF No. 33-10, P. 76:18-19]; (Exhibit "B," No. 19).

51. Undisputed that JGH made no written complaint to Statewide, did not consult an attorney, and did not contact the DOL during his employment. JGH has testified that his complaints were oral. [ECF No. 33-3, Nos. 7-10]; [ECF Nos. 33-4, Nos. 7-10]; [ECF No. 33-10, P. 38:3-12].

## V. CONTRADICTIONS BETWEEN PLAINTIFFS' CLAIMS AND STATEWIDE'S

52. Disputed. Plaintiffs dispute that Defendants' "412034 Hours" spreadsheet accurately reflects which stations they were working at and when. The spreadsheet was prepared and maintained solely by Defendants, without independent verification and without Noel Melo being present at the jobsites after Station 1. The existence of discrepancies between Defendants' self-prepared spreadsheet and Plaintiffs' testimony raises a genuine dispute of material fact, not a basis for summary judgment.

53. Disputed in part. Undisputed that JGH and Esnol worked a four-day Monday through Thursday schedule at JGH's request. Disputed that this schedule resulted in no more than 40 compensable hours per week. [ECF No. 33-1, Pgs. 84:3 – 88:16]; [ECF No. 33-3, No. 6(d)]; [ECF No. 33-4, No. 6(d)]; [ECF No. 33-7, Pgs. 25:6-8, 26:3-7]; [ECF 33-9, ¶4]; [ECF No. 33-10, Pgs. 50:23-25, 58:3-7, 62:20-22, 75:3-10]; [ECF No. 33-11, P. 19:14-16].

54. Undisputed.

55. Disputed. Defendants' Sun Pass-based analysis assumes that JGH worked no overtime during the weeks covered by the records and relies entirely on toll-crossing data as a proxy for work data. The analysis fails to account for work performed at locations that did not require toll crossing and fails to account for the period after August 29, 2023, when JGH and Esnol were no longer driving Statewide's vehicle. [ECF No. 33-1, Pgs. 67:18-22, 68:5-14, 71:1-5]; [ECF No. 33-9, ¶¶ 13-16]; [ECF No. 33-10, Pgs. 58:18-24, 59:9-14, 60:2-7, 71:1-5].

## PLAINTIFFS' ADDITIONAL MATERIAL FACTS

## VI. DEFENDANTS' TIMEKEEPING PRACTICES

56. Defendant Melo testified, individually and as corporate representative of Statewide, that Statewide had no written timekeeping policy beyond a general reference to FLSA regulations. [ECF No. 33-1, Pgs. 32:5-18]. Melo further admitted that Statewide had no formal system to track employee hours, used no time clock of any kind, and used no electronic timekeeping software. [ECF No. 33-1, Pgs. 58:14-25, 59:1-12, 60:21-24]; (Exhibit "B," No. 5). Critically, Melo admitted

there was no written requirement that JGH or Esnol record their start times [ECF No. 33-1, Pgs. 32:19-22], no written requirement that they record their stop times [ECF No. 33-1, Pgs. 32:19-22], and that Plaintiffs were not required to send any kind of timesheets: "[F]or the rest of the station, if Paola was not there, they were providing the information verbally to Paola." [ECF No. 33-1, P. 61:10-19]. Melo further confirmed that Plaintiffs were never required to sign any timesheet to verify the accuracy of the hours recorded. [ECF No. 33-1, Pgs. 113:9-11]; (Exhibit "B," No. 5).

57.     Paola Usuga served as Statewide's secretary since September 2012 and was designated as project manager for the Metrorail project beginning after the first station (Allapattah) in approximately February 2023. [ECF No. 33-7, Pgs. 11:14-15, 11:25-12:2, 12:13-16]. As project manager, her responsibilities allegedly included going to the job site every day, managing materials, coordinating with Miami-Dade Transit representatives, scheduling escorts, and participating in weekly meetings with the County. [ECF No. 33-7, Pgs. 13:22-14:3]. Usuga's regular schedule was 8:00 a.m. to 4:30 p.m. [ECF No. 33-7, P. 31:12-15], while JGH and Esnol typically arrived at the worksite by 5:30–6:00 a.m. and stopped working at approximately 5:30 p.m. [ECF No. 33-3, No. 6(a-b)]; [ECF No. 33-4, No. 6(a-b)]. Usuga confirmed she was never at the stations when Plaintiffs arrived to work in the morning — "No, no, no" — and was present only "few times, very few times" when they left. [ECF No. 33-7, P. 42:14-18]. Moreover, Usuga admitted that the sole method of verifying hours was Plaintiffs' own verbal reports to her, and that she never wrote it down or asked the escorts, who were present during the entire shift, to verify the hours Plaintiffs worked. [ECF No. 33-7, Pgs. 64:3-16].

58.     No documents were prepared by Paola Usuga showing the actual hours worked by JGH and Esnol. [ECF No. 33-1, Pgs. 48:19-49:16]; [ECF No. 33-7, Pgs. 64:3-10, 65:1-8, 81:16-19]; [ECF No. 33-10, P. 74:13-14].

## VII.   STATION BY STATION UNPAID OVERTIME HOURS

59.     At the Allapattah station, JGH and Esnol testified that they worked a total of approximately 16 hours of unpaid overtime during the weeks of April 17-20 and April 24-27, 2023. [ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-10, Pgs. 49:10-25, 50:1-3, 62:17-22, 63:17-24].

60.     At the Santa Clara station, JGH and Esnol testified that they worked a total of approximately 20 hours of unpaid overtime during the weeks of May 8-11, May 15-18, and May

22-25, 2023. [[ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-10, Pgs. 50:4-7, 65:13-17, 66:21-25, 67:10-14].

61.     At the Culmer station, JGH and Esnol testified that they worked a total of approximately 24 hours of unpaid overtime during the weeks of June 12-15, June 19-22, and June 26-29, 2023. [ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-10, Pgs. 50:8-12, 71:11-25].

62.     At the Gap Tie 2 station, JGH and Esnol testified that they worked a total of approximately 8 hours of unpaid overtime during the weeks of July 17-20 and July 24-27, 2023. [ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-10, Pgs. 50:13-15, 72:1-10].

63.     At the Overtown station, JGH and Esnol testified that they worked a total of approximately 8 hours of unpaid overtime during the weeks of August 21-24 and August 28-31, 2023. [ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-10, Pgs. 15:16-18, 72:11-20].

64.     At the Brickell station, JGH and Esnol testified that they worked a total of approximately 8 hours of unpaid overtime during the weeks of September 11-14, September 18-21, and September 25-28, 2023. [ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-10, Pgs. 15:19-22, 72:21-73:9].

65.     While working at the Allapattah, Santa Clara, Cumer, Gap Tie 2, Overtown, and Brickell stations between April and September 2023, Plaintiffs testified that they worked a total of approximately 84 overtime hours for which they were not paid. [ECF No. 16, ¶¶ 3-4]; [ECF No. 33-3, No.13]; [ECF No. 33-4, No.13]; [ECF No. 33-8]; [ECF No. 33-10, Pgs. 49:10-50:25, 51:1-6]; [ECF No. 33-11, P. 37:19-35].

## VIII.   DEFENDANTS' KNOWLEDGE AND CONTROL

66.     The Miami-Dade Metrorail project was designed for a crew of four workers, but only JGH and Esnol were assigned to complete the work, requiring them to work substantially more hours per station. [ECF No. 33-3, No. 6(d)]; [ECF No. 33-4, No. 6(d)]; [ECF No. 33-10, P. 36:7-11]; [ECF No. 33-11, P. 23:18-22]; (Exhibit "A," P. 18).

67.     Miami-Dade County required on-site escorts to be present at the job sites throughout the workday. [ECF No. 33-1, P. 30:16-17]; [ECF No. 33-7, P. 21:20-21]; [ECF No. 33-11, Pgs. 25:2-4, 57-58:21-25 & 1-3].

68.     After completing Station 1, Noel Melo was no longer present at the remaining stations and stopped responding to JGH's calls and complaints. [ECF No. 33-1, Pgs. 48:4-7, 81:21-25, 82:1-3, 17-19]; [ECF No. 33-7, P. 83:6-7]; [ECF No. 33-10 Pgs. 32:8-14].

69.     After completing Station 1 (Allapattah), neither Noel Melo nor Paola Usuga was regularly present while Plaintiffs worked. Usuga's regular schedule was 8:00 a.m., and she would arrive at the stations only around 9:30 or 10:00 a.m. — after Plaintiffs had already been working for up to two or three hours — staying at each station "sometimes one hour, sometimes more." [ECF No. 33-7, Pgs. 15:11-17, 16:25-17:3]. Usuga admitted she was never present when Plaintiffs arrived to work in the morning and was there only "few times, very few times" when they left. [ECF No. 33-7, P. 42:14-18]. Melo himself confirmed this scheduling gap: Paola worked 8:00 a.m. to 4:30 p.m. while Plaintiffs worked 7:00 a.m. to 5:30 p.m., and when asked how Paola could verify Plaintiffs' start and stop times, Melo acknowledged he did not use the word "verify" and that the company relied entirely on Plaintiffs' own verbal reports. [ECF No. 33-1, Pgs. 88:20-25, 89:4-8]. Both Plaintiffs testified that they did not see Paola Usuga or Noel Melo at the job sites and denied reporting their hours to anyone on a daily basis. [ECF No. 33-10, Pgs. 36:21-23, 55:9-12, 74:8-21, 87:1-3, 88:10-11]; [ECF No. 33-11, Pgs. 49:8-10, 49:11-20, 52:3-18].

70.     The CPRs submitted by Defendants to Miami-Dade County under penalty of perjury list Angel Vaillant working a total of 243 hours on the project as an "Electrical Worker/Electrician-Wireman" during the period April 9 through November 4, 2023. [ECF No. 33-5]. However, both Melo and Usuga confirmed at deposition that Angel Vaillant performed no electrical work at any of the Metrorail stations. When asked who was working on the project, Usuga answered: "No, just Jesus and Esnol." [ECF No. 33-7, P. 80:1-2]. When asked specifically whether Angel Vaillant's hours on the CPRs were accurate for the Metrorail stations, Usuga confirmed: "No, at the station is Jesus and Esnol. Jesus and Esnol were the only ones in the station." [ECF No. 33-7, Pgs. 80:14-20]. Usuga further confirmed: "Angel and Noel were not at the station." [ECF No. 33-7, P. 83:6-7]. Melo himself admitted that Angel Vaillant "was never part of this project" and that Angel "was not qualified to be an electrician" — his duties were "more like a helper" involving warehouse work and materials runs. [ECF No. 33-1, Pgs. 93:11-17, 95:6-8]. Notably, Usuga also disclosed that Angel Vaillant is her stepfather. [ECF No. 33-7, P. 76:10-11]. An

employer who falsely lists workers on federally filed compliance reports has demonstrated that those reports are not reliable as to other entries, including hours worked.

71.     The CPRs list Noel Melo working a total of 555 hours on the project as an "Electrical Worker/Foreman" during the period April 9 through November 4, 2023. [ECF No. 33-5]. This is directly inconsistent with Melo's own deposition testimony. Melo admitted he was physically present only at Station 1 (Allapattah) on a regular basis, and that his work at Stations 2 through 6 was only "from time to time," adding: "It is not registered anywhere because I'm the owner, and I'm not forced to provide my time to anyone, not even the LCPtracker." [ECF No. 33-1, Pgs. 99:21-25]. Melo further admitted he had no fixed work schedule during the project: "I'm the owner. I have no schedule. I do whatever I decide is important to do at that time." [ECF No. 33-1, P. 102:13-14]. Usuga confirmed that Melo was not at the stations for Stations 2 through 6: "Angel and Noel were not at the station." [ECF No. 33-7, P. 83:6-7]. The CPR entries attributing 555 hours of work to Melo are thus irreconcilable with his own sworn testimony that his presence at the project after Station 1 was sporadic, unrecorded, and unregistered. [ECF No. 33-1, Pgs. 48:4-7, 81:21-25, 82:1-3, 99:21-25]; [ECF No. 33-5].

72.     Despite listing himself on the CPRs under the classification "Electrical Worker/Foreman (on jobs where 3-9 electricians are employed)," Melo did not actually perform the duties of a foreman at Stations 2 through 6, and the classification itself is facially inapplicable. [ECF No. 33-5]. By Melo's own definition, "the foreman is the one that is performing the work . . . Foreman is an electrician," [ECF No. 33-1, P. 101:6-9], and a foreman "work[s] physically at the job site." [ECF No. 33-1, P. 101:13-17]. Yet Melo admitted that after Station 1, his presence at Stations 2 through 6 was only "from time to time," was "not registered anywhere," and was not reported to the LCPtracker. [ECF No. 33-1, P. 99:21-25]. Moreover, the "Foreman" classification on the CPRs is expressly defined as applicable to "jobs where 3-9 electricians are employed," yet the undisputed record establishes that only two electricians, JGH and Esnol, were assigned to this project throughout its duration. [ECF No. 33-5]; [ECF No. 33-3, No. 6(d)]; [ECF No. 33-4, No. 6(d)]. Usuga confirmed that during Stations 2 through 6, Melo was not at the stations. [ECF No. 33-7, P. 83:6-7]. The CPR foreman classification is therefore both factually unsupported and internally inconsistent with Defendants' own record of the project's staffing.

73.     The 2023 Miami-Dade County Responsible Wages and Benefits Schedule (the "Prevailing Wage Schedule") governs the classification and wage rates applicable to this project. Under the Prevailing Wage Schedule, an "Electrical Workers" Foreman classification is only "[r]equired on any job where 3-9 electricians are employed." (Exhibit "A," P. 18). The undisputed record establishes that this threshold was never met on this project. Melo himself confirmed at deposition that JGH and Esnol were the only electricians on the project: "For these stations, they were the only workers that I had . . . I did not have anybody else on the field." [ECF No. 33-1, P. 78:21-24]. Melo further confirmed that Angel Vaillant "was not part of this project at all" [ECF No. 33-1, Pgs. 95:24-96:13], and Usuga confirmed that only Jesus and Esnol were performing work at the stations: "No, just Jesus and Esnol. Jesus and Esnol were the only ones in the station." [ECF No. 33-7, Pgs. 80:1-2, 80:14-16]. Because the project never employed three or more electricians at any station, the Foreman classification was inapplicable under the Prevailing Wage Schedule. Melo's presence at Stations 2 through 6 was "from time to time" and, by his own admission, "not registered anywhere." [ECF No. 33-1, P. 99:7-11]. Despite this, Defendants' CPRs list Melo as "Electrical Worker / Foreman (on jobs where 3-9 electricians are employed)" for 555 hours throughout the project — a classification that was both factually unsupported and internally inconsistent with Defendants' own admissions about who was actually working at the stations. [ECF No. 33-5]; [ECF No. 33-1, Pgs. 78:21-24, 93:11-17, 95:24-96:13, 99:7-11]; [ECF No. 33-7, Pgs. 80:1-2, 80:14-16, 83:6-7].

## IX.     PATTERN OF CONDUCT

74.     It is a practice of Defendant's to not pay their employees overtime, and they have previously been sued by another employee, Yonel Hernandez, for unpaid overtime and wrongful termination. *Hernandez v. Statewide Electrical Services, Inc.,* No. 2019-29508-CA-01 (Fla. 11th Cir. Feb 6, 2020).

Respectfully submitted this 20th day of May 2026,

Katelyn Schickman, Esq.
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
Patrick Brooks LaRou, Esq. (1039018)
brooks@fairlawattorney.com
Katelyn Schickman, Esq. (1064879)
katie@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue, Suite 770
Coral Gables, FL 33146
Tel:     305.230.4884
*Counsel for Plaintiff*
