UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-22530-BECERRA/TORRES

JESUS E. GONZALEZ HERNANDEZ, AND
ESNOL A. GONZALEZ CANTERO

Plaintiffs,

vs.

STATEWIDE ELECTRICAL SERVICES, INC. AND
NOEL MELO,

Defendants.
_________________________________________/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SPOLIATION SANCTIONS**

Plaintiffs Jesus E. Gonzalez Hernandez ("JGH") and Esnol Alejandro Gonzalez Cantero ("Esnol") (collectively, "Plaintiffs") respectfully submit this Response in opposition to Defendants' Motion for Spoliation Sanctions [ECF No. 48], and state as follows:

**INTRODUCTION**

Defendants ask the Court to instruct the jury that it must presume—or, alternatively, may infer—that handwritten notes no one has seen would have defeated Plaintiffs' overtime claim. The Eleventh Circuit permits that instruction only upon a showing of bad faith, which "generally means destruction for the purpose of hiding adverse evidence." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). Defendants' Motion never makes that showing. Instead, it rests on a premise *Tesoriero* expressly rejected: that because JGH supposedly anticipated a dispute, his disposal of the notes must have been in bad faith. "[A]nticipation of litigation is not the standard for spoliation sanctions—bad faith is." *Id.* at 1183.

The facts are simple. JGH is a Spanish-speaking journeyman electrician who was educated in Cuba and cannot read or write English. While working on the Metrorail project, he jotted down his and Esnol's hours on sheets of paper. When the project ended in September 2023, he had his wife write out a clean, station-by-station summary—because, as he testified, her handwriting is better than his and he did not know how to spell the English words. With "all the numbers for each one of the stations" on that page, JGH saw no reason to keep his scraps of paper. He testified that he "threw them out"; he has since explained that he does not recall exactly when or how they left his possession and believes they may have been discarded or lost in one of two moves before he hired counsel. Either way, the notes were gone before JGH retained counsel in January 2025, before Plaintiffs' counsel sent Statewide a preservation demand in February 2025, and long before this lawsuit was filed—as Defendants concede. JGH kept the summary, Plaintiffs produced it, and JGH disclosed the notes' absence at his deposition. JGH, Esnol, and JGH's wife have each confirmed these facts under penalty of perjury. *See* Exs. A–C.

That is not the conduct of a litigant hiding adverse evidence. It is the conduct of a layperson who reasonably believed he had preserved what mattered. Defendants remain free to cross-examine JGH about the notes and to argue the weight of Plaintiffs' evidence from Statewide's own records. What they may not do is obtain a court-ordered presumption about the contents of documents where the record contains no evidence that the documents were discarded to conceal anything. The Motion should be denied.

## <u>FACTUAL BACKGROUND</u>

### A. Plaintiffs' Overtime Claim and Statewide's Recordkeeping

Plaintiffs allege that they worked uncompensated overtime while performing electrical work on the Traction Power Switchgear Replacement Project at six Miami-Dade Metrorail stations

from April through September 2023. [ECF No. 1]. Defendants characterize their own records as four "independent, contemporaneous" sources establishing that Plaintiffs never worked more than forty hours. [ECF No. 48 at 2–3]. The accuracy of those records is sharply disputed. Statewide used no time clock or electronic timekeeping system and never required Plaintiffs to sign timesheets verifying their hours. [ECF No. 33-1 at 58:14–59:12, 60:21–24, 113:9–11]. Melo prepared the timesheets in his office from hours relayed to him verbally by Paola Usuga. [ECF No. 33-1 at 34:1–4, 61:10–19]. Usuga, in turn, worked 8:00 a.m. to 4:30 p.m., was never present when Plaintiffs arrived in the morning, was present only "few times, very few times" when they left, and never asked the County escorts who were present during Plaintiffs' shifts to verify their hours. [ECF No. 33-7 at 31:12–15, 42:14–18, 64:3–16]. The Court denied Defendants' Motion for Summary Judgment on September 2, 2026. [ECF No. 46].

**B. JGH Is a Spanish-Speaking Electrician Who Kept Informal Notes of His Hours**

JGH speaks only Spanish; he cannot understand, read, or write English. [ECF No. 33-10 ("JGH Dep.") at 8:13–23]; Declaration of Jesus E. Gonzalez Hernandez ("JGH Decl."), attached as Exhibit A, ¶ 2. He completed the twelfth grade and an intermediate electrical-technician course in Cuba, never attended school in the United States, has no legal education or training, and works as a journeyman electrician. JGH Dep. 9:1–24; 85:13–14; JGH Decl. ¶¶ 3–4. Before this case, he had never been a party to a lawsuit, given a deposition, or hired a lawyer for a work-related matter. JGH Decl. ¶ 5. During the project, JGH wrote down on sheets of paper the days and hours that he and Esnol worked. JGH Dep. 39:5–9; 40:1–4; 47:1–13; 48:4–12; JGH Decl. ¶ 7; Declaration of Esnol A. Gonzalez Cantero ("Esnol Decl."), attached as Exhibit B, ¶ 5. He did not consult an attorney or contact the Department of Labor when he realized he was not being paid overtime. JGH Dep. 38:7–12; JGH Decl. ¶ 18.

### C. JGH's Wife Transcribed the Notes Into Bates Gonzalez 000856 Because Her Handwriting Was Better

When the project ended in September 2023, JGH gave his notes to his wife, Maritza Alfonso Bonachea, who transcribed the information into the one-page summary produced as Bates Gonzalez 000856. JGH Dep. 44:19–45:11; JGH Decl. ¶ 9; Declaration of Maritza Alfonso Bonachea ("Bonachea Decl."), attached as Exhibit C, ¶¶ 4–6. JGH explained why his wife, rather than he, wrote the document: "my handwriting is very bad," and "my wife prepared this document because she has good handwriting. And there were a lot of words in English, I don't know how to spell them." JGH Dep. 44:8–13; 45:5–11; *accord* Bonachea Decl. ¶ 4. Ms. Alfonso Bonachea copied the information exactly as JGH and Esnol gave it to her and as it appeared on JGH's sheets of paper; she did not add, remove, or change any hours. Bonachea Decl. ¶¶ 5–7. JGH reviewed the finished summary, which accurately reflects the overtime recorded on his sheets. JGH Decl. ¶ 11.

Once the summary was written, JGH did not think he needed his "old, messy sheets of paper." JGH Decl. ¶ 12. Asked at deposition what became of them, JGH answered: "I threw them out once my wife declared this record here. I had all the numbers for each one of the stations. Why did I want to keep those notes?" JGH Dep. 46:20–24. He also testified that he did not know where the papers were and that "[m]aybe I still have it. I haven't found it." *Id.* 39:10–14; *see id.* 41:12–16, 41:21–24. JGH does not today recall physically throwing the papers away or when or how they left his possession; he believes they may have been discarded or lost during one of two moves, both of which occurred before he retained counsel. JGH Decl. ¶¶ 13–14. Ms. Alfonso Bonachea returned the sheets to JGH after she finished, and neither she nor Esnol discarded them. Bonachea Decl. ¶ 9; Esnol Decl. ¶ 10.

Bates Gonzalez 000856 identifies each of the six Metrorail stations and the overtime attributed to each; contains "calendar" notations beside the Santa Clara and Gap Tie 2 entries, which refer to the day-by-day entries on JGH's sheets of paper; and states that, while unloading equipment at each station, Plaintiffs "always worked more than the [10] established hours." [ECF No. 33-8]; [ECF No. 36 ¶ 34]; JGH Dep. 48:4–12; JGH Decl. ¶ 10; Bonachea Decl. ¶ 6. Esnol, who worked alongside JGH every day and was present when the summary was written, has separately sworn to the same station-by-station overtime, which is consistent with his own memory. [ECF No. 33-4, No. 13]; JGH Dep. 51:4–10; Esnol Decl. ¶¶ 3, 7–8.

**D. JGH Did Not Retain Counsel Until January 2025, and Plaintiffs' Preservation Demand Followed in February 2025**

After the project ended, JGH did not sue. He waited. When JGH prepared the summary, he expected that Melo might not pay the overtime and bonus he owed, and he wanted the hours written down clearly so that he could ask Melo to pay; he was not planning a lawsuit. JGH Decl. ¶ 17. Melo told JGH that Statewide itself had not been paid by the County and could not pay him; JGH waited more than a year for that payment, and only after Melo was paid and told JGH, "I have nothing for you," did JGH decide to look for a lawyer. JGH Dep. 80:4–81:2; 82:2–7; JGH Decl. ¶ 19. JGH retained counsel in January 2025. JGH Decl. ¶ 20. Defendants concede that the notes were discarded before JGH retained counsel. [ECF No. 48 at 4, 7]. The relevant chronology is as follows:

> **September 2023** — Project ends; JGH's wife prepares Bates Gonzalez 000856; JGH no longer believes he needs the underlying notes. JGH Dep. 44:19–45:3; 46:20–24; JGH Decl. ¶¶ 9–12; Bonachea Decl. ¶ 4.
>
> **September 2023 – January 2025** — Melo tells JGH that Statewide has not been paid by the County and cannot pay him; JGH waits more than a year, until Melo is paid and tells him, "I have nothing for you." JGH Dep. 80:4–81:2; 82:2–7; JGH Decl. ¶ 19.

**January 2025** — JGH retains counsel. JGH Decl. ¶ 20.

**February 24, 2025** — Plaintiffs' counsel sends Statewide a pre-suit preservation demand. [ECF No. 48-1].

**June 3, 2025** — Plaintiffs file this action. [ECF No. 1].

No one—not Statewide, not the County, and not any attorney—asked JGH to keep his notes before they were gone, and Defendants identify no demand, threat of suit, agency complaint, or other litigation-related event that preceded their loss. JGH Decl. ¶ 15; Esnol Decl. ¶ 9; Bonachea Decl. ¶ 8.

## LEGAL STANDARD

Because the notes were paper rather than electronically stored information, Rule 37(e) does not apply, and the Court's inherent authority governs. *See* Fed. R. Civ. P. 37(e); *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023); *Flury v. DaimlerChrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). As the movants, Defendants bear the burden of proving that: (1) the missing evidence existed, (2) JGH had a duty to preserve it, and (3) the evidence was crucial to their ability to prove their defense. *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010). A duty to preserve arises only when litigation is reasonably anticipated. *Id.* at 1324.

Even where those elements are met, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Tesoriero*, 965 F.3d at 1184 (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009). Bad faith "generally means destruction for the purpose of hiding adverse evidence," and because "the party's reason for destroying evidence is what justifies sanctions (or a lack thereof)," that reason is the key inquiry. *Tesoriero*, 965 F.3d at

1184. The standard requires more than negligence—or "even gross negligence." *Skanska*, 75 F.4th at 1312. Where, as here, there is no direct evidence of bad faith, the movant must establish every one of four circumstantial hallmarks, including that the act causing the loss "cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Managed Care*, 736 F. Supp. 2d at 1322–23; *see Tesoriero*, 965 F.3d at 1185. Courts also weigh the resulting prejudice and whether it can be cured, the practical importance of the evidence, and the potential for abuse. *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018).

## ARGUMENT

### I. The Motion Rests on a Premise the Eleventh Circuit Has Rejected: Anticipating a Dispute Is Not Bad Faith

Defendants' bad-faith theory reduces to a single piece of testimony: that when the summary was prepared, JGH "knew that something was going to go wrong" and "was going to claim all the overtime hours." [ECF No. 48 at 4, 6–7] (quoting JGH Dep. 45:12–25). Defendants use that testimony to establish a duty to preserve, and then treat the existence of that duty as though it proves bad faith. [*Id.* at 6–8]. *Tesoriero* forecloses that reasoning.

In *Tesoriero*, Carnival formally admitted that it anticipated litigation "immediately after the incident was reported"—an admission the Eleventh Circuit held was "conclusively established"—and its crew nonetheless disposed of the broken chair at the center of the case. 965 F.3d at 1175–76, 1183. The court still affirmed the denial of an adverse inference, holding that "anticipation of litigation is not the standard for spoliation sanctions—bad faith is," and that because Carnival's explanation "reasonably suggest[ed] that the chair was not destroyed to hide adverse evidence," "nothing in the record smack[ed] of bad faith." *Id.* at 1183–86. Defendants cite

*Tesoriero* for the proposition that an admission of anticipated litigation establishes a duty to preserve, [ECF No. 48 at 5–8], but omit the holding that immediately follows.

The same result follows here, *a fortiori*. JGH's testimony is far weaker evidence of anticipated litigation than Carnival's binding admission. And whether JGH threw the notes away once they had been transcribed or they were lost in a later move, the circumstances are at least as benign as the routine disposal of the chair in *Tesoriero*. Even if the Court assumed a duty to preserve, Defendants' Motion would fail for want of bad faith.

## II. <u>JGH Had No Duty to Preserve His Notes Before He Retained Counsel</u>

Defendants cannot establish the threshold duty element in any event. A duty to preserve arises when litigation is reasonably anticipated. *Managed Care*, 736 F. Supp. 2d at 1324. JGH's expectation that there would be "problems" getting paid is not the same as anticipating a lawsuit, and JGH has explained what he meant: he expected that Melo might not pay what he owed and wanted the hours written clearly so that he could ask Melo to pay; he was not planning to sue. JGH Decl. ¶ 17. The rest of the record confirms it. When the project ended, JGH did not consult a lawyer or contact the Department of Labor. JGH Dep. 38:7–12; JGH Decl. ¶ 18. He waited—for more than a year—for Melo to pay him once Statewide was paid by the County, and he decided to look for a lawyer only after Melo finally told him, "I have nothing for you." JGH Dep. 80:4–81:2; 82:2–7; JGH Decl. ¶ 19. In that context, JGH's statement that he "was going to claim" his overtime describes an employee intending to demand his wages from his employer, not a litigant preparing for trial.

The chronology confirms the point. Whether JGH discarded the notes in September 2023 or they were lost in a later move, it happened before he retained counsel in January 2025, before any preservation demand, and well before suit. JGH Decl. ¶¶ 13–14, 20. Defendants concede the

loss preceded retention of counsel. [ECF No. 48 at 4, 7]. Courts in this Circuit draw exactly this line. *Compare Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1293–94 (S.D. Fla. 2020) (finding bad faith where plaintiff scrapped the product "after he had retained counsel and anticipated filing suit"), *and Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (sanctioning destructive testing performed by a team "hired by plaintiffs' attorneys" when litigation was undisputedly foreseeable), *with Smith v. Future Motion, Inc.*, No. 8:22-cv-320-MSS-MRM, 2023 U.S. Dist. LEXIS 236036, at *14–15 (M.D. Fla. Jan. 3, 2023) (finding no spoliation where plaintiff altered the evidence when he "had not retained a lawyer" and "was a layperson," and holding that his "decision as a layperson . . . does not warrant a sanction for spoliation").

Defendants' reliance on Plaintiffs' February 24, 2025 preservation letter only underscores the point. [ECF No. 48 at 4, 7]. That letter was written by counsel, sent to Statewide, and issued after the notes were gone. Its reference to "personal notes, handwritten diaries, and personal calculations" reflects what lawyers know about preservation—knowledge JGH did not have before he had a lawyer. JGH Decl. ¶ 15. A later demand directed to Defendants says nothing about what a layperson reasonably anticipated, or intended, many months earlier.

## III. The Record Affirmatively Refutes Bad Faith

Whether or not a duty had attached, Defendants cannot carry their burden of proving that any disposal of the notes was "for the purpose of hiding adverse evidence." *Tesoriero*, 965 F.3d at 1184. Defendants offer no direct evidence of such a purpose, so they must prove that JGH's conduct "cannot be credibly explained as not involving bad faith by the reason proffered." *Managed Care*, 736 F. Supp. 2d at 1322–23. Every relevant circumstance points the other way.

**A. JGH's Account Is Credible, Unrebutted, and Inconsistent With Concealment**

JGH's account of the notes is straightforward: his wife transcribed them into a clean summary—because her handwriting was better and he could not spell the English words—and, with "all the numbers for each one of the stations" in that summary, he no longer thought he needed the scraps. JGH Dep. 44:8–13; 45:5–11; 46:20–24; JGH Decl. ¶¶ 8–12; Bonachea Decl. ¶¶ 4–7. Whether he then threw them out, as he testified, or they were lost in one of his moves, as he now believes may have happened, the reason is the same: consolidation, not concealment. JGH Decl. ¶¶ 12–14. JGH has also sworn that he did not discard the notes to conceal evidence or to keep them from Defendants, that they contained no hours different from those on the summary, and that he would have kept them had he known he should. *Id.* ¶ 16. That is the only evidence of JGH's purpose in the record. Defendants do not rebut it; they simply characterize it as "self-serving." [ECF No. 48 at 7–8]. But the question is whether the explanation is credible, and nothing about a Spanish-speaking electrician asking his wife to neatly rewrite his hours—and then no longer keeping his own messy notes—suggests a scheme to suppress evidence.

JGH's candor about what he does not remember reinforces the point. His declaration does not contradict his deposition; it is consistent with his testimony that he did not know where the papers were and might still have them. JGH Dep. 39:10–14; 41:12–16, 41:21–24; JGH Decl. ¶¶ 13–14. And on this record, Defendants cannot establish even the "affirmative act causing the evidence to be lost" that the circumstantial bad-faith test requires—let alone that such an act "cannot be credibly explained as not involving bad faith." *Managed Care*, 736 F. Supp. 2d at 1322–23.

JGH's conduct also bears none of the marks of concealment. He did not destroy all record of his hours; he preserved the summary, and Plaintiffs produced it. JGH Decl. ¶ 21. He did not

hide the notes' absence; he disclosed it under oath. JGH Dep. 46:20–24. Nor did he ignore any request to preserve—no one ever made one. JGH Decl. ¶ 15; Esnol Decl. ¶ 9. The Eleventh Circuit has found bad faith where a party was "fully aware" that its adversary wished to inspect evidence and let it be destroyed anyway, and has noted it would be "highly skeptical" of a disposal that followed a preservation request. *Tesoriero*, 965 F.3d at 1185–86 (discussing *Flury*, 427 F.3d at 945). Nothing of the kind occurred here.

**B. JGH Is a Layperson Who Had No Reason to Know of Any Duty to Preserve**

JGH's lack of legal sophistication reinforces the absence of bad faith. The Eleventh Circuit has recognized that "the party's sophistication with regard to litigation" bears on the evaluation of its preservation conduct. *Skanska*, 75 F.4th at 1313 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). In *Skanska*, that factor weighed against a multinational construction company that failed to preserve employees' cell-phone data despite an active litigation hold and pending litigation. *Id.* at 1302, 1312–14. JGH is the opposite: a journeyman electrician, educated in Cuba, who does not read or write English, has no legal training, had never been a party to a lawsuit or given a deposition, had no lawyer, and had received no litigation hold or preservation request when his notes were lost. JGH Dep. 7:10–11; 8:13–23; 9:1–24; JGH Decl. ¶¶ 2–5, 15. He did not know that the law might require him to keep the papers. JGH Decl. ¶ 15. A layperson who stops keeping his working papers after having them rewritten does not thereby reveal a "consciousness of a weak case." *Bashir*, 119 F.3d at 931 (quoting *Vick v. Tex. Emp. Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)); *see Smith*, 2023 U.S. Dist. LEXIS 236036, at *14–15.

Defendants' authorities do not suggest otherwise. *Mann* holds only that negligence cannot support an adverse inference. 588 F.3d at 1310. *Graff*—an unpublished decision—affirmed the

*exclusion* of test results, not an adverse-inference instruction, after a team hired by the plaintiffs' attorneys destructively tested the key physical evidence without notice when litigation was concededly foreseeable. 310 F. App'x at 301–02. And to the extent *Graff*'s observation that the plaintiffs there were "the more culpable party" could be read to dilute the bad-faith requirement, the Eleventh Circuit has since made clear that bad faith requires a purpose of hiding adverse evidence and is more than "even gross negligence." *Skanska*, 75 F.4th at 1312.

**C. Defendants' "Curated Record" Theory Is Speculation**

Lacking evidence of purpose, Defendants assert that JGH "curate[d] the record" by keeping a favorable summary and discarding contradictory source material. [ECF No. 48 at 7]. But there is no evidence that the notes contradicted anything, and the only evidence on the point is to the contrary. The person who wrote the summary has sworn that she copied the hours exactly as they appeared on JGH's sheets and changed nothing. Bonachea Decl. ¶¶ 5–7. JGH has sworn that the summary accurately reflects his sheets and that the sheets contained no different hours. JGH Decl. ¶¶ 11, 16; *see* JGH Dep. 45:5–11. And Esnol, who was present when the summary was written, has sworn that its station-by-station totals are consistent with his own memory. Esnol Decl. ¶¶ 7–8; [ECF No. 33-4, No. 13]. Defendants' theory simply assumes the conclusion their requested instruction would ask the jury to draw. The Eleventh Circuit rejected that approach in *ML Healthcare*, where the movant "provide[d] no reason to believe that the [missing evidence] would have actually shown" what it claimed; "[f]ailure to preserve such speculative evidence does not raise the specter of bad faith." 881 F.3d at 1309. So too here.

**IV. <u>The Remaining Factors Weigh Against Either Instruction</u>**

Because bad faith is absent, the Court need go no further. The remaining *ML Healthcare* factors, however, independently confirm that neither instruction is warranted. 881 F.3d at 1307.

**Prejudice and cure.** Defendants call the notes "the only contemporaneous source of the claimed hours." [ECF No. 48 at 8]. Yet the same Motion insists that Statewide possesses four "independent, contemporaneous" sources—timesheets, a project-hours spreadsheet, Certified Payroll Reports, and SunPass records—that show Plaintiffs never worked overtime. [*Id.* at 1–3]. Defendants cannot simultaneously maintain that their own records disprove Plaintiffs' claim and that they are defenseless without JGH's scraps of paper. They also have Bates Gonzalez 000856, JGH's and Esnol's deposition testimony and sworn interrogatory answers, and the full opportunity to cross-examine both Plaintiffs about the notes and the summary. Any residual prejudice is fully addressed through the ordinary adversarial process.

**Practical importance.** The substance of the notes—the overtime attributed to each station—survives in Bates Gonzalez 000856 and in both Plaintiffs' sworn testimony. The missing day-by-day detail is a proper subject for cross-examination; it is not a basis for presuming the notes' contents.

**Potential for abuse.** Defendants argue that denying sanctions would work "an inversion of the protective rule" that relaxes an FLSA plaintiff's burden where the employer fails to keep adequate records. [ECF No. 48 at 8–9]; *see Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946). The opposite is true. The FLSA places the duty to "make, keep, and preserve" accurate time records on the employer, not the employee. 29 U.S.C. § 211(c). *Mt. Clemens* relaxes the employee's burden because the employer failed to discharge that duty. 328 U.S. at 687–88. An employee's informal personal notes do not transfer Statewide's statutory obligation to JGH—and a rule that punishes an unrepresented employee for discarding his own notes, while the employer's recordkeeping failures go unaddressed, would itself invite abuse. Plaintiffs have consistently

disputed the accuracy of Statewide's records, and the Court denied summary judgment after those disputes were fully briefed. [ECF No. 46].

**The requested instructions.** A mandatory presumption that the notes "would not have supported" Plaintiffs' overtime would effectively direct the outcome of the central factual question the Court has already sent to the jury, and it would do so based on no evidence of the notes' actual contents. The permissive alternative fares no better: as Defendants concede, it too requires "[t]he bad-faith predicate." [ECF No. 48 at 9]; *see Tesoriero*, 965 F.3d at 1184. Because that predicate is absent, both requests fail.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Spoliation Sanctions [ECF No. 48] in its entirety.

Respectfully submitted this 25th day of September 2026,

s/Katelyn Schickman, Esq.
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
Patrick Brooks LaRou (1039018)
brooks@fairlawattorney.com
Katelyn Schickman, Esq. (1064879)
katie@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue, Suite 770
Coral Gables, FL 33146
Tel: 305.230.4884
*Counsel for Plaintiffs*