UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-22530

JESUS E. GONZALEZ HERNANDEZ,

Plaintiff,

v.

STATEWIDE ELECTRICAL SERVICES, INC.,
AND NOEL MELO,

Defendants.
_________________________________/

REMOTE DEPOSITION OF

JESUS E. GONZALEZ HERNANDEZ

THROUGH A SPANISH INTERPRETER

VOLUME 1 (Pages 1 - 92)

Friday, February 20, 20263
10:01 a.m. - 2:51 p.m.

LOCATION: Remote via Zoom
Miami, Florida

Reported by: Shannon Whitaker,
Cert No. CER-12345

Job No.: 436518

Exhibit J

A. 2015, 2016.
Q. Are you a licensed electrical contractor in Florida?
A. No.
Q. Are you a licensed electrician in Florida?
A. Yes.
Q. And that's the journeyman's license?
A. Correct.
Q. Have you ever held an electrical license in any other state than Florida?
A. No.
Q. Do you have any industry certifications?
A. No.
Q. Have you ever been convicted of a felony?
A. No.
Q. You have a son named Esnol Gonzalez Cantero, correct?
A. Cantel. Esnol Alejandro Gonzalez Cantel.
Q. Is that last name spelled C-A-N-T-E-R-O?
A. Yes. C-A-N-T-E-R-O.
Q. What is Esnol's date of birth?
A. November 8th, 1996.
Q. Who is Esnol's mother?
A. Maria Cantero.
Q. Were you ever married to Esnol's mother?



A. We were not married by -- officially. We lived together.
Q. Where did you live together?
A. We lived in Cuba and then my son lived with me in Spain.
Q. During what period of time did your son live with you in Spain?
A. I'm not sure as to the dates. I think it was 2009 and 2010. And then we moved to the United States in 2013.
Q. What were you doing in Spain?
A. I worked in construction.
Q. Were you ever involved in a lawsuit brought against you by Esnol's mother?
A. No.
Q. Do you recall if there was – if Esnol's mother brought a lawsuit against you to establish paternity?
A. I don't know.
Q. Do you recall being involved in a lawsuit brought against you by Esnol's mother seeking child support?
A. Yes. I paid her child support when I came to this country.
Q. Did Esnol's mother have to file a lawsuit in order to get you to pay child support?



A. And we went there voluntarily. Everything was explained to us. I was told how much I had to pay according to how much I earned. It was everything -- everything was done voluntarily.
Q. Where does Esnol's mother live currently?
A. Here in Miami.
Q. How often do you see Esnol?
A. And now that he's working here in the county, I see him every Saturday, sometimes during the weekdays when he works in the morning, and I swing by in the afternoon.
Q. Do you live with Esnol?
A. No.
Q. Have you and Esnol discussed this lawsuit?
A. Yes. We've spoken about it.
Q. How many times have you discussed this lawsuit with Esnol?
A. Not very frequently. Just a few times.
Q. When was the first time you discussed this lawsuit with Esnol?
A. When we finished the job, all the trouble that we had during the last job that we did with them.
Q. Are you referring to when you finished the job at Statewide?
A. Yes.



Q. When was the most recent time you discussed this lawsuit with Esnol?
A. I don't know. Maybe a few days ago.
Q. Have you and Esnol compared notes about the hours you claim to have worked?
A. We were working together, both of us.
Q. Did you and Esnol work together to calculate your overtime claims?
A. Yes. Because we, we tried to recall everything and we jotted it down.
Q. Who calculated the amount of overtime you were claiming in this lawsuit?
A. Both of us. We jotted down the hours that we were working. The only ones who were working there was myself and my son.

D

Q. I'd like to show you what we're going to mark as Exhibit 1, which is plaintiff Jesus E. Gonzalez Hernandez responses to defendants' first set of interrogatories. Do you recognize this document?
(Defendants' Exhibit 1 was marked for Identification.)
A. I can't see it.
Q. Can you see the document on your screen?
A. I'm looking at it to see if I remember it. don't remember this. I don't remember.

Q. Is this your signature on page 11 of the document?
A. Yes.
Q. And you signed this under oath, correct?
A. Yes.
D
Q. In response to interrogatory number 1, you listed your address as 19320 Southwest 190th Street, Miami, Florida 33187. Is that correct?
A. Correct.
Q. And you signed these interrogatory answers on December 2nd, 2025, correct?
A. Yes.
Q. And was that address accurate when you signed these answers?
A. Yes.
Q. Is that still your current address today?
A. No.
Q. How long did you live at 19320 Southwest 190th Street?
A. I don't recall. I don't recall exactly. I don't recall with any accuracy. A year. I don't know.
Q. When did you first move to that address?
A. I don't remember.
Q. Do you own the house located at that address?
A. No.



Q. Who owns that house?
A. Leo Interian.
Q. And for the court reporter, first name is Leo, L-E-O. Last name, I believe, is spelled I-N-T-E-R-I-A-N. Is that correct, Mr. Gonzalez?
A. Okay.
Q. Were you a tenant at that address?
A. No.
Q. Did you have a written lease with the owner?
A. No.
Q. Did you pay rent to the owner?
A. No.
Q. Were you a guest of the owner?
A. Yes.
Q. What is your relationship with the owner of that property?
A. And we were friends. We were close friends. But later on the friendship became even stronger because his wife got sick. He got sick. We were friends. My son, myself and, and, and, and this gentleman.
Q. So you and Esnol and Leo Interian were close friends?
A. Yes.
Q. Who else lived at that address during the time you lived there?



A. My wife, him, and myself.
Q. Did Mr. Interian's wife live there?
A. Yes. When we moved in, she had already passed away.
Q. What is your wife's name?
A. Maritza Alfonso Bonachea. Alfonso, A-L-F-O-N-S-O. Bonachea, B-O-N-A-C-H-E-A. Maritza, M-A-R-I-T-Z-A.
Q. Did your wife pay rent to the owner of the house?
A. No.
Q. Did Esnol live at that address?
A. No.
Q. Did anyone else live there besides you and Leo and your wife?
MS. SCHICKMAN: Objection. Asked and answered.
THE WITNESS: No.
BY MR. VERBIT:
Q. When did you first meet Leo Interian?
A. Around 2015, 2014.
Q. Where did you first meet him?
A. Working at the stations through Noel Melo.
Q. When you say the stations, are you referring to the Metrorail stations that you worked on for Statewide?
A. What?
Q. When you refer to the stations, are you



referring to the Metrorail stations that you worked on for Statewide?
A. I worked there for Statewide.
Q. What were the circumstances that resulted in you meeting Leo Interian for the first time?
A. Work relations. We, we met because I was working for him in those stations and we started to develop a friendship.
Q. How often do you see Leo Interian?
A. Every, every 15 or 20 days, we do talk.
Q. When did you leave the address of the house owned by Leo Interian?
A. I don't know. A year, two years. I don't know.
Q. Well, according to your interrogatory answers, as of December 2nd, 2025, you lived at the address of Mr. Interian. My question is, when did you move out?
A. I don't recall the exact date.
Q. Was it during January, 2026?
A. I don't know.
Q. What is your current address?
A. One moment. 624 Southwest 34th Avenue, Miami, Florida 33135.
MR. VERBIT: I got the Southwest 34th Avenue. What was the house number?

THE INTERPRETER: 624, sir.
MR. VERBIT: 624. And what was the ZIP code?
THE WITNESS: 33135.
BY MR. VERBIT:
Q. When did you move into that address?
A. I don't recall.
Q. Does your wife live at that address with you?
A. Correct.
Q. Does Esnol live there?
A. No.
Q. Are you a tenant at that address?
A. Rent.
D
Q. When was the last time you saw Leo Interian?
A. About a month ago, more or less.
Q. When was the last time you spoke with him?
A. Around three or four days that he had a biopsy performed and I called him to see how he was doing.
Q. Three or four days ago?
A. Three or four days.
Q. Do you consider Leo Interian a friend?
MS. SCHICKMAN: Objection. Asked and answered.
THE WITNESS: A friend. One more of my family.
MR. VERBIT: I'm sorry. Mr. Interpreter, could you say --
THE INTERPRETER: One more member of my family.



BY MR. VERBIT:
Q. One more member of my family?
A. Correct.
Q. Do you consider Leo Interian a family member?
MS. SCHICKMAN: Objection. Asked and answered.
THE WITNESS: A friend.
BY MR. VERBIT:
Q. Is Leo Interian a relative of yours?
A. No.
Q. Have you ever worked with Leo Interian?
A. Yes. At the stations. And he was the project manager there. He was the boss from Miami-Dade county. He was in -- he was -- he was in charge of traction power at the station.
MR. VERBIT: Could you repeat, Mr. Interpreter, that last sentence? I didn't get that.
THE INTERPRETER: He was the project manager, the boss for Miami-Dade county at the stations. He was in charge of traction power.
BY MR. VERBIT:
Q. Traction power?
A. He was a traction power supervisor.
Q. Do you know if Mr. Interian works for Miami-Dade county currently?
A. Currently, he's sick.



MR. VERBIT: I'm sorry, Mr. Interpreter --
THE INTERPRETER: Currently, he is sick.
BY MR. VERBIT:
Q. He's sick. Do you know if Mr. Interian retired or is on medical leave?
A. I don't know. He, he is dealing with a serious illness and he's treating for it.
Q. Have you ever discussed Leo Interian's work with him?
A. No. He doesn't talk about that.
D
Q. Did you know Leo Interian during the time you worked on Miami-Dade county Metro station projects in 2023?
A. Yes. I've known him many years before that year.
Q. Did you ever see Leo Interian at any of the Metro station work sites?
A. Yes. Every day.
Q. Did Mr. Interian have any role in supervising the Metro station projects?
A. He was the one who handled the stations and they had to be delivered to him correctly. We worked for him.
Q. When you say we, who are you referring to?
A. My son and I and no one else. We were the ones



who worked on the stations.
Q. So your testimony is that you and your son worked for Mr. Interian?
A. Leo worked for Miami-Dade and he was the one in charge for Miami-Dade county for traction power.
Q. Did you ever discuss the Metro station projects with Mr. Interian?
A. The projects? The things we were doing?
Q. Yes.
A. Yes. Every day when he arrived on Sundays, he would explain a lot of things.
Q. Did Mr. Interian ever inspect your work on the Metro station projects?
A. Every day.
D
Q. Did you ever discuss your work hours with Mr. Interian?
A. No.
Q. Did you ever discuss overtime with Mr. Interian?
A. We, we discussed on -- we discussed on, on several occasions the hours that we were being run from one station to the next one. We discussed it with Paola and they heard our arguments -- and he heard our arguments with her on several occasions.
And, and, and he was aware of this because he

was in charge of the project. And here he would hear us discussing that. And he would hear that they said that the hours that we worked on this station would be passed on to the next station and we would be paid then.
Q. Do you know if Mr. Interian ever reviewed or approved certified payroll reports for the projects that you worked on?
A. I don't know.
Q. What knowledge or information do you believe Mr. Interian has about your overtime claims in this case?
A. And because he heard the arguments that -- saying that we could -- that he only paid 40 hours and he couldn't pay anymore, and that the hours would be transferred from one station to other one, and that the overtime hours would be paid when we -- the test was done at the last station at the end.
Q. When were these discussions held that you claim that Mr. Interian heard?
A. Well, at all the stations -- we had discussions about this with Paola at all the station. And she was the one who would transmit the information to Noel. Because Noel, we only saw him the first two weeks at the first station and then the last two weeks at the last station. But since she didn't know what to say to us, she had to -- she had to refer to Mr. Noel. And we had a



lot of problems because of this.
Q. So your testimony is that Mr. Interian heard your discussions with Paola that took place at every station. Is that correct?
A. In many of them, not all of them. Not only Mr. Interian. There were other Miami-Dade county employees there as well.
Q. Which other Miami-Dade employees were present?
A. One of them was Dalton Rivera, and the escorts that they would send to open up the station that the traction -- they worked for traction power. I might recall three or four names, but there were many different escorts who came to open up the, the station.
Q. Is it your testimony that Dalton Rivera and these other unnamed escorts heard your discussions with Paola regarding your overtime?
A. I think that if they didn't hear it, it was because they were deaf. And because I speak very loud. And when I'm angry, I speak even loud.

D

Q. How did you come to live at the property located at 19320 Southwest 190th Street?
A. And, and his wife got sick. She was in the hospital for about a month. We would go to the hospital, my wife, myself, Leo, and we would take care of her. And when his wife passed away, he said, "Why don't you move



in with me? And that -- and that way you can save money on rent."
Q. So Mr. Interian invited you to live at his house?
MS. SCHICKMAN: Objection. Asked and answered.
THE WITNESS: Yes. Mr. Interian and his son. It was a mutual agreement so that he would have somebody who could accompany him at home and do things for him.
BY MR. VERBIT:
Q. When did your arrangement with Mr. Interian regarding that property begin?
A. I don't remember. I don't recall the exact date.
Q. Was this arrangement in place during April through September of 2023?
A. Who, who, who can remember that? My, my mind doesn't remember.
Q. When did you first start working for Statewide Electrical Services?
A. 2014 or 2015?
Q. How did you learn about the job at Statewide?
A. Through a cousin of mine, a cousin of my wife who worked with him.
Q. What was the cousin's name?



A. Jose. I don't recall his last name. Jose Luis Jose, something like that. We call him Jose, but his name is Jose Luis.
Q. And Jose Luis was a employee of Statewide at that time?
A. Correct.
Q. Who hired you to work at Statewide?
A. I went there, I introduced myself, and he said, "You start working now with me." That was the contract. He said, "You'll start working for me now." I never saw any contract or anything.
Q. And who was it who said, "You'll start working for me now"?
A. Noel Melo.
Q. And who is Noel Melo?
A. The owner of the company named Statewide Electrical Services.
Q. Do you know what Noel Melo's position was at Statewide?
A. As far as I understand, he was the owner. There's nobody else.
Q. Was Noel Melo your supervisor?
A. Yes. He did everything.
Q. How often did you interact with Noel Melo?
A. At the beginning we would see each other every

date of filing. If I were to claim for overtime hours for all the time I worked for him, he would be paying -- he would -- I -- with this money, he paid all the houses that he owned.

Q. My question is – maybe I'm not asking it right. In this lawsuit, are you claiming overtime for any weeks before April, 2023? It's a simple yes or no.

A. For the month of April, I don't recall what month I started working on the first station. I don't have a computer in my head. I'm claiming from when I -- I'm claiming from when I started the first station in Allapattah until I finished at Brickell. The months and dates, I don't recall.

Q. Can you see the document on your screen, which is your sworn answers to the interrogatories?

A. Yes.

Q. And in your sworn answers, you state that you're claiming overtime for the period from April, 2023 through September, 2023, correct?

A. Correct. Now that I'm seeing it, yes. But you're asking me questions that I would have to rely on my own memory, and I can't.

Q. I don't want you to rely on your own memory when there's a sworn interrogatory answer right in front of you that has the information that I'm asking about,



correct?

MS. SCHICKMAN: Mr. Verbit, can you scroll so that he can see the bottom of it, please? Thank you.

BY MR. VERBIT:

Q. So my question is – a simple yes or no, are you claiming overtime for any weeks before April, 2023?

A. No. Before, no.

Q. Are you claiming overtime in this lawsuit for any weeks after September, 2023?

A. After September, no.

Q. When did you first notice that you were working more than 40 hours in a week?

A. Since we started.

Q. So that would be in April of 2023?

A. Yes. You have asked me the same question three times already.

Q. What made you notice that you were working more than 40 hours in a week?

A. After eight hours, you're working overtime.

Q. When did you first notice that you did not receive payment for overtime hours that you claim to have worked?

A. First week of work, he paid only 40 hours. He paid only 40 hours for every week. He said it very



clearly at the beginning, "There's no money. It's only 40 hours."

D

Q. And in April of 2023, did you bring – the fact that you were claiming to have worked overtime and weren't being paid for it, did you bring this to anyone's attention at the time?

A. And, and in -- starting in April, we discussed it, my son and I, because he said that we -- he would pay us a bonus because the job required four persons to do it, and only two persons were going to do it, my son and I. And we -- he said that he was going to pay us a bonus at the end. Once he said at the end, since he did not pay the bonus, I said, "Well, you'll have to pay me for all the overtime that I worked during the project.

And it's quite clear that they took a -- made a record of hours that we would go beyond the 40 hours. Of course, we were transferred from one station to the next station.

Q. When did you first discuss with Noel Melo that you were working more than 40 hours in a week?

A. I never spoke with him. I saw him in the first month, the first two weeks, and then in the last month, the last two weeks. He never spoke with us.

Q. So you never discussed with Noel Melo that you were working more than 40 hours in a week?



A. No. Because of the agreement that we had between both of us that he did not comply with later.

Q. And you're referring to what you claim was an agreement that he was going to pay you a bonus?

A. And I -- and, and we were working based on the agreement that he would pay us a bonus at the end of the project. And once he did not comply with that agreement, I said to him that we were -- that I was going to claim all the overtime hours that, myself and, and my son had worked. Because he deceived us. He stole money from us.

Q. Did you have any other conversations with Mr. Melo about overtime?

A. No.

Q. Did you ever discuss overtime with anyone else at Statewide besides Noel Melo?

A. With Paola, who's the one who would keep a record of all the hours worked.

Q. So Paola kept a record of all the hours that you worked. Is that correct?

A. And she kept the record of the hours that we had worked overtime and that these hours would be transferred to the next station. But we were never paid for those hours.

Q. After you noticed that you weren't being paid overtime back in April, did you continue working at

Statewide after that?
A. Yes. Until we finished with all the stations.
D
Q. Did you submit any written objection to Statewide about your claim that you weren't being paid overtime?
A. No.
Q. After you noticed that you were working overtime that you claim you were not being paid for, did you consult with an attorney at that time?
A. No.
Q. Did you contact the Department of Labor?
A. No.
Q. Mr. Gonzalez, do you keep a calendar?
A. Of what they didn't pay me?
Q. Just in general, do you keep a calendar for your personal reference?
A. No.
Q. Do you keep a planner or diary?
A. No.
Q. During the period of time from April through September of 2023, did you write down your work hours anywhere?
A. No. Because it was for each station. Once we finished a station, Paola would say, "You have so many overtime hours, these would be transferred for the next



station." It was easy to keep that record. And, and she would say, "For the next station you're owed 8 hours, for the next one you'll be owed 12 hours." She would give us the number.
Q. My question is, during April through September of 2023, did you write down your work hours anywhere?
A. Yes. We kept a notebook with those hours. I don't know where that notebook is, but we did record the hours.
Q. Did I understand correctly? You said you don't know where that notebook is?
A. Well, when everything happened and I filed the lawsuit, I don't know. Maybe I still have it. I haven't found it.
Q. Did you keep any personal records showing the hours you worked each day?
A. Because every -- at each station, we would say, "This week we worked 46, the next week we worked 42, the next week we worked --" That is, we worked three days. That those hours would be transferred on to the next station. It was easy to keep that record. And there were only two of us working. And there can't be a confusion between only two workers.
Q. My question was, did you keep any personal records showing the hours you worked each day?



A. Yes. I kept it.
Q. Was that in the notebook that you can't find?
A. I would write it down, on a sheet of paper, all the hours that we work during the week.
Q. Where's that sheet of paper today?
A. Who knows where it is?
Q. Do you have any documents that show what time you started work each day?
A. We would coordinate that with the escort at the station.
Q. Yeah. My question is, do you have any documents that show what time you started work each day?
A. No. They -- we worked different schedules. And, and this was coordinated with the escort that we had. We had different schedules. Some days we would start at 10 o'clock in the morning, other days at 6 o'clock in the morning. This was something that I coordinated with the escort that would be with us the next day.
Q. Do you have any documents that show what time you stopped work each day?
A. No.
Q. Do you have any documents that show your total hours worked each week?
A. No.



D
Q. Did you ever create any records for yourself showing the overtime hours you claim to have worked?
A. It was something very easy because Paola would tell us every week, "You did five hours more. These would be transferred to the next station for the next month." It was very easy to keep that record for two persons.
MR. VERBIT: I'm sorry. You said it was very easy to keep that record what?
THE INTERPRETER: For two persons.
BY MR. VERBIT:
Q. It was easy for who to keep the record?
A. And it was -- and it was very easy for me and my son. Yes. We could work five hours overtime, and that's it. I wrote it down somewhere, but I don't know where that -- where that paper is.
Q. After you noticed that you weren't being paid overtime, did you or Esnol begin keeping records for yourselves showing the number of hours you claim to have actually worked?
A. Yes. We -- yes, we would write -- we would keep on a sheet of papers the hours that we worked. I don't know where that piece of paper is. You've already asked me -- asked me that same question several times.
Q. Not that I'm asking the same questions. It's

that you're giving the same answers?
MS. SCHICKMAN: Objection. Form. That wasn't a question.
BY MR. VERBIT:
D
Q. Mr. Gonzalez, do you have any text messages about your work hours?
A. No.
Q. Do you have any emails about your work hours?
A. No.
Q. Do you have any photographs showing what days or times you were at work?
A. No.
Q. How did you calculate the amount of overtime you were claiming in this lawsuit.
A. Yes. Because as I said before, she would tell us every week the number of hours that were transferred through the next month. And it was very easy to keep track of the number of hours. And to make your job -- and to make your job easier, you could ask the county for the number of hours that the escorts were there while we were working, and you could figure out the number of hours that we worked.
D
Q. Mr. Gonzalez, you in your sworn answers to the interrogatory number 13, you stated that you estimated working 84 hours of overtime, correct?



A. Correct.
Q. And how did you calculate the amount of 84 hours?
A. The same -- the same question. You're just asking in a different way. Because she would tell me every week the hours that she owed us.
Q. Did you use any documents to calculate your overtime claim of 84 hours in these answered interrogatories?
A. Are you asking me if I used any documents?
Q. Yes.
A. I used what she would tell us for the hours and what I wrote down on the piece of paper. That's why I reached that figure.
Q. So did you rely on your memory?
A. From memory and what I had written down.
Q. Did anyone help you calculate your overtime claim?
A. I and my son, we did not calculate. We just wrote down the number of hours that we had written down that we had worked.
Q. My question was, did anyone help you in compiling your overtime claim?
A. No.
D
Q. I'd like to show you what we're going to mark



as Exhibit 2, which is a handwritten document which was produced in discovery in this case by the plaintiffs as bates number 856. Can you see what's on my screen or what's on your screen, sir?
(Defendants' Exhibit 2 was marked for Identification.)
A. Yes. The hours.
Q. Is this your handwriting on this document?
A. No.
Q. Whose handwriting is it?
A. I think it's my wife's handwriting. I think it's my wife's handwriting because my handwriting is very bad.
Q. Did you create this document?
A. Based on the list that I had, the hours that Paola would give us, and the hours that I would jot down.
Q. My question is, did you create this document?
A. Of course, I created it.
Q. Thank you. When did you create this document?
A. Once we -- once -- when we finished the stations, we knew that there was going to be problems, and that's when it was created. When we finished the last one, we knew that there was going to be problems.
Q. What month and year did you create this document?



A. When I finished the last station.
Q. So that would be September of 2023?
A. Yes. September.
Q. Where were you when you created this document?
A. And, and it -- I did it based on the list that I prepared at each station and which I would write down. And then I gave them to my wife. And my wife prepared this document because she has good handwriting. And there were a lot of words in English, I don't know how to spell them. And my wife was the one who prepared this document.
Q. Did anyone ask you to create this document?
A. No. I was the one who created it because I knew that something was going to go wrong.
Q. Did you create this document before or after you hired your attorney in this case?
A. And I, I prepared it before. When I hired my attorneys, I already had this paper prepared.
Q. How long after you stopped working at Statewide did you create this document?
A. Just when I finished the last station, I had already prepared it because I knew that there was going to be problems. And I knew that he wasn't going to pay me and that's why I was going to claim all the overtime hours.

Q. When you created this document, what sources did you use?

MS. SCHICKMAN: Objection. Asked and answered.

THE WITNESS: I, I already told you. What I would write down and what Paola would tell me. And I would like to make an (indiscernible) so that it be on the record.

BY MR. VERBIT:

Q. Did you use any written records to create this document?

MS. SCHICKMAN: Objection. Asked and answered. Verbit, he told you what he's used like four times. Can we go to the next question, please?

MR. VERBIT: I think he can say yes or no as to whether he used any written records to create this document.

THE WITNESS: Yes. I created -- yes, I kept the record.

BY MR. VERBIT:

Q. And that record is the one that you can no longer find, correct?

A. I threw them out once my wife declared this record here. I had all the numbers for each one of the stations. Why did I want to keep those notes?

Q. Did you use any calendar to create this record?



A. The weeks that we are working, the days that we are working, I would keep a record of per day.

Q. My question was, did you use a calendar to create this document?

A. Of course, I had to keep -- to keep the record, I have to write down the day, the day of the week and put it on the piece of paper.

Q. Did you use any time sheets to create this document?

A. Yes.

Q. Which timesheets did you use?

A. A piece of paper that I would write on it every day.

Q. Did you use any text messages to create this document?

A. No.

Q. Did you use any emails to create this document?

A. No.

Q. Did you use any photographs to create this document?

A. No.

Q. I noticed that the document says "calendar" in parentheses next to some entries. What does that refer to?

A. What is he asking me?



Q. I noticed that the document says "calendar" in parentheses next to some entries. What does that refer to?

A. And I, I think my wife was the one who wrote it, because I had it written down on the sheets of paper in which I had written down everything. And then she put there, "Calendar."

Q. Do you know which calendar she's referring to?

A. And with the sheet of paper which I'd write down, Wednesday the 25th, so many hours, Thursday the 13th, so many hours. That's the calendar she's referring to.

Q. At the top of the document, it says – looks like, "1 Junio, 2022 to 1 Junio, 2025. Three years." What does that refer to?

A. I don't remember. Either the three years that I've been working with him. But I -- that -- this is only for six stations, but I did a whole lot of other stations with him.

Q. When you created this document, were you claiming overtime for periods outside of the April through September period?

A. Outside that, no.

MR. VERBIT: Sorry. Interpreter, could you repeat the answer?



THE INTERPRETER: Outside that period, no.

MR. VERBIT: Okay.

THE WITNESS: You've asked that same question five or six times. He has a very poor memory.

BY MR. VERBIT:

D

Q. This document lists, "Six estaciones de April to September, 2023." Six stations from April to September, 2023. Is that correct?

A. Correct.

Q. The first entry says, "Aallapattah 16H," and then, "Ultra estacion." What does that mean?

THE INTERPRETER: It's not "ultra", it's "primera", first. 1-E-R-A means first.

MR. VERBIT: Okay.

THE INTERPRETER: Excuse me for interrupting, sir.

THE WITNESS: That was the first station that was -- that was done.

BY MR. VERBIT:

Q. Does 16H mean 16 hours?

A. 16 hours that were transferred from Allapattah to Santa Clara.

Q. Is that 16 hours in one day, one week, or the total for the entire period you worked at that station?

A. That was the total number of overtime hours

that I worked on that station during one month. We had one month to do every station. We couldn't fall behind schedule.
Q. The second entry says, "Santa Clara 20H Calendar." What does that mean?
A. 20 hours. I did 20 overtime hours in Santa Clara, which I was not paid for.
Q. And then in the third entry says that you worked 24 hours at the Culmer station. Is that correct?
A. 24 hours.
Q. And that's 24 hours of overtime, correct?
A. Yes. Correct.
Q. And the fourth entry says, "Gap Tie 2, 8H." Is that 8 hours total of overtime at Gap Tie 2?
A. Eight hours overtime.
Q. And the fifth entry says, "Overtown, 8H." Is that 8 hours total overtime at Overtown?
A. Correct.
Q. And the sixth entry says, "Brickell, 8H." Is that 8 hours of overtime that you're claiming that you worked at the Brickell station?
A. Correct.
Q. And if one adds up the hours you listed, it equals 84 hours. Is that correct?
A. 84 hours.



Q. So you're claiming exactly 84 hours of overtime for the April through September, 2023 period, correct?
A. Correct.
Q. Are you aware that your son Esnol is also claiming exactly 84 hours of overtime?
A. Yes. We work together, both of us.
Q. Did you and Esnol compare notes before you created this document?
A. Yes. We did it together. We prepared the notes together. We worked together.
Q. At the bottom of the -- (sneezes) excuse me. At the bottom of the document, there's text in Spanish. Can you read what it says?
A. And, and it says, "Unloading the equipment at each station, we always worked more than 10 hours established. And that's where we accumulated more -- most of the overtime hours. We would finish at 8, 9 or 10 o'clock in the evening every time we did that."
Q. Does it say that you always worked more than the established 10 hours?
A. Correct.
Q. What did you mean by, "Established 10 hours"?
A. We would work from Monday through Thursday, 10 hours a day, so as not to have to work on Friday.
Q. Who established 10 hours?



A. I set the 10 hours. And, and this was -- happened at the first station. Leo was present, Dalton was present, Esnol and myself were present. And we reached the agreement that we -- Noel was present. And Leo asked Noel, "Can they do the job because this job requires four workers?" And Noel said, "Yes. The two of them can do it. And if the two of them do it within the scheduled time period, I will give them a bonus."
Q. Looking at the numbers in this document, Exhibit 2, I believe it is. Looking at these numbers, 16, 20, 24, 8, 8, and 8, how did you come up with these specific amounts?
MS. SCHICKMAN: Objection. Asked and answered.
THE WITNESS: Several times.
MS. SCHICKMAN: You have to answer the question (In Spanish.).
THE WITNESS: Because we jotted down the hours and Paola would tell us the number of hours every week.
BY MR. VERBIT:
Q. For the Allapattah entry showing 16 hours, can you tell me the specific dates when you worked those 16 overtime hours?
A. That's impossible. I don't have that -- I don't keep that in my memory.



Q. For the Santa Clara entry showing 20 hours, can you tell me the specific dates when you worked those 20 overtime hours?
A. No. I can't tell you when I did the overtime hours. I wrote them down, but right now I can't. I don't remember when.
Q. Would you give the same answer for the Culmer entry showing 24 hours?
A. The same answer.
Q. And it would be the same answer with respect to Gap Tie 2, Overtown, and Brickell, correct?
A. Correct.
Q. Did you review any paychecks before creating this document?
A. If I reviewed the checks? The checks were always for 40 hours. His words were, "I don't pay overtime." That's what he said.
Q. So you did not review any paychecks before creating this document, correct?
A. Yes. I reviewed the checks.
Q. Did you review any certified payroll reports before creating this document?
A. No.
Q. Did you create any other versions of this document?

Page 54

A. No.
Q. Did Esnol create a similar document?
A. The same document was for both of us. It was the same thing.
Q. I'm showing you what we're going to have marked as Exhibit 3. And they've been marked with date stamps as "Gonzalez 000940" and "Gonzalez 000941." Do you recognize these documents?
(Defendants' Exhibit 3 was marked for Identification.)
A. I'd have to check to see if these are the same ones like the ones she gave me. The -- this document could only be understood by Paola and Noel.
Q. These documents were produced by you in discovery in this lawsuit, correct?
A. Yes. Correct.
Q. And the documents are numbered as Gonzalez 940 and 941. Those are your production numbers, right?
A. Correct.
Q. Did you provide these calendar pages to your attorney for production in this case?
A. Correct.
Q. Who created these calendar pages?
A. Noel and Paola. One of the two of them had to do it.

Page 55

Q. And Paola was a project manager at Statewide, correct?
MS. SCHICKMAN: Objection. Form.
THE WITNESS: Yes.
BY MR. VERBIT:
Q. As Project Manager, did Paola track work assignments and employee locations?
MS. SCHICKMAN: Objection. Form.
THE WITNESS: She had to do that but I didn't see her all the time. Sometimes she would go three days without going to any one of the -- to any one of the stations.
BY MR. VERBIT:
Q. Did you create or contribute to any of the entries on these calendars?
A. No idea.
Q. Are these calendars that Paola maintained in the regular course of her work at Statewide?
A. And she would bring them to the station where we're working. If she was the one who prepared them or Noel was the one who prepared them, I don't know.
Q. Would Paola have created these calendar entries during May and July, 2023 while the work was being performed?
A. Yes. She would bring these papers when we were

Page 56

at the stations.
Q. How did you come into possession of these calendar pages?
A. She gave them to me. And, of course, since I didn't understand what it read -- what it said, she gave them to me.
Q. When did she give them to you?
A. I don't remember.
Q. Did you obtain them while you were still employed at Statewide?
A. Yes.
Q. Do you recall why Paola would have given these documents to you, these calendar documents?
A. Because of all the arguments we were having about the hours worked, of the hours that would be transferred from one station to the other ones. But I really didn't understand what the document said.
Q. During April through September of 2023, what days of the week did you typically work?
A. From Monday through Thursday.
Q. Did you work on Saturdays?
A. No.
Q. Did you work Sundays?
A. No.
Q. What time did you typically start work each

Page 57

day?
A. It depended on the coordination that I made. Some days we would start at 6 o'clock in the morning, other days at 10 o'clock. Generally at 10 o'clock.
MR. VERBIT: Mr. Interpreter, did he say, "Generally at 10 o'clock."?
THE INTERPRETER: General --
MS. SCHICKMAN: No. He didn't say --
THE INTERPRETER: "But generally at 10 o'clock."
MS. SCHICKMAN: He didn't say that.
THE INTERPRETER: No?
MS. SCHICKMAN: No. No, sir.
THE INTERPRETER: No.
MR. VERBIT: Okay.
BY MR. VERBIT:
Q. Well, I have to ask the question again. What time did you typically start work each day? I heard, "It depends on coordination with somebody. And some days at 6 a.m." And then something about 10 a.m. Could you clarify the answer, please?
A. At 10 o'clock in the morning.
Q. So some days you started at 6 a.m. and other days you started at 10 a.m. Is that correct?
A. At 10 o'clock in the morning. Correct.

Q. What time did you typically finish work each day?
A. If we started at 6 o'clock in the morning, we would work for 10 hours. If we started at 10 o'clock in the morning, we would work for 10 hours. And unless we had to stay more time to finish some job, and that's where the overtime hours came from.
Q. Did your work schedule change from week to week?
A. If I understood it, if I thought that I had to change it, yes.

D

Q. Who determined your work schedule?
A. We, we would determine. Nobody would determine it for us. We determined it according to what I coordinated with the escorts. They didn't know at what time we would you start work every day. If Paola didn't ask me, "At what time did you start work?", they wouldn't know at what time we started work.
Q. During the period from April through September 2023, how did you get to work each day?
A. And I had the -- I used a company van until we reached Overtown station. And after that I had to use my own truck. But when I had the company truck, I -- company van, I had to even pay for the gas myself. He didn't want to pay for the gas. And he said that I had



to pay for the gas myself because I live too far away and I had to pay for the gas myself.
Q. So you drove a vehicle that was provided by Statewide?
A. Yes.
Q. Did you know the vehicle was equipped with a SunPass that would record the times you went through each toll?
A. I think he had it registered, but I had no access to that.
Q. But were you aware that there was a SunPass in that vehicle?
A. I already said I think so. I don't know anything about that.
Q. Would you agree that the SunPass system is not biased in favor of you or Statewide?
A. I didn't understand that question.
Q. Would you agree that the SunPass system, as far as recording the times passing through tolls, is not biased in favor of you or Statewide?
A. I don't know. I don't know anything about that.
Q. Do you dispute any of the times that the SunPass recorded you as passing through toll?
A. I don't know. I have no knowledge about that.



Q. Who paid the tolls?
A. And when -- and when it was the company van, the company paid for them. When it would -- when I started using my truck, I paid for them. But I -- not always did I take -- I didn't always take the expressway. Sometimes I would go using the, the, the, the side streets.
Q. How did you know which station to go to work each day?
A. Because we would start working on one station, and we would work at that station for an entire month.
Q. Who told you which station to work at?
A. And, for example, when we started at the first station, we, we started at Allapattah, we knew it was. Then it was Brickell, and we would know that it was -- the next month would be Brickell. And when I started at the first station, maybe Paola told us to work at there. When I went to Santa Clara, I knew I had to go to work at Santa Clara.
MR. VERBIT: All right. I see that the court reporter is asking for a break. Do you want to take a half hour for lunch, Ms. Schickman, or should we just take a short break?
MS. SCHICKMAN: 10 minutes, please.
THE INTERPRETER: 10 minutes says the witness.



MR. VERBIT: Okay. All right.
THE INTERPRETER: Fine with me, according to Ms. Schickman.
MR. VERBIT: Okay. Shannon, do you want to take -- let's take a 10 minute break?
THE REPORTER: Sounds great. Thank you very much.
MR. VERBIT: You're welcome. We'll come back at 1:15.
MS. SCHICKMAN: Okay. Perfect.
(Off the record.)
THE REPORTER: Back on the record.
MR. VERBIT: Thank you.
BY MR. VERBIT:
Q. Mr. Gonzalez, who supervised your work at the Metro stations?
A. Leo Interian and Dalton Rivera.
Q. Did you ever sign in or out of the work sites?
A. Never.
Q. Did anyone from Miami-Dade county check your work?
A. Dalton Rivera and Leo Interian.
Q. Did anyone from Miami-Dade county verify your hours?
A. No one.

D

Q. We're going to go back to looking at Exhibit 1, the sworn answers to interrogatories. Mr. Gonzalez, during April, 2023, you were driving Statewide's vehicle equipped with a SunPass to and from work, correct?
MS. SCHICKMAN: Objection. Form.
THE WITNESS: Yes. I think -- I think -- yes. I think it did, but I don't know if it had -- it was registered in SunPass or not.
BY MR. VERBIT:
Q. According to your sworn interrogatory answers, you worked at the Allapattah station from April 17th to April 20th, 2023, and from April 24th to April 27th, 2023, correct?
A. It's impossible for me to have worked an entire station from April 17th to April the 20th. I had an entire month to do the work at any station.
Q. According to your sworn interrogatory answers, you worked eight hours of overtime at the Allapattah station from April 17th to April 20th, 2023, correct?
A. From the 17th to the 20th, it's only three days. During the month I worked at the Allapattah station, I had 16 hours of overtime.
Q. According to your sworn answers to interrogatory number 13, you said, "I estimated working 84 hours of overtime based on the following overtime



hours worked during the following weeks at each of the stations I worked for the defendants." Is that correct? Was that your answer?
A. Yes.
Q. And your sworn interrogatory answers that you gave under oath swearing to tell the truth. According to your sworn interrogatory answers, you worked eight hours of overtime at the Allapattah station from April 17th to April 20th, 2023, correct?
A. I could -- I, I had four weeks to work in each station. I could have worked eight hours of unpaid overtime during that week. It could have been in the first week or the second week or the third week. I just wrote down the overtime hours that I worked over the month -- over the whole month. I worked that month, 16 hours overtime.
Q. According to your sworn interrogatory answers, you worked eight hours of overtime at the Allapattah station from April 24 to April 27, 2023, correct?
A. And I could have worked those eight hours of unpaid overtime during that week. But right now I don't recall based on my memory what days I worked overtime hours. And I calculated the overtime hours on the basis of the month.
Q. During the week of April 17 to April 20 –



well, let me rephrase that.
During the period of time from April 17th to April 20th, 2023 in which your sworn interrogatory answers say you worked eight hours of overtime at the Allapattah station, what were you doing at that station that week that allegedly caused you to work overtime?
A. What was I doing? I was working. And I didn't go there to have -- to have a vacation. There were only two of us. We went there to work. The work of four persons was being done by only two persons.
Q. According to your sworn interrogatory answers, you worked eight hours of overtime at the Allapattah station from April 24 to April 27, 2023. My question is, what were you doing at that station that week that allegedly caused you to work overt?
MS. SCHICKMAN: Objection. Asked and answered.
BY MR. VERBIT:
Q. You can answer.
A. And I already -- and I -- as I explained before, the overtime hours were calculated on a monthly basis because I had a month at each station. If I did the unpaid overtime hours, it was because I was working.
Q. During May 2023, you were driving Statewide vehicle equipped with a SunPass to and from work, correct?



MS. SCHICKMAN: Objection. Asked and answered.
MR. VERBIT: I asked him about April, not May. Now I'm asking about May. That's a different question.
MS. SCHICKMAN: You asked him if he drove a Statewide van with a SunPass in it. And he answered you. So that's the same question.
MR. VERBIT: I'm asking specifically about the month of May.
THE WITNESS: I don't recall if I was still using the company van in the month of May.
BY MR. VERBIT:
Q. And according to your sworn interrogatory answers, you worked at the Santa Clara station, station 2, from May 8th to May 11th, 2023, for which you are claiming six hours of unpaid overtime. Is that correct?
A. Correct.

D

Q. What were you doing that week that allegedly caused you to work overtime?
A. Working at the station. And we were only two persons. And sometimes we had to stay overtime because or else we wouldn't finish the station within the month. And we were forced to stay overtime beyond the scheduled work time because the testing people had already been scheduled to come and do the testing. They had already

set their date. They had flights. They were coming in from out of state and everything. So we had to finish the work.
D
Q. Now, I'm showing you the May, 2023 calendar that you produced as Gonzalez 940. And looking at the date range from May 8th to May 11th, what does this calendar show you?
A. What week? I don't understand what you're asking me.
Q. Looking at the date range from May 8th to May 11th. What does this calendar show you?
A. Nothing. Nothing. The only ones who understand this calendar is Paola and Noel. They were the one who prepared this calendar page.
Q. In fact, you were not scheduled to work at all during the week of May 8th, correct?
MS. SCHICKMAN: Objection. Form.
THE WITNESS: I don't know if I worked or not that week. I don't know.
BY MR. VERBIT:
Q. And looking back at, according to your sworn interrogatory answers, you worked at the Santa Clara station from May 15th to May 18th, for which you're claiming six hours of unpaid overtime. Is that correct?
A. Correct.



D
Q. What were you doing at that station that week that allegedly caused you to work overtime?
A. Working.
Q. To try to save time, to make this deposition shorter, can we agree that if I ask you what you were doing at the stations during the weeks that you claim to have worked overtime, that your answer is going to be that you were working?
A. Working.
Q. According to your sworn interrogatory answers, you worked at the Santa Clara station from May 22nd to May 25th, for which you were claiming eight hours of unpaid overtime, correct?
A. Correct.
Q. Why did you increase your estimate for that week from six hours of overtime the previous week to eight hours of overtime that week?
A. Because the work in each station got complicated. Each station wasn't the same. And you would have to work more in one station than in the other one. And, for example, to get the floors so that they could pass the test, sometimes you spent an entire week just painting the floor. It was unpredictable.
D
Q. Now I'm showing you the May, 2023 calendar that you produced as Gonzalez 940. Looking at the date range



from May 22nd to May 25th, this calendar shows you were working at Gap Tie 2, correct?
A. That's what that says. And this was prepared by Noel and Paola. There are things that are written there that I don't understand what they mean.
Q. Do you remember working at Gap Tie 2 from May 22nd to May 25th, 2023?
A. Based on my memory, I don't remember.
Q. Let me ask you about a specific day, May 25th, 2023. Do you remember where you worked that day?
A. How can I remember where I was working on May 25th, 2023? That's impossible.
Q. Is Gap Tie 2 a passenger station?
A. No.
Q. What is located at Gap Tie 2?
A. Overtown -- between Overtown and the next station, which is Earlington, there's too large a distance. And in order to not have a voltage drop, there is this Gap Tie 2 where they have four breakers and four -- and they don't have the transformers. And they don't have the 700 volts as -- and this is set up so that there isn't a voltage drop that stops -- that would hinder the operations of the trains.
Q. So there's four breakers located at Gap Tie 2. Is that correct?



A. Correct.
Q. What else is located at Gap Tie 2?
A. Annunciators. The skeeter where all the low voltage connections are located. The skeeter is where all the low voltage connections and the control are located.
Q. You're using a word I don't understand. Skeeter?
THE INTERPRETER: That's what he says. I don't know what it is either, sir. I'm sorry.
BY MR. VERBIT:
Q. Mr. Gonzalez, what is a skeeter?
A. A skeeter is where all the connections are located and the control.
Q. Does Gap Tie 2 have a traction power room?
A. It's just a station but smaller than the other ones. It's an open area. Two big doors that we had always open so we can have ventilation.
Q. Sorry if you've already answered this, but does Gap Tie 2 have a traction power room?
A. I don't know what you're referring to with that question. A, a traction power room?
Q. I'd like to show you what we're going to mark as Exhibit 4, which is a photo of Gap Tie 2 traction power room. Does that refresh your memory, Mr. Gonzalez?

(Defendants' Exhibit 4 was marked for
Identification.)
A. That, that's where -- and that's where the four breakers, the annunciator, and the skeeter are set up. They can't be set up in the air. They have to have -- they have to have a station.
Q. Is the traction power room open to the public?
A. No.
Q. How would one gain admittance to that room?
A. That's why we -- and that's why we did the coordination of escorts in order -- we would coordinate to be there at 6:00 a.m, and they would come and be there at 6:00 a.m. We can't go into those areas alone. We had to have a county employee with us at all times. They couldn't open up and leave. They had to stay there while we were there.
Q. Did the Santa Clara station also have a traction power room?
A. Much, much -- but one much larger, and the public does not have access to that. Only the traction power employees have access to that room because there's high voltage in those rooms.
Q. I'd like to show you what we're going to mark as Exhibit 5, which is a photo of --
(Defendants' Exhibit 5 was marked for



Identification.)
A. That's Santa Clara.
Q. Santa Clara. Do you recognize that as Santa Clara?
A. Yes, of course.
Q. Mr. Gonzalez, do you remember if you were driving Statewide vehicle during June, 2023?
A. I don't remember. I don't know which month they took away the van.

D

Q. And back at looking at Exhibit 1, your answer to paragraph 13, according to your sworn interrogatory answers, you worked at the Culmer station 3 from June 12th to June 15th, 2023, for which you were claiming six hours of unpaid overtime, correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at the Culmer station from June 19th to June 22nd, 2023, for which you are claiming eight hours of unpaid overtime, correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at the Culmer station from June 26th to June 29th, 2023, for which you are claiming 10 hours of unpaid overtime, correct?
A. Correct.



Q. And according to your sworn interrogatory answers, you worked at Gap Tie 2 from July 17th to July 20th, 2023, for which you were claiming four hours of unpaid overtime, correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at Gap Tie 2 from July 24th to July 27th, 2023, for which you were claiming four hours of unpaid overtime, correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at the Overtown station from August 21st to August 24th, 2023, for which you're claiming four hours of unpaid overtime correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at the Overtown station from August 28th to August 30th, 2023, for which you were claiming four hours of unpaid overtime, correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at the Brickell station from September 11th to September 14th, 2023, for which you were claiming two hours of unpaid overtime, correct?
A. Correct.



Q. And according to your sworn interrogatory answers, you worked at the Brickell station from September 18th to September 21st, 2023, for which you are claiming three hours of unpaid overtime, correct?
A. Correct.
Q. And according to your sworn interrogatory answers, you worked at the Brickell station from September 25th to September 28th, 2023, for which you're claiming four hours of unpaid overtime, correct?
A. Correct.
Q. What were Paola Usuga's job duties as you understood them?
A. And if -- her job was to be project manager, problem was that she didn't master anything about the job. She didn't know anything about the job. But that was not her fault. That was Noel's fault. And all she knew how to do was to bring the materials that we requested that she bring and to get food. That's all she knew.

D

Q. Do you know if Paola handled payroll for Statewide?
A. As far as I know, no. Because she never controlled my hours or anything.
Q. How often did you interact with Paola during the April through September period of time?

A. And she was the one that would come -- not always, she would come to the job site and she would bring the materials that I had requested. She couldn't make any decisions in case there was any problems because unfortunately she was not an electrician. She didn't know what we were doing.
Q. Do you know how Statewide tracked the hours you worked every week?
A. Nobody knows that. Nobody knows that. They didn't know even know what, what time I would start work one day, what time I would finish work on another day. They, they didn't know that.
Q. Did you fill out written timesheets?
A. She never gave us anything of the sort.
Q. Did you report your hours to Statewide?
A. No.
Q. Did you report your hours to Paola?
A. When she asked me once in a while. Sometimes she would call me and ask me, "At what time did you start working today?" But that wasn't all the time. It was once in a while she would do that.
Q. So Paola would call you on the phone?
A. Every once in a while she would call me or I would call her whenever I needed any materials.
Q. When you had these conversations with Paola,



did you tell her what time you started and stopped work each day?
A. And sometimes she would ask me at what time I started work. And I would say we started work at, at 6 o'clock in the morning. And if we left at night -- and that we left work at 9 o'clock in the evening. But she would not write down that we finished at 9 o'clock. She would only write down 10 hours. And the difference, she said, "I'll move -- I'll transfer those hours to the next station."
Q. In these conversations with Paola, did you also tell her Esnol's hours?
A. Yes.
Q. Did you ever have text messages with Paola?
A. I think so, but I'm not sure. I think there's some text messages that we exchanged. I think so.
Q. Did you ever email Paola?
A. No.
Q. Do you still have any text messages from Paola?
A. Yes.
Q. Do you still have any text messages that you sent to Paola?
A. Yes.
Q. Have you provided all those text messages to your attorney?



A. Yes.
Q. Did you ever record any conversations with employees of Statewide?
MS. SCHICKMAN: Objection. Objection. This was a point of contention in the last deposition we did. And it was said that defendants would not speak on it until there was a ruling made. So I will make the same decision for plaintiffs. We will not speak on it until a ruling is made.
BY MR. VERBIT:
Q. I'd like to show you, back at Exhibit 1, your sworn answers to interrogatories and in response to interrogatory number 6. Under subheading F, you answered that, "A particularly memorable discussion occurred at station 2 on or about May 25th, 2023, when my son Esnol, Ms. Usuga, and I discussed this issue." Do you recall providing this answer to interrogatories?
A. Yes. But it wasn't only at that station. We had arguments at every station.
D
Q. Did you record this particularly memorable discussion –
MS. SCHICKMAN: Objection. He's not responding to that.
MR. VERBIT: Are you instructing him not to answer?



MS. SCHICKMAN: To questions regarding the recording that -- yes, I am. I stated during Defendants' deposition, once a ruling is made on that, on the admissibility of that, we can ask questions.
MR. VERBIT: And I just want to make a record of what you're instructing him not to answer. So I'm going to ask two or three more questions on this. And then you can instruct him not to answer, okay?
BY MR. VERBIT:
Q. Did you –
MS. SCHICKMAN: He can answer in regards to the interrogatory.
MR. VERBIT: I understand.
MS. SCHICKMAN: We're just not discussing the contents of the video.
BY MR. VERBIT:
Q. Did you tell Paola that you were recording her?
MS. SCHICKMAN: Don't respond to this one.
MR. VERBIT: Are you instructing her not to answer that?
MS. SCHICKMAN: Yeah.
BY MR. VERBIT:
Q. Did Paola consent to being recorded.

MS. SCHICKMAN: Don't respond to this.
MR. VERBIT: And you're instructing him not to answer that?
MS. SCHICKMAN: Yes.
BY MR. VERBIT:
D
Q. Mr. Gonzalez, you received your paychecks on the Monday after each weekly pay period, correct?
A. Monday, Tuesday, Wednesday.
Q. Did Statewide pay you for all the non-overtime hours that you worked?
A. What?
Q. Did Statewide pay you for all the non-overtime hours that you worked?
A. Yes. The 40 hours. They did pay me for my 40 hours.
Q. Do you know what a certified payroll report is?
A. And I'm now working with a company that its checks are not in any way similar with the checks that I received from Statewide. Statewide would give me a check with my name and that's what it paid me. It didn't say how many hours of work. It didn't say anything.
Q. My question was, do you know what a certified payroll report is? Do you know?
A. No.
Q. Did you know that Statewide had to submit



certified payroll reports to Miami-Dade county for the Metro station projects?
A. No. No. I didn't know that. I just worked.
Q. Were you ever asked to provide information for certified payroll reports for Statewide?
A. No.
MR. VERBIT: I just need to take a break for like a minute to grab something. I'll be right back.
Okay. Sorry about that. I'm back.
THE REPORTER: We're still on the record.
BY MR. VERBIT:
Q. Mr. Gonzalez, did you understand that the Metro station projects were government projects?
A. Yes.
Q. Did you understand that there was government oversight of these projects?
A. As far as I understand, yes.
Q. Did you know that the government required reports about worker hours?
A. No. That part, I don't know anything about that.
D
Q. Did you and Esnol work the same hours every week?
A. Correct.



Q. Did you and Esnol always work at the same locations together?
A. Together.
Q. When did you decide to consult with an attorney about this matter?
A. When I realized that he hadn't paid me -- that he didn't pay me my bonus.
Q. When did you realize that?
A. I had to -- and I had to wait a long time to file this lawsuit because the county did not pay Noel on time. Noel had to wait for a year, more than a year before he got paid by the county for the whole project. And he said, "I haven't been paid. I haven't been paid. I can't pay you." And finally when he was got -- when he got paid by the county, he told me, "I have nothing for you." And that's when I decided to file the lawsuit.
Q. When did Noel tell you that?
A. During the time he hadn't been paid. And he even went to Leo's house where I was living to tell me that he hadn't paid -- he hadn't been paid, and then he could not pay us.
Q. And you said that at a certain point that Noel said there's nothing for you, correct?
A. And when he collected the payment, I went to the office and he told me I had to wait. And I kept on



waiting and waiting. He still hasn't paid me. That was the last time I saw him, when I went to the office.
Q. When was that?
A. I don't remember.
Q. When did you first consult with an attorney about this matter?
MS. SCHICKMAN: Objection. Asked and answered.
BY MR. VERBIT:
Q. Oh, I withdraw the question. How did you find your attorney?
THE INTERPRETER: Excuse me.
BY MR. VERBIT:
Q. How did you find your attorney?
A. Through a friend of mine who knew about FairLaw.
D
Q. Are you aware that your attorney sent a demand letter to Statewide before filing this lawsuit?
A. I have no knowledge about that.
Q. I'd like to show you what we're going to mark as Exhibit 6, which is a letter dated February 24, 2025, to Noel Melo from the FairLaw Firm. Have you ever seen this document before?
(Defendants' Exhibit 6 was marked for Identification.)
A. Yes. I, I didn't recall the letter. That was

Page 82

the month that was presented to him.
Q. And this letter is dated about 16 months after your employment was Statewide ended, correct?
A. Correct. Because those were 16 months that he was waiting for the county to pay him. And finally when the county paid him, that was 16 months later, and he did not pay me.
Q. Were you aware of when the county paid Statewide?
A. Yes. Because I, I heard about it.
Q. Who did you hear about it from?
A. I don't -- and I, I don't recall who told me that they had paid it. That's when I called him and he told me, "Yes, I had been paid, and --" But the money is there -- but the money was there and there and never -- and he never paid me.
Q. Did you review this letter before it was sent?
A. What letter? I'm not sure.
Q. I'm talking about what we marked as Exhibit 6, the February 24th, 2025, letter from FairLaw Firm to Noel Melo. And my question is, did you review that letter before it was sent?
A. I don't remember. I can't answer something, something -- about something that I'm not sure.
Q. Did you approve the contents of this letter?

Page 83

A. I must have agreed to and approved this letter because it's the, the one that I made. But I don't remember.
Q. The demand letter claimed that you were owed commissions and bonuses totaling more than $160,000, correct?
A. Correct.
Q. Do you know why those claims are not part of this lawsuit?
MS. SCHICKMAN: Objection. Calls for speculation. He's not an attorney.
MR. VERBIT: I'm asking him if he knows why.
THE WITNESS: Because I had nothing to demonstrate this because it was an agreement between him and myself. I had -- I had nothing to show as evidence of that. I couldn't demonstrate that. And the overtime hours, I could demonstrate them. That's why I filed this lawsuit.
BY MR. VERBIT:
Q. The demand letter claimed that you're owed $15,762.24 in unpaid overtime wages, correct?
A. Correct.
Q. In this lawsuit, you're claiming only $6,331.50 in unpaid overtime wages, correct?
A. Correct.

Page 84

Q. Do you know what caused the amount of your claim for unpaid overtime to change between this letter and the lawsuit?
A. And, and as, as I said before, I had no way of demonstrating that he was going to pay me a bonus because it was a verbal agreement in both of us. But the overtime hours, I could demonstrate them. And that's why I filed the lawsuit.
Q. My question was, do you know what caused the amount of your claim for unpaid overtime to change from the 15,762.24 stated in the demand letter to the $6,331.50 you're claiming in this lawsuit?
A. I don't recall that. I can't answer that.
Q. Are you in possession of any documents relevant to this case that you have not yet provided to your attorney?
A. No. Everything that I had, I gave it to them.
MS. SCHICKMAN: Can we take five minutes because he has to (indiscernible)?
MR. VERBIT: Yeah. No problem.
MS. SCHICKMAN: Okay. Thank you.
(Off the record.)
THE REPORTER: We're back on the record.
BY MR. VERBIT:
Q. Mr. Gonzalez, since leaving Statewide, have you

Page 85

worked anywhere else?
A. Yes.
Q. Where have you worked?
A. At the Electric Union. Currently, I'm working at the Federal Bank with a company called i-Tex.
THE INTERPRETER: I-T-C-H. I think that's the name.
MR. VERBIT: I-T-C-H? That what he said?
THE WITNESS: i-Tech. i-Tech.
THE INTERPRETER: I-T-E-C-H. But I'm not sure.
MR. VERBIT: Okay. That sounds fine.
BY MR. VERBIT:
Q. And are you working as an electrician for them?
A. As a journeyman -- as a journeyman electrician.
Q. I'd like to show you a series of 19 photographs that were produced by the plaintiffs in discovery in this case. Mr. Gonzalez, do you recognize these photographs?
A. That was all -- that was the work that we did, all of us did in the -- at each station.
Q. Who took these photographs?
A. I did. And my son.
Q. And when were they taken?
A. I don't remember.
Q. And what do these photographs show us?
A. That is the lightning arrester. It's a

protection against lightning bolts. And they're on the train tracks themselves.
Q. What was your purpose in taking these photographs?
A. Because I had to send it to them because they didn't visit the work -- job site.
Q. Who did you have to send them to?
A. To Noel or Paola. I think I sent them all to Noel. And that was when we had good communication between Noel, myself, and my son. After he got the money, we lost all communication.
Q. Did Noel ever explain why he wanted you to send him these photographs?
A. Because it -- because it was the work we were doing, so he could know what we were, were doing.
Q. What equipment did you use to take these photographs?
A. My, my cell phone or my son's cell phone. Either one of them.
Q. I have no further questions.
MS. SCHICKMAN: I do have a few questions for him. It shouldn't take too long.
CROSS-EXAMINATION
BY MS. SCHICKMAN:
Q. Mr. Gonzalez, did you record all the hours that



you worked, every single day, each day that you worked?
A. To whom -- to whom could I report them? There was nobody there that I could report my hours.
Q. And during the course of this deposition, Mr. Verbit kept asking you about number 13 to your interrogatories with a list of hours and stations that were worked. Are those exact hours or are those hours estimated?
A. For me they're -- for me they're quite -- they're pretty exact, but they're still an approximation. And in my opinion, I'm missing out on hours.
MS. SCHICKMAN: Mr. Verbit, can I have you pull up the exhibit because my laptop's not connected to this computer.
MR. VERBIT: Okay.
MS. SCHICKMAN: Thank you. Thank you. (talks in Spanish).
MR. VERBIT: Excuse me.
MS. SCHICKMAN: Sorry. Sorry.
BY MS. SCHICKMAN:
Q. The first paragraph of question number 13, can you read it to me?
MS. SCHICKMAN: Well, I don't think he can read it. Okay. Would you be able to read it to him, Translator?



THE INTERPRETER: I can translate it to him, ma'am. No problem.
MS. SCHICKMAN: Okay. Please do so.
BY MS. SCHICKMAN:
Q. I'll ask you one more time. Are these hours an estimate?
A. An estimate? Yes. Based on what I jotted down.

D

Q. And my last question for you, Mr. Gonzalez, who at Statewide kept track of your hours?
A. No one.
MS. SCHICKMAN: I have no further questions at this time.
MR. VERBIT: Okay. All right. We're done.
THE REPORTER: Well, let me ask, are we going to read or waive?
MR. VERBIT: Mr. Gonzalez, you have the right to read the transcript of this deposition to satisfy yourself that the court reporter has accurately transcribed your testimony.
MS. SCHICKMAN: We can go ahead and waive it. He can't even read in English.
MR. VERBIT: Okay.
THE REPORTER: Okay.
MR. VERBIT: Okay. So waive.



THE REPORTER: So we'll waive. Does anybody want to order a copy?
MR. VERBIT: I do.
THE REPORTER: Okay.
MS. SCHICKMAN: We'll get back to you about that.
THE REPORTER: All right. Thank you. And one last question. Mr. Verbit, the last photos you showed, will that be Exhibit number 7?
MR. VERBIT: Yes.
(Defendants' Exhibit 7 was marked for Identification.)
THE REPORTER: Okay.
MR. VERBIT: Composite exhibit. And do you want me to email you the exhibits?
THE REPORTER: Yes, please. If you will.
MR. VERBIT: Okay. And I'll copy Katelyn on that as well.
THE REPORTER: All right. Thank you so much.
MS. SCHICKMAN: Okay. Thank you.
THE REPORTER: All right. With that, we can go off the record.
(Deposition concluded at 2:51 p.m.)