UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-22530-BECERRA/TORRES

JESUS E. GONZALEZ HERNANDEZ,

PLAINTIFF,

vs.

STATEWIDE ELECTRICAL SERVICES
INC., AND NOEL MELO,

Defendant.

DEPOSITION OF NOEL MELO

TAKEN ON BEHALF OF THE PLAINTIFF

FEBRUARY 2ND, 2026
10:10 A.M. TO 2:02 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

REPORTED BY:
SYDELL FOOTMAN,CER, CDR, CERTIFIED COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



Exhibit A

has more information about this project.
Q. Okay. Perfect. Mr. Melo, did you prepare for today's deposition in any way?
A. If I prepare for the deposition in any way?
Q. Yes.
A. What do you mean?
Q. Did you do anything to get ready for the deposition today?
A. I don't see the intention of your question.
You're going to ask me about things that I know, so I'm always prepared.
Q. Right, but other than your normal work with Statewide, did you review any documents to prepare for today's deposition?
A. We have been submitting evidence for the last two months. Did you consider that to be ready?
Q. I'm not talking about documents that were just exchanged during the course of this litigation.
I'm saying for you to be able to testify here today, is there anything that you did to prepare yourself?
A. I don't understand the question, but to be honest and try to answer that, I've been submitting evidence about this case, so somehow I'm prepared. I know what happened. I have all the evidence that shows



that what they're saying is not true.
So, if that answers the question, that's the answer.
Q. So, did you review any documents to prepare for today?
A. I've been reviewing documents for the last two months. Does that classify for that?
Q. Sure. What documents did you review?
A. Everything that I've been submitting to my counsel, every document that has been submitted as an evidence. I've been doing that myself, so that -- your question is if I was prepared? Yes, I was. I've been doing this for two months.
Q. Sure. I don't want to go into anything that you're discussing directly with your counsel, but I want to get a sense of what documents specifically you reviewed in order to prepare for today's deposition, especially because you're testifying on behalf of Statewide as its corporate representative. So, which documents did you review to prepare?
A. We have submitted evidence of the SunPass recording for the transporter that he was driving. We have -- I have been able to submit the daily project report I chose every day that was worked in the job site. And that's everything that I've seen is related



to those particular topics.
Q. Okay. Did you speak with anyone in preparation for today's deposition? And again, if you spoke with your counsel, I don't want to know anything that you said to him or that he said to you.
A. My answer is no.
Q. Okay. And do you understand that your testimony as corporate representative is binding on Statewide on the company itself?
A. Yes.
Q. And referring back to the document that I just showed you, the deposition notice, are there any topics from that document that you are not prepared to testify about today?
A. I believe I have enough knowledge about the project, so I'm prepared to answer any questions you have.
Q. Okay. Great. So, first, I want to talk about the general business and background of Statewide.
And now when I refer to Statewide throughout the deposition, I'm referring to Statewide Electrical Services, Inc., the Defendant in this lawsuit, understood?
A. Can you repeat that, please?
Q. Sure. Throughout the deposition, I might



refer to Statewide Electrical Services, Inc., just as Statewide. So, do you understand that's what I mean when I say Statewide?
A. Yes, I understand.
Q. And throughout the deposition, I might also refer to the Plaintiff, Jesus E. Gonzalez Hernandez, just as Jesus. Do you understand what I'm talking about when I say Jesus?
A. Yes.
Q. And last point I wanted to clarify is that when I refer to Esnol, I'm talking about Esnol Gonzalez Cantero, the opt-in Plaintiff in the lawsuit, understood?
A. Yes.
Q. Okay. So, what is your involvement with Statewide?
A. I am the owner and the President of Statewide since 1999.
D
Q. Has there ever been any other owner of Statewide?
A. No.
Q. And has there ever been any other President of Statewide?
A. My wife probably was a Vice President at one time, but I do not recall exactly when it was. But most

Page 26

its employees, during the time that Jesus and Esnol were working for Statewide?

A. Can you repeat the question? So, I can provide you with the right answer.

Q. Of course. During the time that Jesus and Esnol were working for Statewide, what was Statewide's timekeeping policy for its employees?

A. The timekeeping for the employees. We were - - they were voluntarily giving the hours. The FLSA doesn't specify how to keep the hours. So, they were voluntarily giving the hours. When I was on site, I was taking the time myself, which is what's for the first station Allapattah, and after that, he was communicating with my project manager and giving the time voluntarily to my project manager, so I can write down the time sheet myself in the office.

But I want to point out something else. He was giving 10 hours a day, and he was not working even 10 hours. And we got the proof according now, not only the escort. We have to prove with the SunPass. Okay. So, just for you to know.

Q. Okay. Again, Mr. Melo, I don't mean to be difficult here, but I need to make sure that your answers are directly responsive to my questions, right?

I am not looking for kind of your personal

Page 27

side takes on these issues. I need to make sure that you're responding directly to my questions, understood?

A. I do.

Q. Okay. So, you mentioned that the timekeeping policy for Statewide during the time that Jesus and Esnol worked there was that the hours were voluntarily given. Can you explain to me what you mean by that?

A. Yes. Our first day, so I was in the office.

I was recording the time myself and the rest of the station, they were either given the information to Paola, they were given the information to Paola, which was my project manager. Paola was referring the information to me, and I was doing the time sheet in the office.

Q. So, you were preparing the time sheets from Statewide's office for the employees that were working out in the field on the projects?

A. Yes. That's not a violation.

Q. Okay.

A. Let's say that doesn't specify how to do it.

Q. Mr. Melo, I didn't ask you whether it was a violation.

A. But I want to make –

MR. VERBIT: Excuse me. Mr. Melo is allowed to explain his answers, okay? You don't get to

Page 28

just cut them off like that.

BY MR. LAROU:

Q. Sure. But I need to make sure that we're not wasting time here today and that the answers are directly responsive to my questions.

A. I have all day.

Q. Okay. So, you mentioned that you were personally preparing these time records in the office.

You also refer to Paola as having some kind of involvement in the timekeeping. What was Paola's level of involvement in that?

A. Paola was the project manager for that particular project. First station was Allapattah, which is located 3501 Northwest 12th Avenue. I was in that station myself for a month, to determine what the job requires to be completed. Since all the stations were the same type, I decided that we were able to do the project within 40 hours every week, four weeks.

So, that's why we always mentioned 40 hours a week, four weeks, because it was what I decided when I was in Allapattah doing the first station. All the stations are typical; it's the same job in every address.

Q. So, what do you mean that you decided there would be 40 hours for –

Page 29

A. because I –

Q. – the Allapattah – project.

A. No, let me go back. Allapattah, I was the one doing this station. Jesus and Esnol were there with me and we did it in less than a month. So, we took that in consideration to do the rest of the station.

And then for Santa Clara, I put Paola in charge because I already knew what it took to get the job done. So, I was actually making sure the project was on a schedule, and we're completing the task within the time that we already decided, and we had available to do.

Q. So, you said, "Paola was in charge." What were her responsibilities as far as the timekeeping during the Santa Clara portion of the Miami-Dade Metrorail Project?

A. Paola was in charge from the first station.

She was in charge of the communication schedule. And after station number two, Santa Clara, she was also in charge of the completion of the station on the job site. That's why she was going there every day for the first station, it was me. The rest of the station was Paola. That's why we decided to do the timekeeping that way. So, they can't report the time to Paola. I was doing the time sheet in my office.

Page 38

A. No, I didn't say that.
Q. Right. I guess that's why I'm confused because you stated, several times that they were, they were, the policy was that employees voluntarily report the hours they worked to Statewide.
A. Probably that's not the best way to describe that particular task, but we were taking the information from them.
If they were voluntarily classified, I'm not sure, but they had to -- probably voluntarily is not the best description. They had to report the time to Paola from the second station up to the last station. And that's what they did. We were using -- if you go back to the FLSA voluntarily is a word that is written there.
Okay. So, I mean, I don't know what type of question you're trying to, to give it for me, to give you an answer for, but they were voluntarily described there.
So, if it is not a violation, they do report the time every day, whatever the description, the word that described that action is they did, and that's what the law requires.
Q. So, you mentioned that beginning at the Santa Clara station and moving forward through the Miami-Dade Metro Project, Jesus and Esnol were reporting their

Page 39

hours to Paola, right? And I know you mentioned earlier that you were the one preparing time records for Jesus and Esnol. How was that information communicated to you?
A. You mean how that information was getting to me?
Q. Yes.
A. From Paola.
Q. Okay. So, if I'm understanding correctly, Jesus and Esnol, they would tell Paola what hours they worked and then Paola would tell you.
A. No, it's not that simple. Paola was there every day. And when Paola was there every day doing the, what the job is required to be completed, Paola was also writing down the time that they were working.
Let's say, Paola got there at 10:00 A.M., Paola will ask them, what time do you guys got here? 8 o'clock.
Usually, we started at 07:00 for that particular station with the exception of some days, but most of the time it was a seven.
So, Paola will ask them, they will provide the time at 07:00. And then if Paola has to go and go someplace else, go someplace else and do not come back to the office the following day, they will provide the

Page 40

time or at the end of the day, they will provide the time to Paola so we can keep track of time.
But like I said before, they were reporting 10 hours a day and there's some patrols that they were leaving early. How do you explain that?
Q. Okay. So, you mentioned that, that Paola would write down the hours that Jesus and Esnol would work during the metrorail project?
A. Yes. That's one of the methods approved by the FLSA. There is no specification on how to keep track of the time. FLSA is very vague in that particular description. They do not say how to keep it, they do not say if it is electronic method, written method, voluntary information. They said, "Employee must keep accurate, must keep records of the time that the employees work and has to be accurate." And that's what we did.
Q. Yeah. I don't, I don't disagree with you on that. But those records that Paola was keeping, do you, do you still have those records?
A. You have them here. It's one of the notes that I have here. This is the time sheet that I was doing every day. You already have this probably as an evidence. This is my handwriting.
Q. Sure. And give me just one second. I'm going

D

Page 41

to pull up a second exhibit.
Okay. So, showing you what I'll mark as Exhibit 2, which are Statewide's handwritten notes, Bate stamped as ST0112 through ST0139. And Mr. Melo, the, the document that I'm sharing with you on my screen, is this the same document that's in front of you?
(Thereupon, Plaintiff's Exhibit 2 was entered into the record.)
A. Yes.
BY MR. LAROU:
Q. Okay. So, you mentioned these handwritten notes. These were kept by you?
A. Yes.
Q. When did you prepare these notes?
A. At the same time that the work was performed.
Q. Okay. And my question for you -- going back to my last question before showing you the exhibit regarding Paola's recording of the employers, do you or Statewide currently have any of those handwritten contemporaneous notes that were taken by Paola?
A. The information that she provided to me is the information that is here that was contemporaneously done according to the job. The notes you're talking about, I have no note. I have -- I don't have anything like; I don't have any information like that. Paola was the one

Page 50

the notes? This is a – these are the notes. This is the only notes I have, and this was done the same day that work does. Does that answer the question?

Q. Sure, so I don't – it does. My question is do either you or Statewide have documents prepared by Paola showing the – reflecting the hours that Jesus or Esnol worked?

MR. VERBIT: Objection, asked and answered. Now, four times.

A. Is this the document that you're referring to?

BY MR. LAROU:

D

Q. All right. So, I'll take that as a no. So, after Jesus and Esnol would report their hours to Paola while working at the metrorail project, would Paola communicate that information to you?

A. Paola has my phone number. We have a personal communication and we make contact in the office every day either in the morning or the afternoon. Usually in the afternoon at the end of the day. So, she was communicating the information to me and I was writing this document that I showed before.

Q. Are there any – did Paola ever communicate the hours worked by Jesus or Esnol in writing to you?

A. Communication with Paola and this is the only note we have that was contemporaneously done with the

Page 51

time with the work performed at the job site. These are the notes – these are the only notes. So, if you keep referring to any other note, this is what you always have because this is the reality and this is the only thing we have.

The communication that I had from Paola, I made this document based on that information. The information was provided by them voluntarily like the FLSA says that we can do and this document was done every day and this corroborate the daily report project and this corroborate the SunPass, which by the way, I paid them more than what they say, I pay 10 hours and they were leaving at 04:00, 2 O'clock. So, that means Paola already went there and they were not – they were taking in consideration Paola's not going to come back anymore. So, they were not being actually very honest.

Q. Sure, but my question was: how did Paola communicate that information to you, was she communicated –

A. Verbally.

Q. – verbally.

A. Yes.

Q. Okay.

A. By the way, by the way, it's not a – it's not a – it's not a violation. The violation is if I do

Page 52

this document the same day. It doesn't matter how I get the information. What's important is that the document was done contemporaneously with the work.

That's the only thing that is important. So, do not try to find anything. It's not here. It's just this note. Okay. You have them, you have them as approved as an exhibit. Maybe I don't know what is the Exhibit number, but that's what you have and that's what you will get and this is corroborated by this.

Corroborated by this, and corroborated by the LPC tracker that we haven't talked about it, which is an official document that was submitted to the Dade county. We can talk about it more if you want to.

Q. Sure. So, for each day worked by Jesus and Esnol that's reflected in Exhibit 2 that I just showed you, those handwritten notes, Paola communicated that information to you verbally every single time?

A. Yes.

Q. Did she – how did she tell you? Was it over the phone or?

A. We meet – we usually meet at the end of the day. Paola has his computer in the office next to mine. So, seeing each other every day at the end of the day.

Q. Okay. During the time that Jesus and Esnol were working at the Miami-Dade Metrorail Project, did

Page 53

Statewide have any kind of meal break requirements?

A. They were taking their own lunch, but I want to add something to that, adults are not required to have any lunch. But I'm just going to say what the law says, but they were taking the lunch. Adults are not required to have lunch. If you go – if you go back to the timesheet, the time they're requesting for lunch, I actually pay for that time. The law says if they take 10-15 minutes I have to pay for that time, so that I actually did for the – pay for that time, even they took more than – more than – more than 15 minutes.

What can you expect when they're leaving two hours early? How could you expect they're going to take just 10-15 minutes?

These people were lazy. They were in – they were in connection with the project manager. They were doing whatever they wanted there and that's what you want – don't want to hear. They had something else going on there and I can't prove it. They were leaving at 02:00 or 03:00 P.M. and we're paying them until 05:30. So, does that make any difference at all, the 15, 20, 12 minutes? So, you're going to try to trick me into a lunch break. Lunch break, if it is half an hour I can deduct and not pay them. If it is less than 15 minutes I can incorporate that in the paycheck so you

Page 62

take a quick 15 minute break?
THE COURT REPORTER: Sure.
MR. VERBIT: Yeah.
THE COURT REPORTER: Okay. The time is 11:30 a.m., we'll be back at 11:45. Going off the record.
(Thereupon, a short discussion was held off record.)
(Deposition resumed.)
THE COURT REPORTER: The time is 11:46 A.M. Back on record.
BY MR. LAROU:
Q. Okay. Mr. Melo, we spent quite a bit of time talking about the handwritten records that were contemporaneously, and maintained by Statewide to reflect the coursework by Jesus. Are there any other type of documents that exist –
A. Yes.
Q. – they were created by Statewide that reflect the hours worked by Jesus or Esnol?
A. Yes. Let me turn off the AC. It is making too much noise over here. I'll answer.
Q. Sure.
A. That's better. Now, can you repeat the question, please?

Page 63

D

Q. Yeah, of course. You know, we spent a lot of time talking about the handwritten notes that were – you're alleging were contemporaneously kept, which I introduced as an Exhibit 2, other than that document.
Are there any other documents prepared or maintained by Statewide that reflect the hours that Jesus and Esnol worked?
A. Yes.
Q. What documents are those?
A. Okay. There are several documents. I'm going to start with a simple one, which is the daily report, I believe. You already have the daily report. I have been able to show it to you a couple of times.
I believe you have this document that described every day that we were in every station with the test that was performed, and the hours that we work. Okay, that's one.
The other method of information that we have that can corroborate the hours are the schedule. We have several e-mails about the schedule for the stations.
So, we're not allowed to be in the station without an escort. So, there are several person that can serve as a witness. One of them is Leo Iterian and one more time by coincidence he used to live in the same

Page 64

house like with Leo Iterian. We also have Dalton Rivera and we have the other people were escort. They were changed from time to time. So, I do not recall the names, might be one or two.
But in addition to that to comply with that, to provide more information about it, we have the SunPass with the address of every station in the time he was leaving his house, the time he was going through the SunPass to pick up his son, and the time he was getting off in the last talk going to the station, and also we have the time he was going back home that most of the time does not – it's not the amount of hours that we actually paid. Every time that you see a circle here, that means they left, let's say, for example August 31st, we paid them up to 06:00 P.M. But he was driving back home at 04:44 P.M. And we have this here in the SunPass with the transporter that we can attach to the vehicle he was driving with the tag number and the VIN number.
And we can go on and on every day that is specified in the claim, which is not even accurate.
The order of the station is not accurate. But we will go – we can go by this and go to the SunPass, to the timesheet, to the witnesses that were there, but there is also one document that I believe is the most

Page 65

important one.
This project is for Miami-Dade County. There is a process that we have to comply with in order to get paid. That's what they call the LPC tracker. I don't know if you are familiar with that. That's a document that I have to incorporate in a website that belongs to Miami-Dade County that says, "How many hours and how many employees were present at the job site, and how many hours they work, with the salary that we pay them." So, that document is – a document that is not only official, it's a document that I did – that I completed under perjury that I was saying the truth.
In addition to that, we have Leo Iterian was the project manager that can corroborate. It was the one that was approving those hours for us to get paid. We also have Dalton, that was another project manager for the project for Miami-Dade County that can corroborate our information. So, we have like – and also we have the check. When we give back the check to them they were taking a look at the check, and they were signing that the hours reflected in the paycheck are in compliance with the time that they work on the job site.
However, if we go check by check – we only go by the SunPass, we can determine that every week we pay them more than – we pay them 40 hours. They were not

even close, okay? So, you were asking how many layers I have to demonstrate this I have like 4, 5 or 7, that they all match to the point.

Q. Okay.

THE COURT REPORTER: Okay. Counsel, so I'm sorry to interrupt. I need the names, the spelling of the names of the escorts.

THE WITNESS: The name of the escort is -- I do not remember the name of the escort. I can look it up and provide it to you. Usually we don't keep track of the person that was there for Miami-Dade County. But the project managers that were present either Leo Iterian or Dalton Rivera can spell it for you.

THE COURT REPORTER: Yes.

THE WITNESS: I believe his information was provided by my counsel to --

THE COURT REPORTER: Yes, you said it on the record. So, I just need you to spell those two project manager names.

THE WITNESS: Okay. Dalton is D-a-l-t-o-n and his last name is Rivera, R-I-v-e-r-a. That's one of the project manager and the other project manager, it was Leo, L-e-o, Iterian, I-T-E-R-I-A-N.



THE COURT REPORTER: Thank you. That was all I needed.

BY MR. LAROU:

Q. Okay. So, all of the documents that you just referenced reflecting the hours worked by Jesus and Esnol during the Miami-Dade Metrorail Project, all of those documents have been produced to us. Is that right?

A. They have been sent to my Counsel, so I believe they do.

Q. And other -- those documents other than the documents that have been produced to us so far as of today, are there any missing documents that Statewide or you have that reflect the hours worked by Jesus and Esnol?

A. I believe that we have provided everything we have.

Q. Okay. Just a moment ago you mentioned SunPass records. How did you get those records?

A. It was driving a company's car and the transporter -- this transporter that the company paid for and I do have the transporter number attached to the vehicle he was driving and with a VIN number in the tag number. I can give it to you if you want to.

Q. That's okay. So, who was driving that



vehicle, Jesus, or Esnol?

A. Jesus.

Q. Did Jesus drive a company car to work every single day that he worked?

A. Yes. Up to 09/01/2023 that the vehicle was broken and we took it to the Palmetto Ford.

Q. I'm sorry, you said when? I just -- I didn't hear you.

A. September 1st, 2023. The vehicle was taken to Palmetto Ford. It was broken --

Q. Okay.

A. -- it was still on the warranty. So, they -- they didn't use the company truck anymore after that particular date, September 1st, 2023.

Q. But before September 1st, they always drove the company car to work.

A. Yes. He was taking the car to his house. Yes.

Q. Okay. Do you know how Esnol would get to work?

A. He was picking up Esnol every day. He was living on the 19320 Southwest 190th Street, which is the same address like Leo Iterian, same house, it was going to Esnol's house that I believe Esnol was leaving -- I don't have his address right now, but it was his house

D



was located around 24th Street, Cutaway in 80- some. I do not recall the exact address. It was getting off right there. And then he was going back to the expressway and going to the upside and he was doing the same thing in the afternoon.

Q. Okay. So, earlier you -- we discussed in detail the timekeeping process for Statewide employees.

You mentioned that other than at the Allapattah project, where you were working at stations two through six, Jesus and Esnol would report their hours to Paola, Paola would report those hours to you, and then you would keep those handwritten notes, reflecting the hours that they worked.

While you were keeping those records, did you have any procedure to verify whether those hours were accurate?

A. I was acting in good faith. I was taking the information they were providing us, and I didn't have a reason to believe they were lying to us at that time.

I've been an employee for the company since 2014, so it was doing a good job. I have to admit that. I'm not saying they were bad workers. I'm saying they were actually lying to me about the hours that were actually in the job site, and the transactions that we have from the SunPass shows very clear that we're

Page 74

this actually shows. This document by itself, without anything else, shows they were working less than 40.
And by the way, this document, I cannot do anything about it. This is a SunPass record. He was driving my car. This is electronic evidence of everyday job, and if you can see the consistency of the traveling when he was getting to the first stall next to his house, and then to the following stall to pick up his son, going back to the expressway, and then finally arriving at the station, and I have the address right here for every station that is very close to the last stall they were taking. Actually, if you go to the map, you will see they were actually getting off in the closest place to every station in every day they went to work, and that they did not went to work just as SunPass by itself shows that it's no activity at all.
Q. Correct.
A. -- so, the van was not moving, so he was not in the job site, and there were no experts there.
Q. Got it. Okay. So, during the time that Jesus and Esnol was working for Statewide, was there ever any kind of audit performed, to confirm that the hours being paid to them accurately reflected the hours they were?
A. We haven't had any audit from anybody. The hours were approved by the project manager, they were

Page 75

submitted through the LPC tracker on their oath, and that's what I did, and we never had any issue.
Q. Okay. Has Statewide ever had to correct any errors in time records to either Jesus or Esnol?
A. No, that I remember of.
Q. For my next few questions, I want to focus on 2020 -- the year 2023, and specifically during the time that Jesus and Esnol were working the Miami-Dade Metrorail Project, and so throughout 2023, how much was Jesus paid, what was his rate of pay? Mr. Melo, did you hear my question?
A. Sorry, I didn't get the question. Can you repeat the question again, please?
Q. Yeah, I said, what was -- you know, during 2023, while Jesus and Esnol were working on the Miami-Dade Metrorail Project, what was their rate of pay?
A. First of all, I believe the question is incomplete, so I need to have a complete question for me to give a complete answer. Are you asking me about regular pay?
Q. Yeah, I'm asking what was their pay rate? How much were they getting paid?
A. It seems like you're not informed about this project, but I'm going to go back and explain to you exactly what you have to know.

Page 76

The pay rate was $30 for Jesus and $20 for Esnol, okay? The project that we're doing is under the Prevailing Wages Act, which is a Miami-Dade County Ordinance, regular rate that they're employed for. I have a table that I sent to my Counsel.
2022, they were paying $49.20. The 2022, $49.20.
2023, $50.52. In 2024, $52.28. That in compliance with the document of the Prevailing Wages document that we have to update every year, 1st of January.
Q. Got it. Okay. So, while -- I just want to make sure I'm understanding correctly. So, you're saying while Jesus and Esnol were working on the Miami-Dade Metrorail Project during 2023, both of them were being paid $50.52?
A. That's correct. Yes, that's what I said.
Q. Okay. Got it. So, I know Jesus and Esnol, they worked for statewide for a long time. Did they ever work more than 40 hours?
A. Never. We never worked more than 40 hours.
Q. So, they were never paid time and a half at any point?
A. We never worked overtime. I have enough people to get the job done without paying overtime.
It's something that we do here in the office.

D

Page 77

We hire people so we don't need to work those extra hours.
Q. Did statewide have any kind of written agreement with Jesus regarding the amount that he would be paid?
A. Any written agreement about what?
Q. The amount that Jesus would be paid.
A. I believe in the application, it has the number there. Yes, I do not have that in front of me, but he was getting paid $30 before we were doing this job, and the check reflects that.
Q. Okay. And I'll ask you the same question for Esnol. Was there any kind of written agreement between statewide and Esnol that reflected the rate that he would be paid?
A. Job application shows that, and the check also shows that.
Q. Do you know if that job application has been produced during the course of this litigation?
A. I do not recall. Might be. I got to check.
Q. Okay.
A. But what is important here, they admitted that what you're asking me is exactly what I was paying them, so I don't understand actually the question. So, they were admitting they were getting paid regular time, 30

completed. And that's what I did for the first station, which was Allapattah. After that, Paola was in charge of that. But Paola is not an electrician.

She is a project manager. She was going to the job site, but she was not doing any actual work. She was coordinating the work with the county and scheduling the work and doing every task that is related to communications, materials, same thing like that.

So, to answer the question, Jesus and Esnol were the only electricians on site. Does that answer the question?

Q. Sure. Well, partially. I wanted to know all individuals that were physically present there at the job site while Jesus and Esnol were there?

A. Even if they were not there the whole day?

Q. Yes.

A. Okay. First station was me, Paola going from time to time because it was the first station, and the rest of the station was Jesus, Esnol, and Paola.

Q. Okay.

A. From Statewide. There are other people there, but they are not from the company.

Q. Okay. I think earlier you mentioned escorts from Miami-Dade County. Would they be physically present at the job site while Jesus and Esnol were



working?

A. Absolutely. We were working equipment related to the transportation system. So, one of the requirements for us to be in the station is to have an escort from the department, so they can respond to any situation that arises from the construction site in real time.

So, there's no way that we can get inside the station without an escort. And Leo Iterian was present there most of the time, also Dalton Rivera, but they were the project managers. They also had someone that was just dedicated to be there with us to open the station for us and close the station at the end of the day.

So, there is no way for us to be there without an escort, it's one of the departments.

Q. Okay. Would there be Miami-Dade escort present at the job site all day or would they just open and close?

A. All day.

Q. Okay. What were the typical work hours while working on the Miami-Dade Metrorail Project?

A. I'm glad you asked that. Can you be very specific pick up a date. Tell me one day. I can tell you exactly the time they started and the time they



left, the time they reported, and the time they actually worked according SunPass, just pick up one day.

Q. Right. I'm not asking about a specific date.

I'm asking more generally was -- I mean, did they work the same schedule every week, and some people work 09:00 to 05:00, same job, same hours every week. But did the work schedule fluctuate from the time that -- were working there?.

A. Yes. Monday, just to give you an idea, if you allow me. Friday, 09/23. They started 07:00 A.M., 12:00 P.M., took lunch, 12:30 P.M., 05:30 P.M., 10 hours. However, there's some SunPass transactions that were going back home at 04:44, and I paid them up to 05:30.

Next day, 09/28/23, started 7, 12, 12:30 lunch, 05:30, 10 hours, according to 28/28, according to this one, they were returning back home around 03:45. And we can go on and on. So, to answer the question, yes, 07:00, 12:00, 12:30, 05:00 P.M., Monday through Thursday, with some exceptions that are actually recorded right here in the daily project report, saying, "What we did was what station we're working, what the activities that we did, that was a project report that was submitted to Miami-Dade County," and I believe it was also submitted to my counsel. So, you have this



information here that shows every day where they were and the activities they were doing that match this SunPass with the exception that we were paying them more than what SunPass says that match this, that match the LCPtracker, that match the check and the approval from Leo Iterian knowing that they work less hours than the hours they were reporting to.

Q. Okay. So, you're saying the hours that Jesus and Esnol were paid for don't -- accurately reflect the hours they actually work?

A. I did say that and I have proof.

Q. Okay. So, I just want to make sure I'm understanding correctly as well.

A. Okay.

Q. You said that the typical, a typical day on the metrorail project was 07:00 to 05:30?

A. Yes.

Q. Okay.

A. I said before, let me clarify that. They were starting at 07:00 A.M., working until 12, taking lunch from 12:00 to 12:30 and working until 5:30. Is that what you said -- I mean, is that what you repeated? Because I couldn't understand the last part.

So, I want to make sure that you understood exactly what I said. You said, "What are the typically

hours?"Typically hours are 07:00 to 12:00, 12:00 to 12:30 lunch, 12:30 to 05:00, 05:30, most cases. That's our time. Usually the work was between Monday and Thursday, 10 hours a day.
Now you might ask me, and I hope you ask why they were working 10 hours a day and they were not working Friday. And let me tell you why. Jesus used to live around 24 -- around Coral Way. I'm going to tell you the exact day that he went to Leo's house. And after that particular day, he said, "It's too far for me.
It's 35 miles for me to drive." And he kept the car.
He was driving 35 miles. So, he coordinated with Leo to work four days, 10 hours, soaking up one day and take a break. And it's consistent with the SunPass. That's why they work 10 hours a day, four days a week.
And if you go to the SunPass, you will see most of their Fridays that they are not shown here in the time sheet is because there's no activity in the SunPass and there is no escort that we're pressing at the job site.
So, they decided to change.
The law doesn't say they can work 10 hours a day.
I got to pay overtime more than 40 hours a week. So, 10 times 4, that's 40. But like I said,



these shows, they were not even working 10 hours a day.
So, we do not owe them any time. Actually he's the one that owe us money.
Q. Okay. So, Paola, the project manager, was she paid by the hour or was she paid a salary?
A. No, she's paid by hours.
Q. By the hour. Okay.
A. Everybody here is paid by hours. We have no salaries.
Q. Okay.
A. And the checks reflects that.
Q. Okay. And what hours did Paola typically work at the metrorail project?
A. Paola had the task to go there every day.
There was no specific time. She had a lot of things to do about the projects, not just to be there, to double check that the job was being completed is communication is material.
She had to order some materials, scheduled escort.
She had so many things, but she had to go to the job site because she was the project manager every day.
So, the information that I was putting right here in my notes, contemporaneously with the work that was done now was taken, was given voluntarily or



whatever you want to describe it. I believe voluntarily is not a bad word for this action because it's already shown in the FLSA.
Employees can voluntarily report the hours to their supervisor. And that's the word I use. I don't know if it is any legal implication in that, but I want to go back and refer to that particular expression that says, very clear voluntarily.
I don't see why they're going to say that they work less when they actually work more. It's not in their best interest. So, they were reporting the hours to Paola according to the -- voluntarily Paola was referring that's how it was to me. And I was doing this. I am responsible for this document that was done at the same time that the job was performed. Does that answer the question?
Q. I think partially. So, but really more what I was getting at is what hours did Paola typically work at the job site during the metrorail project?
A. Paola has a schedule from 08:00 to 04:30.
Q. Okay. So, if Paola is working 08:00 to 04:30, but Jesus and Esnol are working 07:00 to 05:30, how is Paola able to verify their start and stop time?
A. I didn't use the word verify. It's a word that they're using verify. I want to go --



Q. Right. And that's my question. I use that word for a specific reason. How would she be able to verify the hours they were working?
A. Because while we're doing everything in good faith, we will believe in them. And I want you to point out that you want to use the word verify, in the word verify is not in the FLSA. It says, "Voluntary in good faith." I don't need to think about anything bad about any person is voluntarily. He has the option to report voluntarily in his reading in the law.
So, he was saying to Paola, "I got here at 07:00" when we can't demonstrate most of the time he was right. He was getting early. I can double check here, but he was giving the information to Paola. He was leaving late, which is not true. So, I want to point out the good faith action from our part, taking his word for the information for us to complete the timesheet.
When I have this now that says they were home, they were home, it was --
Q. Okay. Do you know how Jesus and Esnol would communicate their hours to Paola?
A. Verbally, they don't speak English.
Q. Verbally?
A. They do speak some, especially Esnol. I believe Jesus doesn't speak English.

Page 138

that was about the time that I spent making decisions for that particular project.

Q. Yeah, okay. And I think earlier you said you didn't report Paola's hours to Miami-Dade County because she wasn't performing electrical work or construction work. You said, those were the requirements for reporting hours to the county, right?

A. Yes, the law requires that to be reported.

Just there's a difference between a requirement and an option. Requirement is what you are obligated to report, okay. And that's what we comply with.

Any other information that's there is fine, but it's not relevant because it's not an obligation. It's an option, so what's the question?

A. Yeah, so, my question for you is, you know, earlier you stated you only had to report the hours of individuals who were performing electrical or construction work, so my question for you, you know, since you're listed here, your hours are reported to the county. Did you ever perform electrical or construction work for this project?

Q. Yes, I said that from the very beginning.

I'm an electrician. I did the first station.

I went there from time to time. My time is not needed

Page 139

to be recorded. I was there when they were doing something incorrect. I was telling them, explaining them how to do it, so if you count that as an electrical work, my answer is yes, absolutely yes.

Q. Okay. Who prepared this document, do you know?

A. Yes.

Q. Who?

A. I'm sorry?

Q. Yeah, I asked, do you know who prepared this document?

A. I did.

MR. LAROU: You did. Hey guys, I think I'm just about finished. If we could just take maybe one last 15-minute break. I just want to go through my notes, make sure I've gone through everything I need to, and then we should be wrapping up here shortly. Is that okay with you guys?

MR. VERBIT: Okay.

THE COURT REPORTER: Okay. The time is 01:44 P.M., going off record.

(Thereupon, a short discussion was held off record.)

(Deposition resumed.)

Page 140

THE COURT REPORTER: Okay. We are back on the record.

BY MR. LAROU:

D

Q. Okay. Mr. Melo, I think we're just about done here. Just one last question for you, probably two. During the time that Jesus worked for Statewide, did he ever complain about inaccuracies with the hours that were being paid to him?

A. Can you ask me the question again?

Q. Yeah, while Jesus worked for Statewide, did he ever complain that the hours being paid to him were not accurate?

A. Never.

Q. And same question for Esnol. When Esnol worked for Statewide, did he ever complain to anyone from Statewide that the hours he was being paid were not accurate?

A. Never.

MR. LAROU: No further questions.

THE COURT REPORTER: I'm sorry, when you say – could you give me the complete spelling of Esnol?

MR. LAROU: Yeah, his first name is E-S-N-O-L. And I think I mentioned him earlier at the beginning of the deposition, his full name is Esnol

Page 141

Gonzalez, G-O-N-Z-A-L-E-Z.

THE COURT REPORTER: Yeah.

MR. LAROU: Cantero, C-A-N-T-E-R-O.

THE COURT REPORTER: Yes, I have that. I needed to confirm Esnol.

MR. LAROU: Okay. Perfect. Okay. I think I'm all set.

MR. VERBIT: I have no questions.

THE COURT REPORTER: Okay. Would you guys like to go over read or waive with the witness?

MR. VERBIT: We'll read.

THE COURT REPORTER: Okay. Would anyone like to order this transcript?

MR. LAROU: Not right now, but thank you.

THE COURT REPORTER: And Mr. Verbit?

MR. VERBIT: We'll let you know.

THE COURT REPORTER: All right. The time is 02:02 P.M., going off record.

(Deposition concluded at 2:02 P.M.)

(Reading and signing of the deposition by the witness has been reserved.)

**Errata Sheet**

**Page 1**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page __13___ Line _15_____ Reason __1, 2, and 3____

From ______Uzcategui______________ to __Usuga__________________

Page __22___ Line ___2___ Reason _1, 2, and 3_____

From ____________owned________ to __owed__________________

Page ___22__ Line _8_____ Reason ____1 2 3__

From ____transporter________________ to ________transponder____________

Page __22___ Line ___18___ Reason __1 2 3____

From ________waiting____________ to ____paying________________

Page 23 Lines 5 and 6 Reason: 1 and 2

From October 15, 2024 to April 15, 2024

Page ____23_ Line _25_____ Reason _1 2 3 _____

From __transporter__________________ to _____transponder_______________

Page __24___ Line __1____ Reason ___1 2 3___

From _____transporter_______________ to ______transponder______________

Page __25___ Line _17_____ Reason __1 2 3____

From ____for your________________ to _________project___________

_______________________

**Errata Sheet**

**Page 2**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page __25___ Line __21____ Reason __1, 2, and 3____

From ___________some_________ to _____the same_______________

Page __27___ Line _10_____ Reason __1 2 3____

From ___given_________________ to ______giving______________

Page __27___ Line __11____ Reason __1 2 3____

From ____given________________ to ____giving________________

Page _29____ Line ____24__ Reason ___1 2 3___

From ______can't______________ to ______can______________

Page __30___ Line __5____ Reason __1 2 3____

From ___Uzcategui_________________ to ________Usuga____________

Page __31___ Line ___8___ Reason _1 2 3_____

From _____Iterian_______________ to ____Interian________________

Page __32___ Line ___23___ Reason __1 2 3____

From _____given___________________ to _________giving______________

______________________

**Errata Sheet**

**Page 3**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page __33___ Line __15____ Reason __1, 2, and 3____

From _______pacify_____________ to _______specify_____________

Page __33___ Line ___25___ Reason _1 2 3_____

From _performer___________________ to ___performance_________________

Page __34___ Line ___20___ Reason _1 2 3_____

From ____to prove________________ to _______the proof_____________

Page __35___ Line ___5___ Reason __1 2 3____

From _____side_______________ to _______site_____________

Page ___35__ Line ___15___ Reason _1 2 3_____

From ___we're_________________ to _____they are_______________

Page __40___ Line _4_____ Reason __1 2 3____

From ____patrols________________ to _____records_______________

Page __40___ Line __14____ Reason ___1 2 3___

From ____Employee________________ to ________Employer____________

________________________

**Errata Sheet**

**Page 4**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ___43__ Line ___7___ Reason __1, 2, and 3____

From __________reading__________ to _____writing_______________

Page _43____ Line __8____ Reason __1 2 3____

From ____doing________________ to _____done_______________

Page ___43__ Line _15_____ Reason __1 2 3____

From _______can now_____________ to ____cannot________________

Page __46___ Line _13_____ Reason __1 2 3____

From _____can't_______________ to ___can_________________

Page __52___ Line __22____ Reason __1 2 3____

From _____his_______________ to ___her_________________

Page __53___ Line _19_____ Reason 1 2 3______

From _____can't_______________ to _____can_______________

Page ___59__ Line _9_____ Reason ____1 2 3__

From ______seed______________ to ______thing______________

**Errata Sheet**

**Page 5**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page __64___ Line ___10___ Reason __1, 2, and 3____

From ______talk ______________ to _____toll_______________

Page __64___ Line __17____ Reason __1 2 3____

From _________transporter___________ to _____transponder_______________

Page __65___ Line __14____ Reason __1 2 3____

From ____It________________ to _______He_____________

Page __67___ Line __20____ Reason __1 2 3____

From __________It__________ to _____Jesus_______________

Page __67___ Lines _21 and 22_____ Reason __1 2 3____

From ________transporter____________ to ___transponder_________________

Page __69___ Line ___4___ Reason ____1 2 3__

From ______upside_____________ to ______job site______________

Page __69___ Line __20____ Reason __1 2 3____

From _____I've been_______________ to _____Jesus was_______________

_______________________

**Errata Sheet**

**Page 6**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page __69___ Line __21____ Reason __1, 2, and 3____

From _____it_______________ to _______he_____________

Page ___69__ Line __25____ Reason _1 2 3_____

From ____we're________________ to _____they were_______________

Page __70___ Line _19_____ Reason __1 2 3____

From _____Leo_______________ to ___The law_________________

Page __72___ Line ___15___ Reason __1 2 3____

From _______job, the report_____________ to _the project report______________

Page __73___ Line __12____ Reason __1 2 3____

From ____time's work________________ to __times worked__________________

Page __74___ Lines __7, 8, and 12____ Reason 1 2 3______

From ____stall________________ to __________toll__________

Page __74___ Line __19____ Reason __1 2 3____

From ___experts_________________ to _____escorts_______________

____________________

**Errata Sheet**

**Page 7**

NAME OF CASE: Jesus E. Gonzalez Hernandez vs Statewide Electrical Services, Inc.

DATE OF DEPOSITION: 02/02/2026

NAME OF WITNESS: Noel Melo

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ___81__ Line __1____ Reason __1, 2, and 3____

From ______side______________ to _____site_______________

Page ___83__ Line _16_____ Reason _1 2 3_____

From ______departments______________ to ____requirements________________

Page __119___ Line __13____ Reason _1 2 3_____

From ________for evading____________ to ______demonstrating______________

Page __122___ Line ___21___ Reason __1 2 3____

From _____to_______________ to _______the_____________

Page __122___ Line __22____ Reason __1 2 3____

From ____random________________ to __correct__________________

Page __135___ Line __25____ Reason _1 2 3_____

From ____again________________ to _____against_______________

Page __136___ Line __13____ Reason __1 2 3____

From _____can't_______________ to ______can______________

_______________________________________
Noel Melo, individually
and as President of Statewide Electrical Services, Inc.